## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SOCIETY OF GENERAL INTERNAL
MEDICINE,
    1500 King Street, Suite 303
    Alexandria, VA 22314, and

NORTH AMERICAN PRIMARY
CARE RESEARCH GROUP,
    11400 Tomahawk Creek Parkway
    Suite 24
    Leawood, KS 66211,

        *Plaintiffs*,

        v.

ROBERT F. KENNEDY, JR., in his
official capacity as Secretary of Health
and Human Services,
    200 Independence Ave. SW
    Washington, DC 20201,

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
    200 Independence Ave. SW
    Washington, DC 20201,

ROGER D. KLEIN, in his official
capacity as Director of the Agency for
Healthcare Research and Quality,
    5600 Fishers Lane
    Rockville, MD 20857, and

AGENCY FOR HEALTHCARE
RESEARCH AND QUALITY,
    5600 Fishers Lane
    Rockville, MD 20857,

        *Defendants*.

Civil Action No.

1

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Congress has long recognized that scientific research into and the promotion of healthcare best practices is crucial to ensuring that Americans receive appropriate, high quality, and high value medical care. *See* 42 U.S.C. § 299(b). To that end, Congress created a centralized hub within the Department of Health and Human Services (HHS) to support healthcare research: the Agency for Healthcare Research and Quality (AHRQ). *Id.* § 299(a). AHRQ is the "principal agency for health care research and quality," *id.* § 299b-1(a)(1), and its statutory responsibilities include conducting research into healthcare practices, supporting other researchers and research institutions through grantmaking, and providing substantial training and technical assistance to healthcare systems and providers nationwide.

2.      AHRQ's work focuses on health services research—an area of study that focuses on how our health system works, how to support patients and clinicians in choosing the right care, and how to promote health through improving the delivery of care. AHRQ also works to develop and disseminate research and tools to improve health practices, aiding health systems and clinicians to provide high-quality, safe, and high-value care.

3.      AHRQ's work has saved lives and saved money across the healthcare system. For example, AHRQ has estimated that its work on an initiative addressing infections and other conditions that patients can develop while hospitalized helped save 125,000 lives and $28 billion in health system expenditures over just a six-year period. *See* AHRQ, *Building Bridges Between Research and Practice* (2017) (describing interventions in part developed through AHRQ research grants).[1] AHRQ is also the only federal agency focused on billion-dollar issues like how to reduce diagnostic errors and how to improve treatment and prevention of chronic diseases

---

[1] https://www.ahrq.gov/sites/default/files/wysiwyg/cpi/about/impact/ahrq-works.pdf (last visited Aug. 18, 2025).

through primary care interventions. AHRQ does all this work on a modest budget of around $500 million annually—about .04% of the federal government's expenditures on healthcare.

4.    AHRQ carries out a substantial portion of its health-services mandate through grants to researchers at universities and other settings. By statute, Congress has authorized or instructed AHRQ to award grants on a wide range of topics related to the provision of healthcare, from developing healthcare quality measures to supporting improvement of the provision of primary care. *See, e.g.*, 42 U.S.C. § 299a(a); *id.* § 299b-31(c). In fiscal year 2024, of the $369 million that Congress had appropriated for that fiscal year, the agency spent nearly $140 million on research grants. *See* Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 661–62 (Mar. 23, 2024); HHS, *Agency for Healthcare Research and Quality Fiscal Year 2025 Justification of Estimates for Appropriations Committees* at 16 (Fiscal Year 2025 Budget Justification).[2] Through its most recent continuing resolution, Congress has appropriated the same level of support for AHRQ and its grantmaking functions during fiscal year 2025, which runs through September 30. *See* Full-Year Continuing Appropriations Act, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10–11 (Mar. 15, 2025).

5.    Despite the critical and statutorily required support for health services research that AHRQ provides through its grantmaking program, Defendants Secretary of Health and Human Services Robert F. Kennedy, Jr., HHS, AHRQ Director Roger D. Klein, and AHRQ have shut down AHRQ's grantmaking program: They have destroyed the agency's capacity to process grant

---

[2] https://www.ahrq.gov/sites/default/files/wysiwyg/cpi/about/mission/budget/2025/fy2025-cj.pdf (last visited Aug. 18, 2025). In the budget justification, AHRQ noted that it received a total of $373 million in discretionary funding in fiscal year 2024 because it had been separately appropriated funds to support Long COVID research. *See id.*

applications, withheld decisions on pending grant applications, and refused to spend appropriated funds on the high-priority healthcare research that Congress wanted the agency to support.

