# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SOCIETY OF GENERAL INTERNAL
MEDICINE & NORTH AMERICAN
PRIMARY CARE RESEARCH
GROUP,
     *Plaintiffs*,

       v.

ROBERT F. KENNEDY, JR., *et al.*,
     *Defendants*.

Case No. 8:25-cv-2751-BAH

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Stephanie B. Garlock (D. Md. Bar No. 31594)
Allison M. Zieve
(*pro hac vice* application forthcoming)
Cormac A. Early
(*pro hac vice* application forthcoming)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Plaintiffs*

August 21, 2025

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

Introduction ....................................................................................................................... 1

Background ......................................................................................................................... 2

    A.    AHRQ's public health mandate ............................................................... 2

    B.    Defendants' stalling of AHRQ's grantmaking activities ............................ 5

    C.    Harm to Plaintiffs and the public ............................................................. 8

Legal Standards ................................................................................................................ 10

Argument .......................................................................................................................... 10

    I.    Plaintiffs are likely to succeed on the merits .................................................... 11

        A.    Plaintiffs have shown a substantial likelihood of standing ...................... 11

        B.    Plaintiffs are likely to succeed on the merits of their claims. ................... 14

            1.    Defendants' halt of AHRQ's grantmaking function is reviewable final agency action. ......................................................................................... 14

            2.    Defendants' cessation of AHRQ's grantmaking function is contrary to the Public Health Service Act and governing regulations. .............................. 16

            3.    Defendants' cessation of AHRQ's grantmaking function violates appropriations statutes. ............................................................................. 16

            4.    Defendants' cessation of AHRQ's grantmaking function is arbitrary and capricious. ............................................................................................... 19

            5.    Defendants have unreasonably delayed decisions on Plaintiffs' members' AHRQ grant applications. ........................................................................... 21

    II.    Plaintiffs will suffer irreparable harm absent a preliminary injunction. ......................... 26

    III.    The balance of the equities and the public interest support a preliminary injunction..... 27

    IV.    The Court should grant the relief requested in this motion. ............................................ 29

Conclusion ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Califano*,
   474 F. Supp. 974 (D. Md. 1979) ........................................................................... 16

*Afghan & Iraqi Allies v. Blinken*,
   103 F.4th 807 (D.C. Cir. 2024) ........................................................................... 25

*Ass'n of American Railroads v. Hudson*,
   144 F.4th 582 (4th Cir. 2025). ........................................................................... 13

*Ass'n of Community Cancer Centers v. Azar*,
   509 F. Supp. 3d 482 (D. Md. 2020) ............................................................... 12, 14

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................... 14

*Biden v. Texas*,
   597 U.S. 785 (2022) ........................................................................................... 15

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) .................................................................... 27

*Cabrera v. U.S. Department of Labor*,
   No. 25-cv-1909-DLF, 2025 WL 2092026 (D.D.C. July 25, 2025). ...................... 27

*Campaign Legal Center v. FEC*,
   No. 20-cv-0809-ABJ, 2021 WL 5178968 (D.D.C. Nov. 8, 2021) ......................... 25

*Child Trends, Inc. v. U.S. Department of Education*,
   No. 25-cv-1154-BAH, 2025 WL 1651148 (D. Md. June 11, 2025) ............ 11, 14, 27

*City of Houston v. HUD*,
   24 F.3d 1421 (D.C. Cir. 1994) ........................................................................... 30

*City of New Haven v. United States*,
   634 F. Supp. 1449 (D.D.C. 1986) ....................................................................... 18

*City of New York v. U.S. Department of Defense*,
   913 F.3d 423 (4th Cir. 2019) ............................................................................. 15

*Connecticut v. Schweiker*,
   684 F.2d 979 (D.C. Cir. 1982) ........................................................................... 30

*Defy Ventures, Inc. v. U.S. Small Business Administration*,
   469 F. Supp. 3d 459 (D. Md. 2020) .................................................................... 30

*DHS v. Regents of the University of California*,
    591 U.S. 1 (2020) ................................................................................. 19, 20

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................ 14

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,
    528 U.S. 167 (2000) ................................................................................ 11

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020). ....................................................... 12

*Gonzalez v. Cuccinelli*,
    985 F.3d 357 (4th Cir. 2021) .................................................................. 23

*Goodluck v. Biden*,
    104 F.4th 920 (D.C. Cir. 2024) .............................................................. 30

*Guilford College v. Wolf*,
    No. 1:18-cv-891, 2020 WL 586672 (M.D.N.C. Feb. 6, 2020) ............... 29

*Healthy Teen Network v. Azar*,
    322 F. Supp. 3d 647 (D. Md. 2018) ....................................................... 16

*Humane Society of the United States v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) ................................................................. 13

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) ............................................................... 17

*In re Barr Laboratories*,
    930 F.2d 72 (1991) ................................................................................. 25

*In re Core Communications, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ............................................................... 23

*Independent Equipment Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ............................................................... 14

*Janay v. Blinken*,
    743 F. Supp. 3d 96 (D.D.C. 2024) ......................................................... 23

*Joshua v. Jaddou*,
    No. 1:24-cv-00667-JRR, 2025 WL 449001 (D. Md. Feb. 10, 2025), ...... 23

*L'Association des Americains Accidentels v. U.S. Department of State*,
    633 F. Supp. 3d 74 (D.D.C. 2022) ......................................................... 13

*League of Women Voters of North Carolina v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) .......................................................................... 10, 27

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ................................................................................. 27

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................................. 16

*Lovo v. Miller*,
   107 F.4th 199 (4th Cir. 2024). ............................................................................ 21

*Lujan v. National Wildlife Federation*,
   497 U.S. 871 (1990) ............................................................................................. 29

*Maine Community Health Options v. United States*,
   590 U.S. 296 (2020) ............................................................................................. 21

*Maryland v. Corporation for National & Community Service*,
   No. 25-cv-1363-DLB, 2025 WL 1585051 (D. Md. June 5, 2025) ...................... 14, 15, 27, 28

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
   336 F.3d 1094 (D.C. Cir. 2003) .......................................................................... 25

*Mayor of Baltimore v. Azar*,
   973 F.3d 258 (4th Cir. 2020) .............................................................................. 19

*Michigan v. EPA*,
   576 U.S. 743 (2015) ............................................................................................. 19

*Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983) .......................................................................................... 19, 20

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
   915 F.3d 197 (4th Cir. 2019) .............................................................................. 26

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ............................................................................................... 11

*National Environmental Development Association's Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014) ........................................................................ 16, 20

*National Fair Housing Alliance v. HUD*,
   No. 25-cv-1965-SLS, 2025 WL 2105567 (D.D.C. July 28, 2025) ...................... 24, 25, 26, 30

*National Federation of Independent Business v. OSHA*,
   595 U.S. 109 (2022) ............................................................................................. 16

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................... 10

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004) ............................................................................ 21

*Outdoor Amusement Business Ass'n, Inc. v. DHS*,
983 F.3d 671 (4th Cir. 2020) ............................................................ 11

*People for the Ethical Treatment of Animals v. Tabak*,
662 F. Supp. 3d 581 (D. Md. 2023) ................................................... 15

*Roe v. Department of Defense*,
947 F.3d 207 (4th Cir. 2020) ............................................................ 27

*Spirit Airlines, Inc. v. U.S. Department of Transportation*,
997 F.3d 1247 (D.C. Cir. 2021) ......................................................... 15

*Standage v. Braithwaite*,
526 F. Supp. 3d 56 (D. Md. 2021) ..................................................... 14

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009) .......................................................................... 12

*Teton Historic Aviation Foundation v. U.S. Department of Defense*,
785 F.3d 719 (D.C. Cir. 2015) ..................................................... 11, 12

*Telecommunications Research and Action Center v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ..................................................... 23, 24, 25

*U.S. Army Corps of Engineers v. Hawkes Co.*,
578 U.S. 590 (2016) .......................................................................... 14

*Village of Bald Head Island v. U.S. Army Corps of Engineers*,
714 F.3d 186 (4th Cir. 2013) ............................................................ 15

*Wanrong Lin v. Nielsen*,
377 F. Supp. 3d 556 (D. Md. 2019) ................................................... 20

*White Tail Park, Inc. v. Stroube*,
413 F.3d 451 (4th Cir. 2005) ............................................................ 11

*Whitman v. American Trucking Ass'ns*,
531 U.S. 457 (2001) .......................................................................... 14

*Widakuswara v. Lake*,
No. 1:25-cv-0887-RCL, 2025 WL 2159180 (D.D.C. July 30, 2025) .................................... 17

v

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................. 10

**Statutes**

2 U.S.C. § 682 ....................................................................................................... 23

