# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SOCIETY OF GENERAL INTERNAL
MEDICINE & NORTH AMERICAN
PRIMARY CARE RESEARCH
GROUP, et al.,
  *Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., et al.,
  *Defendants*.

Case No.

**DECLARATION OF JOHN DOE #1**

I, John Doe #1, declare as follows:

  1. This declaration is based on my personal knowledge and information that has been shared with me through conversations with my colleagues.

  2. I was until July 14, 2025, an employee of Defendant U.S. Department of Health and Human Services (HHS) in the Agency for Healthcare Research and Quality (AHRQ). I am submitting this declaration under a pseudonym and have withheld certain identifying details because I am concerned about potential retaliation.

  3. In the early morning of April 1, 2025, I received an email at my AHRQ email address from OHRCorrespondence@hhs.gov that stated that I was being affected by a reduction in force (RIF) action. The attached Notice stated, among other information, that my separation date from AHRQ would be June 2, 2025. The Notice further stated that "[t]his RIF is necessary to reshape the workforce of HHS" and referenced Executive Order 14210. And it stated that the RIF action was being taken "…because your duties have been identified as either unnecessary or

1

virtually identical to duties performed elsewhere in the agency." There was no language related to a transfer of function in the RIF notice.

4. The email notifying me of the RIF also stated that, after I received the notice, I would be placed on administrative leave and would no longer have building access beginning Tuesday, April 1, 2025. Also, on April 1, 2025 at some point approximately between 11:00 A.M. and 12:00 P.M. Eastern Time, HHS terminated access to my AHRQ laptop and phone, which meant I could not access email, files, the HHS or AHRQ intranet, or any system that required use of my HHS identification card. I never received any formal notification from HHS that I would not have access to AHRQ or HHS electronic systems.

5. As a result of a preliminary injunction entered in other litigation, I received notice from HHS in May that my separation date from the agency had been postponed. After the Supreme Court stayed that preliminary injunction, I had seen public reports and statements from HHS that affected employees, including those at AHRQ like me, were officially separated from HHS at the close of business on July 14, 2025.

6. Until I was placed on administrative leave, I worked in AHRQ's Office of Extramural Research, Education and Priority Populations (OEREP), an office that played a key role in AHRQ's grantmaking process for AHRQ's extramural research. It is my understanding, based on conversations with my colleagues since April 1, that nearly all the staff of OEREP—other than the director of the office and the few staff who were Commissioned Corps of the U.S. Public Health Service—received the same RIF notice (with the only differences being individualized information such as name and personal and position-specific data), were on administrative leave starting on April 1, and officially separated from HHS on July 14. Based on

reports from colleagues, and email communications, the OEREP director has remained in the same position following the abolishment of all competitive areas of OEREP.

7. It is likewise my understanding, again based on conversations with my colleagues, that all or nearly all of the employees of other AHRQ offices with central roles in the AHRQ grantmaking process were similarly sent RIF notices and have now been separated from the agency. Those offices include the Division of Grants Management (DGM) and the Division of Financial Management (DFM) in the Office of Management Services, as well as the Office of the Director.

8. Through my work with OEREP, I am familiar with the processes AHRQ uses to develop funding announcements (typically referred to as NOFOs), publish and announce funding announcements, review grant applications, and award grants to fund extramural research—that is, research conducted by researchers at universities, academic medical centers, and other institutions and organizations based outside of the agency but funded through AHRQ grants and cooperative agreements.

9. Until April 1, 2025, the staff at OEREP were responsible for critical functions for AHRQ's extramural research. OEREP staff managed AHRQ's research training programs, including individual fellowships, dissertation grants, and institutional training grants. OEREP staff also managed AHRQ's conference grant program and managed research grants, including some funded by the Patient-Centered Outcomes Research Trust Fund.

10. OEREP staff also managed research grants and conducted health services research on priority populations—including women, children, minority groups, and low-income groups. AHRQ is required by statute to have an office focused on these and other "priority populations"

3

and to ensure that the agency's research portfolio reflects these priorities and adequately addresses the health care needs of groups traditionally underserved by the health care system.

11. OEREP staff played a key role in many steps that led to new grant awards. From the start of the process, when project officers in other parts of AHRQ had a specific research objective that they wanted to fund through grants, they would work with OEREP staff to draft the funding announcement and seek the necessary approvals. OEREP staff were then responsible for submitting notices of funding opportunities for publication in the NIH Guide for Grants and Contracts, also published on grants.gov. OEREP staff also ensured that all notices of funding opportunities announcements and grant policy notices complied with HHS and general federal grantmaking requirements before publication

12. While those notices of funding opportunities were open and while applications were later under review, OEREP and DGM staff served as key points of contact for interested applicants to ask a range of questions about grant applications.

13. For the approximately 700 grant applications AHRQ received each year, staff at OEREP managed the receipt and referral process—the first and crucial stage of the grant application review cycle.