6.      In early April 2025, as part of a large-scale restructuring of HHS, HHS fired the AHRQ staff responsible for coordinating external grantmaking, including staff who coordinated the review of new grant applications and who processed and managed grant awards and payment. Immediately following that reduction in force, AHRQ halted its statutorily required peer review of grant applications that had been planned for this spring and summer. In late July, AHRQ gave notice to certain grant applicants that the agency had no more grant administration staff and therefore no ability to issue any grant funding. The agency has admitted that it is at best "uncertain" whether AHRQ can or will spend the funds that Congress appropriated and that the agency had previously budgeted for fiscal year 2025.

7.      Defendants' cessation of AHRQ's grantmaking process violates the statutory and regulatory requirements governing the agency's grantmaking process. It has resulted in an unlawful impoundment of millions of dollars that Congress expected and instructed AHRQ to spend on grantmaking and other research functions. And it was arbitrary and capricious, as the termination of grantmaking functions, among other things, ignored the substantial reliance interests that grant applicants, the broader research community, and healthcare providers and patients had in the agency's continued funding of health services research. In addition, the halting of AHRQ's grantmaking is unlawfully withholding or unreasonably delaying review and evaluation of grant applicants' research proposals. The Court should declare unlawful and set aside Defendants' cessation of its grantmaking process and its refusal to consider and process grant applications, and require the agency to restart its grantmaking process, as required by law.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law.

9.     Venue is proper in this judicial district because at least one defendant resides in this district and a substantial part of the acts or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(e)(1).

## PARTIES

10.     Plaintiff Society of General Internal Medicine (SGIM) is a nonprofit membership association headquartered in Alexandria, Virginia. With more than 3,200 members, SGIM is the leading organization for general internal medicine physicians, who work at medical centers throughout the country to provide care for patients, train medical students and residents in internal medicine, and conduct research on innovations in internal medicine and the provision of primary care. SGIM's mission is to cultivate innovative educators, researchers, and clinicians in academic general medicine, leading the way to better health for everyone. To support that mission, SGIM hosts conferences to promote professional development and share the latest research, and it offers grants and other career-development programs to foster the next generation of leaders in internal medicine and primary care. SGIM also publishes the *Journal of General Internal Medicine*, which publishes research on problems in internal medicine, as well as topics such as clinical medicine, epidemiology, prevention, healthcare delivery, and curriculum development. SGIM has members who rely on AHRQ to fund their research, including members with pending applications for new or continued grant funding.

11.     Plaintiff North American Primary Care Research Group (NAPCRG) is a nonprofit membership organization headquartered in Leawood, Kansas. With more than 1,000 members, NAPCRG is the leading organization for primary care research. NAPCRG is committed to

nurturing primary care research that improves health and healthcare for patients, families, and communities. NAPCRG operates a number of programs in support of this mission, including programs to encourage and develop innovative research in family medicine departments, as well as fellowships, awards, and training programs for early-career researchers. NAPCRG also helps disseminate primary care research and provides a forum for collaboration among researchers and practitioners through its conference programs. In particular, with continuous support from AHRQ grants dating back more than a decade, NAPCRG has run an annual conference for practice-based research networks—an innovative mechanism for primary care providers to study common issues in community-based care and translate research findings into practice. NAPCRG has an application pending with AHRQ for a grant to support that longstanding initiative in future years. NAPCRG also has members who rely on AHRQ to fund their research, including members with pending applications for new or continued grant funding.

12.    Defendant Robert F. Kennedy, Jr., is the Secretary of Health and Human Services and is sued in his official capacity.

13.    Defendant U.S. Department of Health and Human Services is an agency of the United States and is headquartered in Washington, D.C.

14.    Defendant Roger D. Klein is the Director of the Agency for Healthcare Research and Quality and is sued in his official capacity.

15.    Defendant Agency for Healthcare Research and Quality is an agency of the United States housed within the Department of Health and Human Services and is headquartered in Rockville, Maryland.

## FACTUAL BACKGROUND

**AHRQ's Mandate to Support Health Services Research**

16.     More than three decades ago, Congress recognized that a "broad base of scientific research" and "the promotion of improvements" in the delivery of healthcare services were essential to "enhanc[ing] the quality, appropriateness, and effectiveness" of the healthcare Americans receive. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6103, 103 Stat. 2106, 2189 (1989), *codified at* 42 U.S.C. § 299(b). Accordingly, it created within HHS an agency focused on research, training, and the dissemination of information about healthcare— known at the time as the Agency for Health Care Policy and Research.