2 U.S.C. § 683(a) ................................................................................................... 18

2 U.S.C. § 683(b) ................................................................................................... 18

2 U.S.C. § 684 ....................................................................................................... 23

5 U.S.C. § 555(b) ................................................................................................... 22

5 U.S.C. § 706(2) ................................................................................................... 29

5 U.S.C. § 706(2)(A) ............................................................................................. 19

26 U.S.C. § 9511(a) ................................................................................................. 5

26 U.S.C. § 9511(b)(4) ............................................................................................ 5

26 U.S.C. § 9511(d)(2)(C) ...................................................................................... 5

31 U.S.C. § 1502(a) ............................................................................................... 23

42 U.S.C. § 299(b) ............................................................................................. 2, 16

42 U.S.C. § 299a(a) ................................................................................................. 2

42 U.S.C. § 299b(b)(1) ............................................................................................ 3

42 U.S.C. § 299b-1(a)(1) ......................................................................................... 2

42 U.S.C. § 299b-1(b) ........................................................................................ 3, 16

42 U.S.C. § 299b-1(c) ........................................................................................ 3, 16

42 U.S.C. § 299b-4(b)(1) ..................................................................................... 2, 9

42 U.S.C. § 299b-34(a) ...................................................................................... 3, 16

42 U.S.C. § 299b-36(e) ...................................................................................... 3, 16

42 U.S.C. § 299b-37(e) ................................................................................... 3, 5, 16

42 U.S.C. § 299c-1(a) ..................................................................................... *passim*

42 U.S.C. § 299c-1(a)(1) ......................................................................................... 3

42 U.S.C. § 299c-1(a)(2) .................................................................................................... 3

Full-Year Continuing Appropriations Act,
    Pub. L. No. 119-4, 139 Stat. 9 (Mar. 15, 2025) ....................................... 4, 17, 23

Further Consolidated Appropriations Act,
    Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460 (Mar. 23, 2024) ..................... 4, 17

Healthcare Research and Quality Act of 1999,
    Pub. L. No. 106-129, 113 Stat. 1653 (Dec. 6, 1999) ........................................ 2, 3

Impoundment Control Act,
    Pub. L. No. 93-344, 88 Stat. 332 (July 12, 1974) ............................................... 17

**Congressional Material**

Explanatory Statement, Further Consolidated Appropriations Act 2024 – Division D – Labor,
    Health and Human Services, Education and Related Agencies Appropriations Act, 2024...... 4

H.R. Rep. No. 93-658, *reprinted in* 1974 U.S.C.C.A.N. 3462 .................................... 18

S. Rep. No. 118-84 (2023) ................................................................................ 4, 9, 17

**Regulatory Material**

42 C.F.R. Part 67 ............................................................................................ 3

42 C.F.R. § 67.15 ......................................................................................... 6, 12

42 C.F.R. § 67.15(a)(1) ............................................................................... 4, 15, 16

42 C.F.R. § 67.15(a)(4) ............................................................................ 4, 15, 16, 22

42 C.F.R. § 67.16 ..................................................................................... *passim*

42 C.F.R. § 67.16(a) ........................................................................................ 22

42 C.F.R. § 67.16(b) ........................................................................................ 22

Notice of Meeting, 89 Fed. Reg. 104155 (Dec. 20, 2024) ........................................... 6

**Other Authorities**

AHRQ, *AHRQ: A Brief History* ........................................................................ 28

AHRQ, *Health Services Research at AHRQ* ............................................................. 2

AHRQ, *Press Release: AHRQ Announces Historic Funding Opportunities to Establish State-
    based Solutions to Accelerate Health Care Improvement* (Sept. 9, 2024) ........................... 28

GAO, B-337203, *Department of Health and Human Services—National Institutes of Health—Application of Impoundment Control Act to Availability of Funds for Grants* (Aug. 5, 2025) ........................................................................................... 18, 19

HHS Funding Opportunity, *AHRQ Health Services Research Demonstration and Dissemination Grants (R18)* ...................................................................................... 23

HHS Grants Policy Statement (Apr. 16, 2025) ............................................................ 29

HHS, *Agency for Healthcare Research and Quality Fiscal Year 2025 Justification of Estimates for Appropriations Committees* ..................................................... 5, 8, 17

HHS, *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025) ........... 5

HHS, *HHS Workforce Optimization Initiative* ............................................................... 5

U.S. Senate Health, Education, Labor & Pensions Committee Minority Staff, *Trump's War on Science* (May 13, 2025) ............................................................................................ 5

## INTRODUCTION

For more than two decades, the Agency for Healthcare Research and Quality (AHRQ) has carried out its congressionally assigned mission of improving the quality, cost-effectiveness, and accessibility of healthcare services. Congress has instructed the agency, a component of the Department of Health and Human Services (HHS), to support research into a wide variety of topics related to that mission. And Congress has consistently provided AHRQ with appropriated funds for it to do so. Consistent with those statutory mandates, the agency has historically operated a robust program of external grantmaking, supporting researchers at universities other institutions seeking to better understand and improve the care that patients receive.

But over the last several months, the Defendants in this case—HHS, Secretary of Health and Human Services Robert F. Kennedy, Jr., AHRQ, and AHRQ Director Roger D. Klein—have halted all grantmaking at the agency. AHRQ has not conducted any peer review of pending grant applications. And in late July, the director of one of AHRQ's key grantmaking offices publicly conceded that AHRQ's grantmaking apparatus was not functioning, telling a group of AHRQ grantees via email that the agency is altogether "unable to process grant awards." Given the upcoming expiration of at least tens of millions of dollars in unspent fiscal year 2025 funds at the end of September, Plaintiffs move for preliminary relief to ensure that AHRQ will carry out its statutory duties to support healthcare research grantmaking before time runs out.

Plaintiffs are two membership organizations of health and medical researchers focusing on issues at the center of AHRQ's work. Plaintiffs each have members with pending applications for AHRQ grant funding, and one Plaintiff has an application pending, too. All have been left in limbo after Defendants stalled AHRQ's grantmaking program. Without an answer from AHRQ on their applications, Plaintiffs and their members have had to cancel planned research studies and abandon work that could have improved the delivery of healthcare and patient outcomes. AHRQ's failure

to process pending grant applications is thus causing Plaintiffs and their members to suffer ongoing irreparable harm, warranting preliminary relief. For the reasons below, the Court should grant the motion, require Defendants to restart AHRQ grantmaking, and order that AHRQ's fiscal year 2025 funding be available for obligation for grantmaking during the pendency of this litigation.

## BACKGROUND

### A.     AHRQ's public health mandate

The Healthcare Research and Quality Act of 1999, Pub. L. No. 106-129, 113 Stat. 1653 (Dec. 6, 1999), an amendment to the Public Health Service Act, designated AHRQ as the "principal agency for health care research and quality" in the federal government. 42 U.S.C. § 299b-1(a)(1). AHRQ now serves as the hub for health services research—a field focused on how the health system works, how to support patients and providers in choosing the right care, and how to improve health by improving care delivery. *See* AHRQ, *Health Services Research at AHRQ*.[1]

To ensure that AHRQ carries out its mandate, the Public Health Service Act tasks it with "promot[ing] health care quality improvement by conducting and supporting" research on a variety of topics—including healthcare technology, costs, and quality—and developing ways to disseminate those findings to patients, providers, and policymakers. 42 U.S.C. § 299(b). The statute generally authorizes the agency to carry out a grantmaking program to support research "on healthcare and on systems for the delivery of such care," including research related to "the quality, effectiveness, efficiency, appropriateness, and value of health care services." *Id.* § 299a(a). And AHRQ's National Center for Excellence in Primary Care Research is, by statute, "the principal source of funding for primary care practice research" within HHS. *Id.* § 299b-4(b)(1).

The Public Health Service Act requires the agency to operate grantmaking programs

---

[1] https://www.ahrq.gov/cpi/about/health-services-research.html.

focused on certain aspects of the healthcare system. For example, the statute mandates that the HHS Secretary, through AHRQ, provide grants to develop, test, and disseminate new techniques and best practices to ensure that patients understand their medical treatment and can participate in decisions about their care. *Id.* § 299b-36(e). Other parts of the statute similarly require AHRQ to support, via grants, certain projects focused on improving the healthcare system and patient care. *See, e.g.*, *id.* § 299b(b)(1) (instructing agency to "employ research strategies" that link research with clinical practice and contemplating award of grants for same); *id.* § 299b-1(b) (mandating that HHS, acting through AHRQ, fund, via grant, at least one center focusing on therapeutics research); *id.* § 299b-1(c) (requiring AHRQ to "conduct and support research and build private-public partnerships" to "reduc[e] errors" in medicine and "improv[e] patient safety"); *id.* § 299b-34(a) (mandating award of grants or contracts related to quality improvement); *id.* § 299b-37(e) (requiring grant program to train researchers in comparative clinical effectiveness).