14. During AHRQ's receipt and referral process, OEREP staff reviewed incoming grant applications to ensure they satisfied the basic requirements of the funding announcement, were complete, and were consistent with other compliance guidelines. Eligible applications were assigned to the appropriate Center for programmatic management and to the appropriate study section for peer review. OEREP's work also included providing training to AHRQ staff and providing technical assistance to researchers. Among other things, OEREP staff provided training

to agency staff on human subjects protections requirements and oversaw compliance with human subjects protections requirements for extramural research grants

15. In the AHRQ peer review process, all compliant grant applications were assigned to one of five study sections (or to a special emphasis panel (SEP) if they did not fit with any of the five sections): Healthcare Effectiveness and Outcomes Research (HEOR), Healthcare Safety and Quality Improvement (HSQR), Healthcare Systems & Value Research (HSVR), Healthcare Research Training (HCRT), and Healthcare Information Technology Research (HITR). Each of the sections typically met three times a year (HCRT typically met 4 times a year) and SEPs met on an as needed basis.

16. OEREP staff coordinated the scientific peer review process by recruiting and managing the panels of external scientific expert reviewers for each study section and, when needed, SEPs; drafting the required notices of the study section meetings in the Federal Register; and serving as the point of contact listed in the notices for any questions. During the scientific review meetings, OEREP staff also provided oversight, ensured compliance with applicable regulations, and later compiled summary statements of the peer review of each grant application.

17. During the peer review process, grant applications discussed would receive an impact score. When applicable, applications were also assigned a percentile rank relative to other applications reviewed by the same scientific review group at 3 consecutive meetings. During this process, OEREP staff compiled the scores and reviewers' critiques. OEREP staff also generated a summary statement that includes the aggregate score, percentile (as applicable), compiled reviewers' critiques and a summary or consensus remarks. This information was used to produce materials that the agency considered to make its decision, including a funding recommendation memo, the summary statement, applicant responses, and the underlying grant application.

18. Following the peer review meetings, OEREP staff coordinated a funding meeting. To prepare for those meetings, OEREP staff would generate a ranked list and agenda based on the application type and application competitive range. Funding meetings typically occured three times a year, with special funding meetings on an as needed basis. At funding meetings, Program Officers present recommended applications based on the ranking list and senior leadership make recommendations recorded in a database. The compiled recommendations are shared with the AHRQ Director for final approval. Funding decisions usually fall into one of three categories: Approved, Disapproved or Approved but Unfunded. AHRQ can fund out of rank order.

19. Once AHRQ had decided which grants to award, our colleagues at DGM would then take over managing the process for issuing the notice of award (NoA) and processing payments. Other offices subject to the RIF played a role in this award process. For example, the Division of Financial Management's staff would have already ensured that funding was available for awards. Together, these staff ensured that grant applications were in compliance with applicable cost principles, regulations, and grants management policies.

20. At the time OEREP and DGM staff were put on administrative leave, my colleagues and I were not aware of any plan to continue managing new grant applications. As far as I know, no plan was put in place or implemented to provide updated contact information to applicants or grantees who had been working with OEREP and other staff subject to the RIF. Nor were plans put into place for how to continue moving grant applications through the receipt and referral process, coordinate the next round of peer review meetings, or generally assess the need to award new or continuation grants in the future.

21. At the time that I was placed on administrative leave, staff at OEREP were working on the May and June peer review meetings and planning to publish notices in the Federal Register

that would allow the agency to hold these meetings to review new grant applications. I have checked the Federal Register and have not seen any notices indicating that the agency announced those meetings. Based on communication with colleagues, I learned that the meetings were not held due to the RIF.

22. I believe that it is not possible for AHRQ to fund any new grants without the separated OEREP, DGM, and other Divisions and Offices covered by the RIF. Staff in OEREP and DGM played the key roles in ensuring that the research AHRQ funds complies with all required policies, meets the requirements of the specific funding announcement, is scientifically rigorous, and is consistent with agency priorities. Without OEREP and DGM staff, AHRQ is not able to successfully develop and submit for publication funding announcements and related grant policy notices, conduct the first line review of all grant applications, hold peer review study section meetings and manage all the related activities, manage research and training program grants, or provide a wide array of technical assistance to researchers and institutions. AHRQ is also not able to successfully train program officers on human subject protections, grant policies, and other related issues.

23. Without the separated staff in DGM, I believe it is not possible for AHRQ to conduct any activities that require issuing awards, sending payments, monitoring institutions' and organizations' use of grant funds, and managing the closeout process. Without the separated staff in the Division of Financial Management, I do not believe it is possible for AHRQ to conduct any activities that require managing appropriations law compliance, handling payment processing, certifying availability of funding for grant awards and managing the availability and allocation of grant funds within the agency's budget.

24. Overall, based on the HHS April 1 RIF and my knowledge of AHRQ's organization and operations, the elimination of all essential competitive areas that comprise AHRQ's grant program, without any transfer of function language noted in the RIF notice, appears to have rendered AHRQ unable to continue operating its extramural grant program.

Executed on August 19, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ John Doe #1
John Doe #1