17.     The Healthcare Research and Quality Act of 1999, Pub. L. No. 106-129, 113 Stat. 1653 (Dec. 6, 1999), an amendment to the Public Health Service Act, redesignated that entity as the Agency for Healthcare Research and Quality and assigned it new statutory duties and powers. *See* 42 U.S.C. § 299(a). AHRQ, a component of the Public Health Service, *id.*, now serves as the federal government's "principal agency for health care research and quality," *id.* § 299b-1(a)(1).

18.     By statute, Congress tasked AHRQ with "promot[ing] health care quality improvement by conducting and supporting" research on a variety of topics—including healthcare technology, costs, and quality—and developing ways to disseminate those findings to patients, providers, and policy makers. *Id.* § 299(b). While other HHS agencies conduct and support research into specific diseases, AHRQ is the sole agency charged with understanding the healthcare system as a whole and improving the provision of care to patients throughout the system. AHRQ also serves as "the nation's lead federal agency supporting patient safety

research," ensuring that Americans remain safe when they go to the doctor or need to be hospitalized. *See AHRQ: A Brief History.*[3]

19.    To ensure that AHRQ fulfills its statutory mission, Congress has required AHRQ to support what is known as "extramural research"—in other words, to offer grants and enter contracts that support health services researchers outside of HHS, including in universities, hospitals, and other research institutions. The Public Health Service Act mandates that AHRQ "shall conduct and support research, evaluations, and training, support demonstration projects, research networks, and multidisciplinary centers, provide technical assistance, and disseminate information on health care and on systems for the delivery of such care." 42 U.S.C. § 299a(a); *see also id.* § 299a(b) (authorizing the AHRQ Director to provide "training grants"). The statute also requires AHRQ to provide support for research on specific topics, including through grantmaking. *See, e.g.*, *id*. § 299b(b) (instructing agency to "employ research strategies" that link research with clinical practice and contemplating award of grants for same); *id.* § 299b-1(b) (mandating that HHS, acting through the AHRQ Director, fund, via grant, at least one center focusing on therapeutics research); *id.* § 299b-1(c) (requiring AHRQ Director to "conduct and support research and build private-public partnerships" to "reduc[e] errors" in medicine and "improv[e] patient safety"); *id.* § 299b-4(b) (requiring establishment of a center for primary care research to "serve as the principal source of funding for primary care practice research" within HHS); *id.* § 299b-31(c) (directing the award of "grants, contracts, or intergovernmental agreements to eligible entities for purposes of developing, improving, updating, or expanding quality measures"); *id.* § 299b-34(a) (mandating award of technical assistance grants or contracts related to quality improvement); *id.* § 299b-36(d)(1), (e)(3) (requiring grant programs to develop and test

---

[3] https://www.ahrq.gov/cpi/about/brief-history.html (last visited Aug. 18, 2025).

"patient decision aids" and "shared decisionmaking techniques"); *id.* § 299b-37(e) (requiring establishment of grant program to train researchers in comparative clinical effectiveness).

20.     The Public Health Service Act requires AHRQ to take certain steps to ensure that it processes and evaluates grant applications appropriately. In particular, the Act instructs AHRQ to conduct "[a]ppropriate technical and scientific peer review … with respect to each application for a grant." *Id.* § 299c-1(a)(1). And it requires that "[e]ach peer review group to which an application is submitted … shall report its finding and recommendations respecting the application to" AHRQ's Director. *Id.* § 299c-1(a)(2).

21.     In addition, AHRQ has, by regulation, adopted requirements to govern its grantmaking process. *See* 42 C.F.R. Part 67. Among other things, those regulations mandate that "[a]ll applications" for AHRQ grants, other than certain small grants, "will be submitted … for review to a peer review group" and that the peer review group "shall make a written report … on each application." *Id.* § 67.15(a)(1), (4). The regulations also require that, "[a]fter appropriate peer review," AHRQ "will evaluate applications recommended for further consideration," and on the basis of that evaluation, make a determination as to each application—either "giv[ing] consideration for funding, defer[ring] for a later decision, pending receipt of additional information, or giv[ing] no further consideration for funding." *Id.* § 67.16.