AHRQ is required by law to take certain steps to ensure that it processes and evaluates grant applications appropriately. The Public Health Service Act instructs that "[a]ppropriate technical and scientific peer review shall be conducted with respect to each application for a grant" funded by AHRQ. *Id.* § 299c-1(a)(1). The statute then requires that each peer review group "shall report its finding[s] and recommendations regarding" each application to the AHRQ Director. *Id.* § 299c-1(a)(2). AHRQ has also, by regulation, adopted requirements that govern grantmaking. *See* 42 C.F.R. Part 67.[2] Echoing the statutory requirements, those regulations mandate that "[a]ll applications" for grants, other than for certain small awards, "will be submitted … for review to a

---

[2] These regulations refer to the Agency for Health Care Policy and Research, AHRQ's predecessor, and that entity's Administrator. When Congress redesignated the agency as AHRQ in 1999, that legislation clarified that "[a]ny reference[s] in law" to the Agency for Health Care Policy and Research or its Administrator are "deemed to be" references to AHRQ and its Director. Pub. L. No. 106-129, § 928, 113 Stat. at 1670, *codified at* 42 U.S.C. § 299 note.

peer review group," and that the peer review group "shall make a written report … on each application." *Id.* § 67.15(a)(1), (4). In addition, the regulations require that, "[a]fter appropriate peer review," AHRQ "will evaluate applications recommended for further consideration," and, on the basis of that evaluation, make a determination as to each application—either "giv[ing] consideration for funding, defer[ring] for a later decision, pending receipt of additional information, or giv[ing] no further consideration for funding." *Id.* § 67.16.

Congress has appropriated funds for AHRQ to carry out grantmaking. In its most recent continuing resolution, Congress continued AHRQ funding at the same level as it had during the previous fiscal year—ultimately providing AHRQ with $369 million to carry out all its duties during fiscal year 2025, which ends on September 30. *See* Full-Year Continuing Appropriations Act, Pub. L. No. 119-4, § 1101, 139 Stat. 9, 10–11 (Mar. 15, 2025) (approving appropriation for fiscal year 2025 at unchanged levels unless otherwise noted) (FY 2025 Continuing Resolution); *id.* § 1106, 139 Stat. at 12 (indicating that funds are available through September 30, 2025); Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. 460, 661–62 (Mar. 23, 2024) (appropriating funds for fiscal year 2024) (2024 Appropriations Act). As Congress made clear in its last full appropriations cycle, only a small portion of that amount—$73 million—was to be spent on program support, leaving hundreds of millions to be spent instead on grants and other projects to fund health services research. *See* S. Rep. No. 118-84 at 156 (2023); Explanatory Statement, Further Consolidated Appropriations Act 2024 – Division D – Labor, Health and Human Services, Education and Related Agencies Appropriations Act, 2024 (2024 Explanatory Statement) (indicating that Senate Report 118-84 "is approved and indicates Congressional intent" unless otherwise noted). Congress also specifically directed that at least $2 million be spent on primary care research. S. Rep. No. 118-84 at 154.

In addition to these annual appropriations, AHRQ receives a substantial mandatory appropriation from the Patient-Centered Outcomes Research (PCOR) Trust Fund—a fund created by the Affordable Care Act and drawn from a tax on insurers. *See* 26 U.S.C. § 9511(a), (b)(4), (d)(2)(C) (creating fund and designating that a portion be used to carry out certain AHRQ functions). AHRQ is required to use some of these funds to "build capacity for comparative clinical effectiveness research" through "a grant program that provides for the training of researchers." 42 U.S.C. § 299b-37(e). This fiscal year, AHRQ received $126 million in mandatory funds from the PCOR Trust Fund. *See* HHS, *Agency for Healthcare Research and Quality Fiscal Year 2025 Justification of Estimates for Appropriations Committees* at 10 (FY 2025 Budget Justification).[3]

### B.    Defendants' stalling of AHRQ's grantmaking activities

Shortly after his confirmation, Defendant Kennedy announced a large-scale reorganization of HHS and substantial cuts to its workforce. *See* HHS, *HHS Announces Transformation to Make America Healthy Again* (Mar. 27, 2025).[4] On April 1, Secretary Kennedy and HHS (the HHS Defendants) began implementing that reorganization by sending out a mass reduction-in-force, or RIF, notice to thousands of HHS employees, including approximately 123 in AHRQ. *See* U.S. Senate Health, Education, Labor & Pensions Committee Minority Staff, *Trump's War on Science* at 11 (May 13, 2025).[5] The affected staff represented over a third of AHRQ's workforce. *See* FY 2025 Budget Justification at 13. On July 14, 2025, AHRQ staff that received the RIF notice were officially separated from their roles. *See* HHS, *HHS Workforce Optimization Initiative*.[6]

---

[3] https://www.ahrq.gov/sites/default/files/wysiwyg/cpi/about/mission/budget/2025/fy2025-cj.pdf.

[4] https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

[5] https://www.sanders.senate.gov/wp-content/uploads/HELP-Committee-Minority-Report-Trumps-War-on-Science.pdf.

[6] https://www.hhs.gov/about/agencies/asa/workforce-optimization-initiative/index.html.

The HHS Defendants' cuts to AHRQ focused on the agency's grantmaking apparatus. As a result, Defendants have ground its grantmaking process to a halt. AHRQ is refusing to consider grant applications and has stopped processing continuations of previously awarded grants.

More specifically, the HHS Defendants' RIF eliminated essentially all staff from the Office of Extramural Research, Education, and Priority Populations (OEREP), which managed the grant application process, other than that office's director. OEREP staff included the project officers with scientific expertise needed to craft notices of funding opportunities and review and process applications. *See* John Doe #1 Decl. ¶¶ 7–18; John Doe #2 Decl. ¶ 7. OEREP staff played a particularly important role in the peer review process, which AHRQ is required to engage in by both statute and regulation. *See* 42 U.S.C. § 299c-1(a); 42 C.F.R. §§ 67.15–16. AHRQ staff in OEREP convened "study sections" of peer reviewers, arranged section meetings, and shepherded each application through peer review. *See* John Doe #1 Decl. ¶¶ 13–16; John Doe #2 Decl. ¶ 7.

There is significant evidence that, following Defendants' decision to fire all OEREP staffers, the agency is now entirely unable and refusing to process grant applications or issue new awards. As of February 1, 2025, AHRQ's website indicated that its five study sections were set to meet three times this year, with meetings set for May and June. *See* Bass Decl. ¶ 9 & Ex. A. Those meetings were canceled. *See* John Doe #2 Decl. ¶ 12. Moreover, the agency must publish notices of study section meetings in the Federal Register. *See* 5 U.S.C. § 1009(a)(2); *see, e.g.*, Notice of Meeting, 89 Fed. Reg. 104155 (Dec. 20, 2024). That responsibility was previously handled by OEREP, and the agency has not posted any notices over the last five months. *See* John Doe #1 Decl. ¶¶ 16, 21. Without these meetings, AHRQ cannot satisfy its obligation to peer review all applications and also cannot award any new grants, despite Congress giving funds for it to do so.

And, indeed, AHRQ has not done so. The Tracking Accountability in Government Grants

6

System (TAGGS) database—a publicly available, official source of HHS grants—lists only five

"actions" taken on grants in their first year of funding between April 1 and the date of this filing.[7]

But each of those five was tied to an "action amount" of either $0 or negative dollars—indicating

that these do not in fact represent new grant awards. A staffer recently at the agency has confirmed

that, through the summer, AHRQ had issued no new grant awards. *See* John Doe #2 Decl. ¶ 13.