22.     Congress has consistently appropriated funds for AHRQ to carry out its grantmaking and other functions. Congress generally appropriates funds for AHRQ's operations on an annual basis. For fiscal year 2024, Congress appropriated $369 million for AHRQ to carry out its duties. *See* Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 661–62 (Mar. 23, 2024). Of that, Congress directed only a small portion—$73.1 million—for AHRQ program support, leaving the rest to be spent on grants, contracts, and other

projects to fund health services research and efforts to disseminate research results for use in patient care. *See* S. Rep. No. 118-84 at 156 (2023); Explanatory Statement, Further Consolidated Appropriations Act 2024 – Division D – Labor, Health and Human Services, Education and Related Agencies Appropriations Act, 2024 (indicating that the language in Senate Report 118-84 "is approved and indicates Congressional intent" unless otherwise noted). Congress also directed that at least $2 million be spent on primary care research supported by the statutorily mandated center for primary care research. *See* S. Rep. No. 118-84 at 154. In the budget justification it submitted to Congress at the end of 2024, AHRQ reported that it spent just over $139 million on research grants using those fiscal year 2024 funds, and that it planned to spend at least that much should it receive similar or additional appropriations from Congress in fiscal year 2025. *See* Fiscal Year 2025 Budget Justification, *supra*, at 16.

23.     In March 2025, Congress enacted a continuing resolution that continued to fund AHRQ at the same level—$369 million—through fiscal year 2025. *See* Full-Year Continuing Appropriations Act, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10–11 (Mar. 15, 2025). Those funds are available for expenditure only through September 30, 2025.

24.     In addition to these annual appropriations, AHRQ receives a substantial mandatory appropriation from the Patient-Centered Outcomes Research (PCOR) Trust Fund, which was created by the Affordable Care Act and drawn from a tax on insurers. *See* 26 U.S.C. § 9511(a), (b)(4), (d)(2)(C) (creating fund and designating that a portion of appropriated amounts must be transferred to HHS to carry out certain AHRQ functions). AHRQ's mandatory appropriation from that fund supports the agency's work to develop and disseminate research findings on patient-centered outcomes and clinical effectiveness—in other words, an approach to research focusing on how to ensure that the healthcare patients receive provides a meaningful and measurable

positive impact. Historically, AHRQ has used a portion of its transfers from the PCOR Trust Fund to support training grants to foster "the next generation of researchers" working to "improve the quality of care and patient outcomes." AHRQ, PCOR Trust Fund Investments At-A-Glance.[4] In Fiscal Year 2025, AHRQ received $126 million in mandatory funds from this source. *See* Fiscal Year 2025 Budget Justification, *supra*, at 10.

**Defendants' Unlawful Halting of AHRQ's Grantmaking Function**

25.     During his confirmation process, Defendant Kennedy assured members of Congress that, as Secretary, he "looked forward to working with AHRQ to hear their proposals on how they will make America healthy again" and that he would work with Congress "to understand how best AHRQ can support" that health mission. Senate Finance Committee, Questions for the Record for Robert F. Kennedy, Jr., Nos. 146 & 147.[5] Defendants have instead destroyed AHRQ's ability to carry out key statutory functions—in particular, its ability to support important health services research through grantmaking.

26.     In the early morning of Tuesday, April 1, as part of a large-scale reorganization of HHS without congressional authorization, Defendants Kennedy and HHS (the HHS Defendants) sent a reduction-in-force, or RIF, notice to approximately 123 staffers across AHRQ offices. *See* U.S. Senate Health, Education, Labor & Pensions Committee Minority Staff, Trump's War on Science at 11 (May 13, 2025).[6]

27.     The HHS Defendants immediately placed many employees subject to the RIF notice on administrative leave, and they cut off email access just a few hours later. On information

---

[4] https://www.ahrq.gov/pcor/at-a-glance/index.html (last visited Aug. 18, 2025).
[5] https://www.finance.senate.gov/imo/media/doc/responses_to_questions_for_the_record_to_robert_f_kennedy_jrpart2.pdf (last visited Aug. 18, 2025).
[6] https://www.sanders.senate.gov/wp-content/uploads/HELP-Committee-Minority-Report-Trumps-War-on-Science.pdf (last visited Aug. 18, 2025).

and belief, the HHS Defendants did not inform AHRQ staff of any plan to transition the work of those employees.