Defendants' RIF also functionally eliminated the Office of Management Services, which

housed staff in the Division of Grants Management (DGM) responsible for sending out and

managing grant awards. *See* John Doe #1 Decl. ¶¶ 7, 19; John Doe #2 Decl. ¶ 8. DGM staff handled

the logistics of all AHRQ grants, including issuing awards and monitoring compliance with HHS

regulations and other rules. John Doe #2 Decl. ¶ 8. They also played a key role in ensuring that

existing grantees would receive funding in the years after their first award, through non-competing

continuation awards. *See* John Doe #2 Decl. ¶ 8. On July 23, the Director of OEREP sent an email

to a group of AHRQ grantees for one of the agency's training-grant programs, who had been

awaiting an answer on their applications for continuation awards. *See* Trivedi Decl. ¶ 7. That email

stated, "As a result of recent reduction in force at HHS, AHRQ's grants management staff were

---

[7] Those five actions are tied to the following awards: *SCALE-LHS: Synthesize, Coordinate, Amplify, Learn, and Evaluate the AHRQ/PCOR LHS network*, U18HS030335, https://taggs.hhs.gov/Detail/AwardDetail?arg_AwardNum=U18HS030335&arg_ProgOfficeCode=7; *The Effect of Hospital-Physician Vertical Integration on Costs, Quality, and Utilization for Insured Patients with Multiple Chronic Conditions*, R36HS029643, https://taggs.hhs.gov/Detail/AwardDetail?arg_AwardNum=R36HS029643&arg_ProgOfficeCode=7; *Dissemination of a Facilitation Strategy to Deimplement Unnecessary Post-Operative Antibiotics at Children's Hospitals*, R18HS030070, https://taggs.hhs.gov/Detail/AwardDetail?arg_AwardNum=R18HS030070&arg_ProgOfficeCode=7; *Keck COVID Recovery Clinic Optimal Outcomes for Patients, a Comprehensive Assessment and Management Program*, U18HS029950, https://taggs.hhs.gov/Detail/AwardDetail?arg_AwardNum=U18HS029950&arg_ProgOfficeCode=7; *Improving Cultural Competency Across the Mental Healthcare Delivery Network*, R13HS029604, https://taggs.hhs.gov/Detail/AwardDetail?arg_AwardNum=R13HS029604&arg_ProgOfficeCode=7.

separated from Federal service on July 14, 2025. We are currently unable to process grant awards and are evaluating options for our grant program. With the permanent separat[ion] of these staff, FY2025 funding of non-competing applications is uncertain." Trivedi Decl. Ex. A.

In short, Defendants have halted AHRQ's grantmaking activities. Following major cuts to AHRQ staff, the agency has publicly conceded that it no longer has any capacity to operate the grantmaking process required by statute. It is no longer conducting peer review mandated by both statute and regulation. It is no longer making required decisions on grant applications. And it is no longer approving grant awards or obligating any funds that Congress appropriated for that purpose. As a result, Defendants have left researchers with applications for new grants without any ability to compete for grants, and current grantees without access to needed and expected funding.

The cessation of the AHRQ's grantmaking functions also makes it impossible for the agency to spend anywhere close to the amount Congress appropriated. According to the TAGGS database, the agency has so far obligated only around $55 million in fiscal year 2025 on grants[8]— less than 40 percent of what it spent out of an identical appropriation last fiscal year, *see* FY 2025 Budget Justification at 16 (reporting that AHRQ spent just over $139 million out of its annual appropriations on grants). If the agency is not ordered to obligate funds before September 30, or the expiration date is not extended, AHRQ's 2025 appropriations will expire and the agency will have no way of spending the money Congress instructed it to use to support valuable research.

### C.    Harm to Plaintiffs and the public

Defendants' halt of AHRQ grantmaking has harmed members of Plaintiffs the Society of

---

[8] To determine this number, Plaintiffs filtered the TAGGS database for awards with "Funding FY" of 2025 and "Operating Division" of AHRQ. *See* https://taggs.hhs.gov/SearchAward. That search generated a report cataloguing $54,827,002 in spending on grants this fiscal year. If anything, this figure likely overstates the amount of AHRQ's 2025 appropriation that has been spent, as it also includes awards funded by the PCOR Trust Fund.

General Internal Medicine (SGIM) and the North American Primary Care Research Group (NAPCRG). Both Plaintiffs are associations of healthcare researchers who are committed to conducting research intended to improve the quality, safety, and efficacy of the care that patients receive. *See* Bass Decl. ¶¶ 3–7; Katz Decl. ¶¶ 4–6. Both Plaintiffs have members with pending applications for AHRQ grant funding. *See* Bass Decl. ¶ 10–17; Katz Decl. ¶ 10–14; Schnipper Decl. ¶¶ 4–6; Rodriguez Decl. ¶ 6. In addition, NAPCRG has a grant application awaiting peer review. *See* Katz Decl. ¶¶ 7–8. Those members and NAPCRG have been harmed because AHRQ can no longer review applications or award grants, and it is no longer doing so.

Members with applications awaiting peer review have been deprived of critical feedback on their proposals that they would ordinarily expect. *See* Bass Decl. ¶ 12; Katz Decl. ¶ 12. That peer review process can help researchers hone their projects and ensure that they will make useful contributions that improve the provision of healthcare and patient health. *See* Dolber Decl. ¶ 6. Because these members have not had their projects reviewed after months of delay, their research timelines have been substantially set back—regardless of whether they later secure funding from AHRQ or another source. *Id.* With each day that the delay continues, that harm only compounds.

More broadly, NAPCRG and Plaintiffs' members with pending applications have been injured by the agency's refusal to review those applications or issue awards using the substantial funds Congress appropriated. These members had been counting on the opportunity to compete for AHRQ funding, including the only pot of federal money specifically designated for primary care research, *see* 42 U.S.C. § 299b-4(b)(1); S. Rep. No. 118-84 at 154. *See* Bass Decl. ¶¶ 8–18, 22; Katz Decl. ¶ 10–15; Schnipper Decl. ¶¶ 5–6; Schulson Decl. ¶¶ 7–9. Again, they have been left without an answer on whether they will receive funding, setting back their research timelines and making it substantially harder for them to embark on important work that could advance their

careers and benefit the patients they seek to serve. Plaintiffs' members seeking continuation funding have been left in a particularly difficult limbo, as they are mid-stream on projects that they had expected AHRQ to fund for the following year or years to come. *See* Bass Decl. ¶¶ 15–18; Linder Decl. ¶ 7. Those projects may not continue without AHRQ funding, leaving researchers with potentially years of wasted work. *See* Bass Decl. ¶ 18; Linder Decl. ¶ 7. Without this court's immediate intervention, Plaintiffs' members will be left without the legally required answer on their applications, and without any prospect of funding out of the agency's FY 2025 appropriation.

The abrupt halt to AHRQ's grantmaking function affects more than just Plaintiffs' members. Though a small part of overall federal spending on healthcare research, AHRQ's grants represented an important investment in studying and improving how patients receive care and how to improve the safety, efficacy, and quality of that care. *See* Bass Decl. ¶¶ 8, 19–23; Katz Decl. ¶ 15. Without this research, patients and the public will be left worse off.

## LEGAL STANDARDS

To secure a preliminary injunction, "Plaintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where, as here, the government is the opposing party, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

By halting AHRQ grantmaking, Defendants have abdicated their statutory responsibilities to review grant applications and to spend the funds that Congress appropriated to support research into healthcare quality, patient safety, and other important areas for the functioning of our healthcare system. Because these legal violations have harmed Plaintiffs' members and the public,

and because the public interest is served by requiring Defendants to carry out their statutory grantmaking duties, this Court should grant the motion for a preliminary injunction.

## I.    Plaintiffs are likely to succeed on the merits.

### A.  Plaintiffs have shown a substantial likelihood of standing.

A plaintiff seeking a preliminary injunction "must make a clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotation marks omitted). An organizational plaintiff can establish either "associational standing to bring an action in federal court on behalf of its members" or "standing to bring suit on its own behalf when it seeks redress for an injury suffered by the organization itself." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (internal citations and quotation marks omitted). Both Plaintiffs have associational standing, and NAPCRG also has organizational standing.

**1.** "An association has associational standing when at least one of its 'identified' members 'would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000)). Plaintiffs satisfy all three prongs of this test.

Plaintiffs each have members with pending grant applications injured by Defendants' unlawful halt of AHRQ's grantmaking. *See* Bass Decl. ¶¶ 10–18; Katz Decl. ¶¶ 10–14; Linder Decl. ¶¶ 6–7; Schnipper Decl. ¶ 6; Schulson Decl. ¶¶ 6–9. The "loss of an *opportunity to pursue a benefit*" constitutes "a constitutionally cognizable injury." *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015); *see also Child Trends, Inc. v. U.S. Dep't of Educ.*, No. 25-cv-1154-BAH, 2025 WL 1651148, at *10 (D. Md. June 11, 2025) (recognizing that "the loss of the right to bid … appears to register as an injury for Article III standing purposes").