28.    After the RIF notices were sent on April 1, an AHRQ manager sent an email to employees explaining that "[d]ecisions on how today's events would transpire were not shared in advance with AHRQ." Bob Herman & Tara Bannow, *Trump administration begins mass cuts of federal health policy researchers*, STAT News (Apr. 2, 2025).[7] "At th[at] point," he continued, AHRQ leaders "ha[d] more questions than answers" about the RIF.

29.    At the close of business on July 14, 2025, AHRQ staff that received the April 1 RIF notice were officially separated from their roles. *See* HHS, HHS Workforce Optimization Initiative.[8]

30.    Although AHRQ is required by statute to make grants to support research into primary care, clinical effectiveness, patient safety, and other key issues related to how and how well care is delivered to patients, the HHS Defendants' termination of AHRQ employees has halted AHRQ's grantmaking program. AHRQ and Defendant Klein are not currently considering pending grant applications.

31.    The RIF eliminated all relevant grant staff from the Office of Extramural Research, Education, and Priority Populations (OEREP), including the project officers with scientific expertise in health services research who had crafted notices for funding opportunities and reviewed and processed grant applications. Following the RIF notice and placement of key OEREP employees on administrative leave, AHRQ has not held any of the previously scheduled

---

[7] https://www.statnews.com/2025/04/02/trump-administration-begins-mass-cuts-of-federal-health-policy-researchers/ (last visited Aug. 18, 2025).

[8] https://www.hhs.gov/about/agencies/asa/workforce-optimization-initiative/index.html (last visited Aug. 18, 2025).

meetings of the study sections that peer review grant applications. Although AHRQ's website had, as of February 1, indicated that those study sections were set to meet in May and June of 2025, the agency has since removed that information from its website. And while the agency generally publishes notices of those peer review meetings in the Federal Register, *see, e.g.*, Notice of Meeting, 89 Fed. Reg. 104155 (Dec. 20, 2024), it has not posted such a notice for the originally scheduled May and June meetings. Without these meetings, AHRQ cannot fulfill its statutory mandate to peer review all grant applications, 42 U.S.C. § 299c-1(a), and it cannot otherwise approve new grant awards, in violation of its statutory mandate to support health services research through external grantmaking.

32.     The RIF also covered all of the grants management staff within the agency's Office of Management Services (OMS). That staff was responsible for the logistics of all AHRQ grants, including issuing grant awards and monitoring compliance with HHS regulations and other rules. That staff also played a key role in awarding continuation funding for current grantees. Although AHRQ grants typically cover a multi-year project period—during which the agency intends to support the project without requiring a full, competitive process—grantees must apply for non-competing continuation awards each year. On information and belief, the agency has typically granted continuation awards unless there is some malfeasance on the part of the grantee, issue with the project, or lapse in funding.

33.     In the weeks between the April 1 RIF notice and the July 14 separation date, AHRQ required some OMS staff to continue working so that they could process non-competing applications for continuation awards for existing grantees. Still, the agency did not approve a single new award for grant funding during that time.

34.     After the RIF was finalized in mid-July, AHRQ grantmaking ground to a halt. On July 23, the Director of OEREP sent an email to a group of grantees who had been waiting for an answer on their applications for continuation awards. The email stated: "As a result of recent reduction in force at HHS, AHRQ's grants management staff were separated from Federal service on July 14, 2025. We are currently unable to process grant awards and are evaluating options for our grant program." The email went on to warn that, "[w]ith the permanent separat[ion] of these staff, FY2025 funding of non-competing applications is uncertain."

35.     In short, Defendants' actions have eliminated AHRQ's ability to operate the grant programs required by statute. *See supra* ¶¶ 19–20 (listing statutory requirements).

36.     AHRQ likewise has no ability or plan to spend the substantial appropriations that Congress has directed it to use for external grantmaking this fiscal year. *See supra* ¶¶ 22–24 (describing AHRQ appropriations). According to HHS's Tracking Accountability in Government Grants System (TAGGS), a publicly available database of grantmaking by AHRQ and other HHS components, AHRQ has obligated only around $55 million in fiscal year 2025 grant funding. Unless AHRQ restarts its grantmaking apparatus, the agency cannot spend the remaining appropriated funds before they expire on September 30.

**Harm to Plaintiffs**

37.     Defendants have a statutory responsibility to peer review and process grant applications, and to spend the money that Congress appropriated for critical health services research. They also have a statutory obligation under the Administrative Procedure Act (APA) to engage in reasoned decisionmaking. The actions described above that Defendants have taken in violation of those statutory mandates have harmed Plaintiffs' members, as well as Plaintiff NAPCRG directly.