Plaintiffs' members with pending applications have been deprived of the opportunity to compete for AHRQ funding. That injury is caused by Defendants' cessation of AHRQ's grant review process. And although any given member is not guaranteed to receive a grant, the injury is redressable by an order requiring AHRQ to restart review. *See Teton*, 785 F.3d at 726.

In addition, Plaintiffs' members are injured by Defendants' violation of their procedural right to a decision on their grant applications. "While violation of a procedural right '*in vacuo*' is insufficient by itself to confer Article III standing, a procedural injury that is tethered to some 'concrete interest' adversely affected by the procedural deprivation is sufficient." *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 492 (D. Md. 2020) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). Here, under applicable statutes and regulations, Plaintiffs' members who have applied for AHRQ grant funding are entitled to peer review and an ultimate decision on their applications. *See* 42 U.S.C. § 299c-1(a); 42 C.F.R. §§ 65.15–16. The delay and functional denial of their applications is tethered to the members' concrete interest in competing for and potentially receiving funding from AHRQ. *See* Bass Decl. ¶¶ 8–18; Katz Decl. ¶¶ 10–14; Schnipper Decl. ¶ 6; Schulson Decl. ¶¶ 6–9. These members have thus been injured by Defendants' "withholding of statutorily mandated, non-discretionary review" of their applications. *Gomez v. Trump*, 485 F. Supp. 3d 145, 171 (D.D.C. 2020). As above, that injury is caused by Defendants' halt of all grant review and would be redressed by relief requiring the agency to restart application processing. *See id.* at 172 (explaining that plaintiff "need only demonstrate that the relief she requests *could* better protect her concrete interest in the adjudication of her … application").

As to the second prong, each Plaintiff's mission is to promote research into health services, health quality, primary care, or other areas at the center of AHRQ's statutory mandate. *See* Bass Decl. ¶ 4; Katz Decl. ¶ 4. Each organization also focuses on securing federal support for the kind

of research that their members have proposed to do in pending applications. *See* Bass Decl. ¶¶ 5–7; Katz Decl. ¶ 5. That easily satisfies the "undemanding" test for germaneness, which requires "mere pertinence between litigation subject and organizational purpose." *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988); *see, e.g., L'Association des Americains Accidentels v. U.S. Dep't of State*, 633 F. Supp. 3d 74, 79 (D.D.C. 2022) (holding that association with mission of protecting interests of American citizens abroad had standing to bring unreasonable delay claim on behalf of members with stalled applications for renunciation of citizenship).

Finally, individual participation of Plaintiffs' members is not required. Plaintiffs challenge an across-the-board stop to grantmaking at AHRQ, which does not require individual members to "come forward as parties with particularized proof." *Ass'n of Am. Railroads v. Hudson*, 144 F.4th 582, 592 (4th Cir. 2025). And they request prospective, injunctive relief requiring Defendants to restart AHRQ's legally required grantmaking activities, not damages or other remedies that would require individualized evidence or calculations. *Id.* at 590.

**2.** For similar reasons, NAPCRG also has standing in its organizational capacity to challenge Defendants' cessation of AHRQ's grant-review process, which has left NAPCRG without an answer on its own pending grant application. For more than a decade, NAPCRG has received funding from AHRQ to support an annual conference for practice-based research networks (PBRNs), an innovative mechanism for bringing the latest research evidence to bear on the care that patients receive. Katz Decl. ¶ 7. AHRQ is required by statute to support "research strategies and mechanisms," like PBRNs, that link research directly with clinical practice. *See* 42 U.S.C. § 299b(b)(1). NAPCRG currently has an application pending for a grant that would support this conference for 2026, 2027, and 2028. Katz Decl. ¶ 8. But that application has not yet been peer reviewed, and NAPCRG is currently unable to receive any response. *Id.* As above, NAPCRG

is injured because it is unable to compete for AHRQ funding, and it has been deprived of the legally required answer on its application. *See Child Trends, Inc.*, 2025 WL 1651148, at *10; *Ass'n of Cmty. Cancer Centers*, 509 F. Supp. 3d at 492.

        **B.**      **Plaintiffs are likely to succeed on the merits of their claims.**

              **1.**    **Defendants' halt of AHRQ's grantmaking function is reviewable final agency action.**

       The Administrative Procedure Act (APA) provides for judicial review of final agency action. 5 U.S.C. § 704. Under the APA, "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). This definition "undoubtedly has a broad sweep," and "is meant to cover comprehensively every manner in which an agency may exercise its power." *Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1363-DLB, 2025 WL 1585051, at *12 (D. Md. June 5, 2025) (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) and *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)). An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). Courts take a "pragmatic" approach to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Standage v. Braithwaite*, 526 F. Supp. 3d 56, 87 (D. Md. 2021) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (plurality op.)).

       The halting of all AHRQ grantmaking constitutes final agency action. Grantmaking has stopped entirely, with both legal and practical effect. This halting has limited applicants' ability to enter into new grant agreements with the agency. *See Spirit Airlines, Inc. v. U.S. Dep't of Transp*.,

14

997 F.3d 1247, 1252 (D.C. Cir. 2021) (holding that agency action is final where it "limits or defeats a party's ability to enter into an advantageous … arrangement"). And it has prevented remaining agency staff from carrying out the process as set out by statute. *See Biden v. Texas*, 597 U.S. 785, 802 (2022) (agency action is final where it binds agency "staff by forbidding them to continue [a] program"). Further, the halt of AHRQ grantmaking had an "immediate and practical impact" on Plaintiffs and their members, *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019), because they can no longer receive an answer on their applications or compete for available funds. *See Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *14 (recognizing that the closure of AmeriCorps was final agency action because it "had 'an immediate and practical impact'" on plaintiffs, including because "grantees" would "no longer receive funding").

Defendants' failure to process, peer review, and evaluate grant applications are likewise final agency actions. As the Fourth Circuit has recognized, "'agency action' includes a 'failure to act," and "agency inaction can … be judicially compelled when it is a discrete 'agency action' that the agency was required to take." *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 196 (4th Cir. 2013). Decisions on grant applications are discrete final agency actions, with both practical and legal consequences for the agency and applicants. *See People for the Ethical Treatment of Animals v. Tabak*, 662 F. Supp. 3d 581, 591 (D. Md. 2023) (recognizing that a "decision to approve [a] grant is the consummation of the agency's decisionmaking process that is of sufficient legal consequence[ ]" to make the action final (internal quotation marks omitted)). Moreover, AHRQ is legally required to review and evaluate each grant application, by both statute and regulation. *See* 42 U.S.C. § 299c-1(a); 42 C.F.R. § 67.15(a)(1), (4); *id.* § 67.16. This kind of "ongoing failure[] to carry out discrete obligations can be subject to review" under the APA. *City of New York*, 913 F.3d at 433.

### 2. Defendants' cessation of AHRQ's grantmaking function is contrary to the Public Health Service Act and governing regulations.

Because "[a]dministrative agencies are creatures of statute," *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022), they are "not free simply to disregard statutory responsibilities," *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). An agency likewise "has no discretion to decide whether and when to abide by its own regulations." *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 656 n.11 (D. Md. 2018); *see also Adams v. Califano*, 474 F. Supp. 974, 986 (D. Md. 1979) ("A fundamental concept of administrative law is that an agency must follow its own regulation."); *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (same).

By statute and regulation, AHRQ is required to operate a grantmaking program and process grant applications. The Public Health Service Act mandates that the agency issue grants related to certain topics crucial to healthcare quality and the healthcare system. *See* 42 U.S.C. §§ 299b, 299b-1(b)–(c), 299b-34(a), 299b-36(e), 299b-37(e). That statute and AHRQ regulations require AHRQ to review grant applications. *Id.* § 299c-1(a); 42 C.F.R. § 67.15(a)(1), (4). And AHRQ regulations further instruct its Director to make a decision whether to fund each grant application, with deferrals allowed only "pending receipt of additional information." *Id.* § 67.16. Defendants have acted contrary to the statutes and regulations governing AHRQ grantmaking by halting the process entirely. *See supra* at 5–8; *see also* John Doe #1 Decl. ¶¶ 11–22; John Doe #2 Decl. ¶¶ 9–16.

### 3. Defendants' cessation of AHRQ's grantmaking function violates appropriations statutes.

Because Defendants' cessation of AHRQ's grant program means the agency cannot and will not spend funds that Congress appropriated for that purpose, Defendants have also violated statutes governing appropriations—namely, the FY 2025 Continuing Resolution providing AHRQ with appropriations through September 30, and the Impoundment Control Act (ICA).