38.     Defendants' unlawful action shutting down AHRQ's grantmaking function has directly harmed Plaintiffs' members. Each Plaintiff has members with current grants that AHRQ has indicated it can no longer and will no longer approve for continuing funding. Those members are left scrambling, without funding for ongoing projects or programs that they had anticipated would receive support from AHRQ, potentially for years to come.

39.     Each Plaintiff also has members with pending applications for new projects that AHRQ can no longer and will no longer review. Some of those pending grant applications have already gone through the agency's peer review process and were ranked highly, indicating that these members would have almost certainly received funding were the agency capable of issuing—and willing to issue—new grant awards. Other members have pending grant applications that have not yet been reviewed. But AHRQ is no longer putting those grant applications through the statutorily required review process.

40.     All of these grantee and potential grantee members are, as a direct result of Defendants' unlawful halting of AHRQ's grant program, not receiving adequate and timely responses to their applications. In effect, they have no way of competing for the funding that Congress appropriated to the agency for grant-supported research. These members have wasted hundreds of hours putting together applications that will never be reviewed—time that could have been spent pursuing alternate funding sources. As a result of Defendants' actions, these researchers are stymied in their ability to plan for or carry out important research work into healthcare efficacy and quality, patient safety, primary care practice, and other topics central to both Plaintiffs' and AHRQ's missions.

41.     In addition, Defendants' halting of AHRQ's grantmaking has harmed Plaintiff NAPCRG directly. As part of its statutory obligation to "employ research strategies and

mechanisms that will link research directly with clinical practice," 42 U.S.C. § 299b(b)(1), AHRQ has consistently provided grant funding to NAPCRG to host a conference for practice-based research networks across the country. NAPCRG currently has a pending grant application seeking funding for this conference in future years. Because AHRQ's grantmaking has halted, NAPCRG has no way to compete for that funding.

### COUNT I
### (APA – Contrary to the Public Health Service Act and AHRQ Regulations)

42.     The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

43.     The Public Health Service Act tasks AHRQ with awarding grants to support health services research, with specific mandates to support research into primary care, quality measures, shared patient-clinician decisionmaking techniques, and more. *See* 42 U.S.C. §§ 299b-1(b)–(c), 299b-4(b), 299b-31(c), 299b-34(a), 299b-36(d)(1) & (e)(3), 299b-37(e). The statute also mandates that "appropriate technical and scientific peer review shall be conducted with respect to each application for a grant … under this subchapter," and that peer review groups "shall report [their] finding[s] and recommendations respecting" each application to AHRQ's Director. *Id.* § 299c-1(a)(1)–(2).

44.     AHRQ is also required by regulation to take steps to carry out its grantmaking program. The relevant regulation mandates that "[a]ll applications" for AHRQ grants, other than certain small grants, "will be submitted … for review to a peer review group," and that the peer review group "shall make a written report … on each application." 42 C.F.R. § 67.15(a)(1), (4). In addition, the regulation requires that, after applications go through "appropriate peer review," AHRQ "will evaluate applications recommended for further consideration," and on the basis of that evaluation, make a determination as to each application. *Id.* § 67.16. The agency must either

"give consideration for funding, defer for a later decision, pending receipt of additional information, or give no further consideration for funding." *Id.*

45.     Defendants' cessation of AHRQ's grants program, including by not processing grant applications or issuing grant awards, is in violation of the Public Health Service Act and relevant AHRQ regulations.

## COUNT II
### (APA – Contrary to Appropriations Statutes)

46.     The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

47.     In the latest continuing resolution, Congress has appropriated $369 million to AHRQ for Fiscal Year 2025. *See* Pub. L. No. 119-4, § 1101, 139 Stat. at 10–11; Pub. L. No. 118-47, 138 Stat. at 661–62. This fiscal year, AHRQ also received by statute $126 million in mandatory appropriated funds from the Patient-Centered Outcomes Trust Fund. *See* Fiscal Year 2025 Budget Justification, *supra*, at 10.

48.     Defendants' cessation of AHRQ's grant program has made it impossible for AHRQ to obligate the funds that Congress has appropriated to it to support health services research. Defendants' actions therefore violate the appropriations statutes mandating that the agency expend funds.