**a.** The executive branch "does not have unilateral authority to refuse to spend … funds"

that Congress appropriated. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). The FY 2025 Continuing Resolution, which was passed by both houses of Congress and signed by the President, continued AHRQ at a stable funding level for fiscal year 2025. *See* FY 2025 Continuing Resolution § 1101, 139 Stat. at 10–11. Under the statute, AHRQ has $369 million to carry out its duties through fiscal year 2025, which ends on September 30. *See id.* § 1106, 139 Stat. at 12; 2024 Appropriations Act, 138 Stat. at 661–62. Under congressional directives, less than 20 percent of that total is for internal operations, *see* S. Rep. No. 118-84 at 156—leaving nearly $300 million to spend on grants and other external research. Last year, out of the same appropriated amount, AHRQ spent approximately $139 million on new and continuing grants. *See* FY 2025 Budget Justification at 16. And in the budget request HHS transmitted to Congress, AHRQ committed to spending a similar amount on grants if it received the same funding this fiscal year. *Id.*

AHRQ has come nowhere close to obligating its full appropriation on grants as Congress intended. So far this fiscal year, it has obligated only about $55 million in new or continuation awards. *See supra* at 8. There is no prospect of AHRQ spending any more on grants, as the director of a key grants office has conceded it can no longer issue awards. *See* Trivedi Decl. Ex. A. Given the upcoming expiration of the fiscal year 2025 appropriations, Defendants' halting of AHRQ's grantmaking function violates the dictates of the FY 2025 Continuing Resolution. Defendants should not be permitted "to run out the clock on the fiscal year, without putting the money Congress appropriated toward the purposes Congress intended." *Widakuswara v. Lake*, No. 1:25-cv-0887-RCL, 2025 WL 2159180, at *3 (D.D.C. July 30, 2025) (appeal pending).

**b.** Because Defendants have unlawfully refused to spend money appropriated by Congress and approved by the President in the FY 2025 Continuing Resolution, they have also violated the ICA, Pub. L. No. 93-344, 88 Stat. 332 (July 12, 1974). Congress enacted the ICA in response to

President Nixon's repeated "withholding" of appropriated "funds from various programs he did not favor." *City of New Haven v. United States*, 634 F. Supp. 1449, 1454 (D.D.C. 1986). "[T]o restore responsibility for the spending policy of the United States to the legislative branch," the ICA created specific procedures for the executive branch to seek permission to avoid spending appropriated funds. H.R. Rep. No. 93-658, *reprinted in* 1974 U.S.C.C.A.N. 3462, 3463. Under those procedures, if the President does not want to spend funds Congress has appropriated, he must transmit a special message to Congress detailing a request to not spend money. 2 U.S.C. § 683(a). Even then, the President must spend the funds available for obligation unless both houses of Congress pass a bill rescinding the funding. *Id.* § 683(b). Absent compliance with that mechanism, congressionally appropriated funds "shall be made available for obligation." *Id.*

Those preconditions have not been satisfied here. President Trump has not sent a message to Congress asking for permission not to spend money appropriated for AHRQ's programming, and Congress has not agreed to relieve the executive of its obligation to spend those funds. Accordingly, Defendants lack authority to refuse to spend AHRQ appropriations.

Earlier this month, the General Accountability Office (GAO)—Congress's watchdog for spending—determined that HHS had violated the ICA in essentially identical circumstances. *See* GAO, B-337203, *Department of Health and Human Services—National Institutes of Health—Application of Impoundment Control Act to Availability of Funds for Grants* (Aug. 5, 2025) (GAO NIH Finding).[9] There, GAO considered, among other things, whether NIH had violated the statute by pausing all grant review and substantially slowing the pace of grant awards, as compared to previous years. *See id.* at 7–11. After reviewing records of NIH's activities and federal spending databases, GAO concluded that NIH had violated the ICA. *Id.* at 18. Critically, GAO concluded

---

[9] https://www.gao.gov/assets/890/880607.pdf.

that an unlawful impoundment had occurred with respect to paused and slowed grantmaking, even though "the majority of NIH's appropriations do not specifically require that NIH award grants and other research contracts." *Id.* at 14. As the agency explained, NIH had historically "use[d] the vast majority of its appropriation for these purposes each year," and there was no "indication from HHS officials" that they intended to use the funds for some other authorized purpose. *Id.*

To the extent there is any daylight between the situation GAO encountered at NIH and the one here, the evidence of AHRQ's ongoing impoundment is even more egregious. While NIH had restarted peer review meetings by the time of GAO's determination, *see id.* at 17–18, AHRQ's peer review process is entirely at a standstill, *see supra* at 5–8. And while both NIH and AHRQ spent less in appropriated funds on grants this year as compared to last, *compare* GAO NIH Finding at 18, *with supra* at 8, some money was at least still going out the door at NIH. AHRQ, meanwhile, is concededly unable to issue any grant awards. *See* Trivedi Decl. Ex. A. Given the funds left over at this point in the fiscal year, this withholding of budget authority from obligation or expenditure "is inconsistent with the requirements of the ICA." GAO NIH Finding at 19.

### 4. Defendants' cessation of AHRQ's grantmaking function is arbitrary and capricious.

The APA "requires agencies to engage in 'reasoned decisionmaking,' and directs that agency actions be 'set aside' if they are 'arbitrary' or 'capricious.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (internal citation omitted) (first quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015), then quoting 5 U.S.C. § 706(2)(A)). To satisfy the arbitrary and capricious standard, "[a]n agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Mayor of Baltimore v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Defendants' halting AHRQ's

grantmaking and refusing to spend funds appropriated by Congress fail to satisfy that standard.

For the most part, Defendants have provided no explanation for halting the agency's grantmaking apparatus, which has consistently supported health services research for decades. "'An agency changing its course must supply a reasoned analysis,' and the court may not infer the agency's reasoning from mere silence." *Wanrong Lin v. Nielsen*, 377 F. Supp. 3d 556, 564 (D. Md. 2019) (quoting *State Farm*, 463 U.S. at 57). To the extent that AHRQ offered an explanation in the July 23 email, the agency blamed its inability "to process grant awards" on "the recent reduction in force at HHS" and the "permanent separat[ion]" of "AHRQ's grants management staff … from Federal service." Trivedi Decl. Ex. A. That is a problem entirely of Defendants' own making, so it cannot validate their decision to halt important, statutorily required grantmaking.

Moreover, "[a]n agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." *Nat'l Envtl. Dev. Assoc.'s Clean Air Project*, 752 F.3d at 1009 (internal quotation marks omitted). Here, Defendants acted contrary to AHRQ regulations governing grantmaking when they halted their grantmaking operations. *See supra* at 5–8, 16.

In addition, when they halted AHRQ grantmaking, Defendants failed to "take[] into account" the "serious reliance interests" of Plaintiffs' members, other grantees and applicants, the health research community, and providers and patients. *See Regents*, 591 U.S. at 30. Researchers with pending applications for new funding, including Plaintiffs' members, invested hundreds of hours applying for AHRQ grants, at the expense of seeking other funding opportunities. *See, e.g.*, Bass Decl. ¶ 13; Katz Decl. ¶¶ 12–14; Schulson Decl. ¶ 9; Bolen Decl. ¶ 7. Researchers in the middle of multi-year projects embarked on their work with the expectation that, so long as funding was available and they met expectations, they would continue to receive support from AHRQ throughout the project period. *See, e.g.*, Linder Decl. ¶¶ 4–7. AHRQ also served as a major funder

20

of early-career researchers in health services, providing support for those seeking to launch a career researching how to improve the healthcare system. *See* Bass Decl. ¶¶ 20–21. There will be fewer opportunities for researchers to build careers in the field, absent AHRQ funding. *Id.* Defendants' abrupt halt of AHRQ's grantmaking did not account for these substantial reliance interests.

Defendants also failed to account for the substantial reliance of the healthcare community—including practitioners and patients—on AHRQ grantmaking. AHRQ funding has supported significant investment in our understanding of how to improve the quality, safety, and efficacy of the care patients receive. Projects that can't move forward, because Defendants halted AHRQ's grants program, would have addressed pressing issues like reducing antibiotic-resistant infections and preventing misdiagnosis of common but serious medical conditions. *See* Linder Decl. ¶¶ 4–6; Schulson Decl. ¶ 4. Providers, patients, insurers, and others relied on AHRQ to fund this kind of innovative research. Defendants again ignored these significant reliance interests.