## COUNT III
### (APA – Contrary to the Impoundment Control Act)

49.     The APA directs courts to hold unlawful and set aside agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

50.     The Impoundment Control Act requires the executive to make appropriated funds "available for obligation" unless the President sends a special message to Congress detailing a

request to rescind or reserve funds and Congress then passes a recission bill rescinding the funding. 2 U.S.C. § 683(b).

51.     The President has not sent a special message to Congress requesting that the funds appropriated for AHRQ grants be rescinded, and Congress has not rescinded the appropriations.

52.     The Impoundment Control Act also requires the President to send a special message to Congress whenever the executive proposes to defer spending appropriated funds, and it prohibits deferral of any budget authority except to provide for contingencies, to achieve savings made possible by changed requirements or greater efficiency, or as otherwise specifically provided by law. *Id.* § 684.

53.     The President has not sent a special message to Congress requesting deferral of the budget authority for AHRQ grants, and none of the statutory circumstances that would permit such a deferral are applicable.

54.     By making it impossible for AHRQ to spend the funds appropriated to it for grantmaking this fiscal year, or otherwise refusing to spend those funds, Defendants have deferred or rescinded funds in a manner contrary to the Impoundment Control Act, in violation of the APA.

## COUNT IV
## (APA – Arbitrary and Capricious)

55.     The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

56.     Defendants have offered no reasoned explanation for halting AHRQ's grantmaking capabilities and have failed to account for the reliance interests of the researchers, healthcare providers, patients, nonprofit organizations, and other stakeholders that benefit from AHRQ's provision of grant support for health services and other important research.

57.    By halting AHRQ's grantmaking program, Defendants have acted arbitrarily and capriciously.

## COUNT V
### (APA – Agency Action Unlawfully Withheld/Unreasonably Delayed)

58.    The APA provides that, "within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). Accordingly, the APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

59.    The Public Health Service Act requires that AHRQ "shall" conduct "[a]ppropriate technical and scientific peer review with respect to each application for a grant" and that those peer review groups "shall report [their] finding[s] and recommendations" for each application. 42 U.S.C. § 299c-1(a). In addition, AHRQ regulations require that the agency "submit[]" "[a]ll applications" for AHRQ grants "to a peer review group," instruct that those peer review groups "shall make a written report … on each application," and mandate that AHRQ ultimately decide whether to grant, defer a decision, or deny funding as to each application. 42 C.F.R. §§ 67.15–16. Accordingly, AHRQ is required by law to submit grant applications to peer review groups, enable those peer review groups to review and issue written reports on grant applications, evaluate the results of those peer reviews, and ultimately render a decision on each application.

60.    By halting AHRQ's grantmaking program, Defendants have ensured that AHRQ cannot satisfy its obligations to process, review, and evaluate grant applications.

61.    Given the upcoming expiration of fiscal year 2025 funds on September 30, Defendants' failure to act on AHRQ grant applications is agency action unlawfully withheld and/or unreasonably delayed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

a. Declare that Defendants' action halting AHRQ grantmaking functions, including by refusing to consider new grant applications and continuing grant applications, is contrary to law and/or arbitrary and capricious;

b. Declare unlawful and set aside as arbitrary, capricious, an abuse of discretion, or otherwise contrary to law Defendants' action rendering non-functional and halting AHRQ's grantmaking program;

c. Enter an order pursuant to 5 U.S.C. §706(1) compelling Defendants to undertake statutorily required steps to peer review and evaluate pending grant applications and to award grants;

d. Enjoin Defendants from taking any steps that hinder AHRQ's ability to perform its statutorily mandated grantmaking tasks;

e. Enter an order extending the deadline for obligation of funds appropriated to AHRQ and AHRQ services for fiscal year 2025 until the implementation of any final relief;

f. Issue a preliminary injunction directing Defendants to cease any actions halting AHRQ grantmaking operations and extending the deadline for obligation of funds appropriated to AHRQ and AHRQ services for fiscal year 2025 to provide sufficient time for obligation;

g. Award Plaintiffs their costs and attorneys' fees for this action; and

h. Grant any other relief as this Court deems appropriate.


Dated: August 21, 2025                              Respectfully submitted,

                                                    /s/ Stephanie Garlock
                                                    Stephanie Garlock (D. Md. Bar No. 31594)
                                                    Allison M. Zieve
                                                    (*pro hac vice* application to be filed)

Cormac Early
(*pro hac vice* application to be filed)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Plaintiffs*