### 5. Defendants have unreasonably delayed decisions on Plaintiffs' members' AHRQ grant applications.

**a.** The APA directs reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs can proceed under 706(1) where they "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). "To assess whether an agency is bound to act," courts "look to the text of the relevant statutes and regulations." *Lovo v. Miller*, 107 F.4th 199, 211 (4th Cir. 2024).

The word "shall" in a statute or regulation "usually connotes a requirement," creating "an obligation impervious to … discretion" on the relevant actor. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 310 (2020) (internal quotation marks omitted, alteration in original). The Public Health Service Act mandates that the agency "shall … conduct" "appropriate technical

and scientific peer review" and that peer review groups "shall" report their findings. 42 U.S.C. § 299c-1(a). Applicable regulations, meanwhile, state that study sections "shall make a written report … on each application" and that the AHRQ Director "will evaluate applications" and "shall" make a decision as to each, 42 C.F.R. §§ 67.15(a)(4), 67.16(a)–(b). Thus, processing applications is a nondiscretionary duty, even if the agency has discretion over which ones to ultimately fund.

The record demonstrates that the agency has failed to take mandated steps to process grant applications, including those submitted by Plaintiffs' members. Defendants fired the staff necessary to coordinate the statutorily mandated peer review process. *See* John Doe #1 Decl. ¶¶ 7–19; John Doe #2 Decl. ¶¶ 6–15. Shortly thereafter, the agency stopped holding its previously scheduled study section meetings. John Doe #2 Decl. ¶¶ 12–14. The agency is no longer complying with its obligation to conduct appropriate technical and scientific peer review. In addition, the agency has not acted on applications ready for evaluation by the AHRQ Director. *See* John Doe #2 Decl. ¶¶ 11, 13; *supra* at 6–7 (cataloguing lack of new grant awards). Indeed, an AHRQ official has stated that the agency no longer has any capacity to issue awards. *See* Trivedi Decl. Ex. A. The agency is therefore also failing to "evaluate applications" that study sections have "recommended for further consideration," and it is no longer making the required disposition of applications. 42 C.F.R. § 67.16(a)–(b). While AHRQ regulations contemplate that the agency can "defer" an application "for a later decision," they allow deferral only in one circumstance: "pending receipt of additional information." *Id.* § 67.16(b). The agency, however, has unlawfully deferred consideration of *all* applications without citing any need for information, abdicating its duty to act.

**b.** The APA requires AHRQ to "proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). As the Fourth Circuit has recognized, to assess whether delay is unreasonable, "most lower courts have followed the D.C. Circuit's decision in *TRAC v. FCC*,

22

750 F.2d 70, 80 (D.C. Cir. 1984)," which lays out six factors that "offer helpful guidance in this inquiry, even if they do not define the entire field." *Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021). These factors favor Plaintiffs here.

The first two factors are "typically considered together." *Joshua v. Jaddou*, No. 1:24-cv-00667-JRR, 2025 WL 449001, at *8 (D. Md. Feb. 10, 2025), and they strongly favor Plaintiffs. Factor one—which some courts have called the "most important"—asks whether "the time agencies take to make decisions" is "governed by a rule of reason." *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (internal quotation marks omitted). Factor two recognizes that a "statutory scheme may supply content of this rule of reason" where "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed." *Id.*

Here, Congress has provided a timeline for the agency's processing of applications: It appropriated funds for AHRQ to spend before the fiscal year ends. *See* FY 2025 Continuing Resolution § 1101, 139 Stat. at 10; 31 U.S.C. § 1502(a) (appropriations are not available past the period authorized by law); 2 U.S.C. §§ 682, 684 (setting out specific procedure for when executive proposes to "defer any budget authority" or "withhold[] or delay[] obligation"). In funding announcements, AHRQ has also noted that grants generally go through "scientific merit review" four months after submission and that projects may start "four months" after that. *See, e.g.*, HHS Funding Opportunity, *AHRQ Health Services Research Demonstration and Dissemination Grants (R18)*.[10] The agency is no longer meeting those timelines and no longer has any prospect of making decisions on pending applications before the funds that could support awards expire on September 30. There is thus no "rhyme or reason—congressionally prescribed or otherwise—for [the] agency's delay." *Janay v. Blinken*, 743 F. Supp. 3d 96, 114 (D.D.C. 2024) (alteration in original).

---

[10] https://grants.nih.gov/grants/guide/pa-files/PA-24-156.html.

The third and fifth *TRAC* factors, which are also routinely considered together, also favor Plaintiffs. Factor three instructs that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake," and factor five requires the court to "take into account the nature and extent of the interests prejudiced by the delay." *TRAC*, 750 F.2d at 80. The interests at stake are substantial. Applicants for new grants, including Plaintiffs' members, invested hundreds of hours in applications that now will not be reviewed and that currently have no prospect of receiving funding. *See, e.g.*, Schnipper Decl. ¶ 6; Schulson Decl. ¶ 9; Dolber Decl. ¶ 6. Their applications concern innovative research meant to improve patient care. Schnipper Decl. ¶ 4; Schulson Decl. ¶ 4; Dolber Decl. ¶ 4. Defendants' withholding of decisions on those applications has caused more than just economic harm, as these applicants have had to spend substantial time and energy searching—perhaps in vain—for substitute funding. Current grantees awaiting a decision on continuation funding are perhaps even more prejudiced by the agency's unreasonable delay. Those grantees are in the middle of their "project periods," and they reasonably relied on agency funding to support ongoing work. *See* Linder Decl. ¶¶ 5–7.

Defendants' delay in processing AHRQ grant applications also harms the health and public welfare. The applications currently pending before AHRQ for new or continued funding include projects that would investigate important issues in the healthcare system and seek to improve the quality, safety, and efficacy of the care patients receive. *See, e.g.*, Linder Decl. ¶ 4; Schulson Decl. ¶ 4; Bolen Decl. ¶ 5. Where an agency's withholding of funding "risks poorer health outcomes for the public," factors three and five favor a finding of unreasonable delay. *Nat'l Fair Housing Alliance v. HUD*, No. 25-cv-1965-SLS, 2025 WL 2105567, at *10 (D.D.C. July 28, 2025).

Factor four, which asks whether there are "higher or competing" agency priorities, *TRAC*, 750 F.2d at 80, also favors Plaintiffs. Under this factor, courts have "refused to grant relief, even

though all the other factors considered in *TRAC* favored it, where 'a judicial order putting [a party] at the head of the queue [would] simply move[] all others back one space and produce[] no net gain." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (quoting *In re Barr Labs.*, 930 F.2d 72, 75 (1991)) (second, third, and fourth alteration in original). Here, however, Plaintiffs do not ask to be brought to the front of some line that is moving, albeit slower than Plaintiffs would like. To the contrary, AHRQ has conceded that its process isn't moving at all. *See supra* at 7–8. A judicial order requiring the agency to start processing applications—which the agency has funding to do—would not require the agency to reorder any priorities. *See Nat'l Fair Housing All.*, 2025 WL 2105567, at *10; *cf. Campaign Legal Ctr. v. FEC*, No. 20-cv-0809-ABJ, 2021 WL 5178968, at *8 (D.D.C. Nov. 8, 2021) (finding factor did not favor government where agency "has not indicated that the administrative complaint has been delayed because it is behind others in a queue"). There are no "concerns about 'line-jumping'" where the requested relief is an order requiring the agency to process applications according to its ordinary schedule and procedures. *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 819 (D.C. Cir. 2024).

Finally, the sixth factor is neutral and does not favor finding the delay here reasonable. This factor recognizes that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80. To the extent Defendants have offered any explanation for their delay, they have blamed the recent RIF, which they apparently initiated without any plan to continue the agency's statutory functions. Although that is at best a sign of the negligence behind the cessation of AHRQ's grant program, Plaintiffs cannot know on the current record why Defendants targeted AHRQ's grantmaking apparatus or whether there is any lurking impropriety. This factor is therefore, at best, neutral.

Taken together, these factors support Plaintiffs. Plaintiffs are thus likely to succeed on their

unreasonable delay claim, and the Court should order Defendants to begin processing grant applications before the funds to support fiscal year 2025 grants expire.

## II.    Plaintiffs will suffer irreparable harm absent a preliminary injunction.

"To establish irreparable harm, the movant must make a clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (internal quotation marks omitted). "Additionally, the harm must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (internal quotation marks omitted). Plaintiffs' members, as well as NAPCRG in its own capacity, are already suffering irreparable harm, and they will continue to absent this Court's intervention.

Defendants' halt of all grantmaking at AHRQ has caused substantial harm to Plaintiffs' members and NAPCRG. Those with pending grant applications have been deprived of the opportunity to compete for funding that could support their important work. *See e.g.*, Bass Decl. ¶¶ 11–14; Katz Decl. ¶¶ 8–14. Some have wasted hundreds of hours preparing applications that will never be reviewed or granted, at the expense of pursuing other funding or other projects. *See, e.g.*, Bass Decl. ¶¶ 13–14; Schulson Decl. ¶ 9; Bolen Decl. ¶ 7. Others have embarked on projects that they intended to carry over multiple years, but that they will have to essentially abandon, unless AHRQ funding restarts soon. *See, e.g.*, Linder Decl. ¶ 7. Early-career members of each organization are facing significant setbacks in their career development—some even having to take on different responsibilities or abandon plans to build a research career. *See, e.g.*, Schulson Decl. ¶¶ 8–9; Rodriguez Decl. ¶ 7; Dolber Decl. ¶ 7. Those kinds of cuts to essential programs and research qualify as irreparable harm. *See Nat'l Fair Housing All.*, 2025 WL 2105567, at *11.

In addition, absent this Court's intervention, Plaintiffs' members will suffer irreparable injury because they will be forever unable to compete for fiscal year 2025 funding. Tens of millions

of dollars that Congress instructed AHRQ to spend on grants expire on September 30, 2025. *See* FY 2025 Continuing Resolution § 1106, 139 Stat. at 12. Unless this Court grants injunctive relief, orders Defendants to restart AHRQ's grantmaking program, and holds open the period of obligation for those funds, those funds will expire without Plaintiffs' members ever having a meaningful chance to compete for them. *Cf. Child Trends, Inc.*, 2025 WL 1651148, at *10 (concluding that plaintiffs had not established irreparable harm only because expiration of funds was "far enough away" that loss of opportunity to compete was not "imminent"). Where there is "no do-over and no redress," harm is irreparable and injunctive relief is warranted. *League of Women Voters of N.C.*, 769 F.3d at 247.

## III.    The balance of the equities and the public interest support a preliminary injunction.

The final two factors of the preliminary injunction analysis—the balance of the equities and the public interest—support granting Plaintiffs' motion for preliminary relief.

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks omitted). Defendants cannot be injured by an order requiring them to conduct grant review mandated by statute and regulation. Nor do they suffer harm from needing to obligate money for the purposes Congress designated. *See Cabrera v. U.S. Dep't of Lab.*, No. 25-cv-1909-DLF, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025). There is likewise "generally no public interest in the perpetuation of an unlawful agency action." *Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *37 (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Rather, the "public undoubtedly has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020) (internal quotation marks omitted). Because Plaintiffs have established that Defendants' halting of AHRQ grantmaking is likely unlawful, the balance of equities and public interest favor granting relief.

In addition, there is substantial public interest in continuing to support AHRQ grants. AHRQ is the only federal agency with a specific focus on funding research into patient safety, healthcare quality, and other important, cross-cutting issues related to the provision of healthcare. *See* AHRQ, *AHRQ: A Brief History*.[11] Even just a handful of applications submitted by Plaintiffs' members demonstrate the scope of what is being lost—including research that would seek to better engage hospitalized patients in making decisions about their care; that would reduce costly and devastating diagnostic errors; and that would develop methods to decrease antibiotic use and reduce antibiotic-resistant infections. *See* Schnipper Decl. ¶ 4; Schulson Decl. ¶ 4; Linder Decl. ¶ 4. Without staff to review applications, the agency also abandoned a planned investment of up to $375 million in an innovative, state-based program to improve care delivery, with a particular focus on improving access and outcomes for underserved populations. *See* John Doe #2 Decl. ¶ 14; Bolen Decl. ¶ 7; AHRQ, *Press Release: AHRQ Announces Historic Funding Opportunities to Establish State-based Solutions to Accelerate Health Care Improvement* (Sept. 9, 2024).[12]

The public interest is served by enabling those or similar projects to continue, thus producing research that can be leveraged to improve the care that patients receive. As Judge Boardman recently recognized in a case about the halting of AmeriCorps grants, the balance of the equities and public interest "heavily favor[]" injunctive relief requiring the government to spend public funds allocated by Congress to carry out important public purposes. *See Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *38. "If, at the end of this litigation, the government is vindicated and cannot recover the funds that Congress appropriated for" AHRQ grants, "the funds will have been spent on improving the lives of everyday Americans," as Congress intended. *Id.*

---

[11] https://www.ahrq.gov/cpi/about/brief-history.html.

[12] https://www.ahrq.gov/news/newsroom/press-releases/state-based-health-extension-cooperatives.html.

IV.    **The Court should grant the relief requested in this motion.**

Plaintiffs request an order (1) preliminarily enjoining Defendants to restart the review of AHRQ grant applications and the award of grants; (2) requiring that Defendants make all fiscal year 2025 grant funds available for obligation; and (3) extending the date that AHRQ's fiscal year 2025 appropriated funds are available for obligation throughout the pendency of this litigation. That relief is appropriate and necessary to prevent the irreparable harm described above.

To begin, Plaintiffs cannot secure complete relief without an order requiring AHRQ to comply with its statutory obligations to process grant applications and spend funds that Congress appropriated for grants. Because Plaintiffs bring this case under the APA and ask the Court to "set aside" Defendants' action halting its grantmaking program, the appropriate relief in this case will undo that action in its entirety. *See Guilford Coll. v. Wolf*, No. 1:18-cv-891, 2020 WL 586672, at *10 (M.D.N.C. Feb. 6, 2020) ("[T]he APA itself instructs courts to 'hold unlawful and set aside' agency actions found to be invalid." (quoting 5 U.S.C. § 706(2)). That's because, where some discrete agency action applies "across the board[,]" a "person adversely affected" can challenge it under the APA and relief could reach the "entire" program. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990). That type of relief is especially appropriate here, as the Court cannot remedy Defendants' legal violations without an order requiring them to restart the grantmaking processes required by statute and make all appropriated funds available for obligation.

There is also no sensible way to limit relief to Plaintiffs or their members. AHRQ applicants are competing for a limited pool of funds. And "HHS policy requires maximum competition for discretionary grants to the greatest extent possible." HHS Grants Policy Statement (Apr. 16, 2025).[13] As a result, there is no viable mechanism for providing relief just to a subset of applicants.

---

[13] https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-april-2025.pdf.

*See Nat'l Fair Housing All.*, 2025 WL 2105567, at *13 n.5 (recognizing that the court "is left providing a remedy with incidental benefits to applicants not before the court" because the agency "cannot peel off" only applications from Plaintiffs' members).

In addition, given the upcoming expiration of fiscal year 2025 funds on September 30, the Court should exercise its equitable authority to extend the period of availability of those appropriations during the pendency of this litigation. This Court has the power to "order that funds be held available beyond their statutory lapse date if equity so requires.'" *Connecticut v. Schweiker*, 684 F.2d 979, 997 (D.C. Cir. 1982) (citation omitted); *see also Defy Ventures, Inc. v. U.S. Small Bus. Admin.*, 469 F. Supp. 3d 459, 478 (D. Md. 2020) ("agree[ing]" that the court has authority "to extend the deadline to apply for" government loan program beyond expiration of appropriation). In particular, "if a case is timely filed"—before the appropriation lapses—"a court may grant a preliminary injunction so that funds from an appropriation that is about to lapse will remain available pending a dispute's resolution." *City of Houston v. HUD*, 24 F.3d 1421, 1427 (D.C. Cir. 1994); *see Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024) (recognizing that, "in the appropriations context, Congress has expressly authorized courts to suspend the lapse of budget authority while lawsuits play out"). Such an order is necessary here to ensure that AHRQ's unobligated 2025 appropriations do not lapse before Defendants can comply with any order requiring them to restart grantmaking and spend the relevant funds. And it would ensure that Defendants are not rewarded by in effect running out the clock on Congress's funding directives.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction as set forth in the proposed order filed concurrently herewith.

Dated: August 21, 2025                    Respectfully submitted,

                                          _/s/ Stephanie B. Garlock_
                                          Stephanie B. Garlock (D. Md. Bar No. 31594)
                                          Allison M. Zieve
                                          (*pro hac vice* application forthcoming)
                                          Cormac A. Early
                                          (*pro hac vice* application forthcoming)
                                          Public Citizen Litigation Group
                                          1600 20th Street NW
                                          Washington, DC 20009
                                          (202) 588-1000

                                          *Attorneys for Plaintiffs*