**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SOCIETY OF GENERAL INTERNAL MEDICINE, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., ET AL., <br><br> Defendants. | Case No.: 8:25-cv-02751-BAH |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

  A.  The Statutory and Regulatory Framework Governing AHRQ ............................ 3

  B.  The Instant Case................................................................................................... 5

ARGUMENT ................................................................................................................. 6

  I.  Legal Standard for a Preliminary Injunction ..................................................... 6

  II.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.................... 7

      A. Plaintiffs' Claims Fail Because They Do Not Seek Judicial Review of a
      Discrete and Final Agency Action........................................................................ 7

          1.  Plaintiffs do not challenge a *discrete* agency action
          subject to APA review ............................................................................ 7

          2.  Plaintiffs do not challenge a *final* agency action
          subject to APA review .......................................................................... 11

      B.  Plaintiffs Impermissibly Seek to Compel Agency Action
      That AHRQ Is Not Required to Take .................................................................. 12

          1.  Neither the Public Health Service Act nor AHRQ's regulations
          require AHRQ to award new grants, evaluate grant applications
          (let alone on Plaintiffs' desired timeline), or allocate a certain
          amount of funds toward grant awards............................................... 14

          2.  The Appropriations Acts do not require that AHRQ allocate all funds
          that have been appropriated to it in lump-sum, let alone that it allocate
          such funds towards grantmaking ...................................................... 17

          3.  The Impoundment Control Act does not compel AHRQ to make
          appropriated funds available in the manner and at the pace that
          Plaintiffs are asking the Court to order here..................................... 19

          4.  The grant terminations were consistent with constitutional separation of
          powers and were not ultra vires. ...................................................... 25

C.  The Actions Plaintiffs Challenge Are Committed to Agency Discretion by Law
and Therefore Not Subject to APA Review ................................................................... 21

D.  Plaintiffs Cannot Rely Upon the Impoundment Control Act
to Support Its APA Contrary-to-Law Claim ................................................................. 23

    1.  The Impoundment Control Act precludes judicial review
under the APA ................................................................................................................. 23

    2.  Plaintiffs are not within the zone of interests that the
Impoundment Control Act is meant to protect ................................................... 25

III.  Plaintiffs Have Not Demonstrated Irreparable Harm ......................................... 28

IV.  The Balance of Equities Does Not Favor Plaintiffs ............................................ 29

V.  The Court Should Require Plaintiffs to Post Security ....................................... 30

CONCLUSION ............................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ......................................................... 18

*Air Courier Conference of Am. v. American Postal Workers Union*,
    498 U.S. 517 (1991) .................................................................................. 25

*Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484 (5th Cir. 2014) ...................... 9

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................ 11, 12

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984)................................................ 23, 24

*Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631 (2005)................................................. 19

*Child Trends, Inc. v. U.S. Dep't of Educ.*, Case No. 25-cv-1154-BAH,
    2025 WL 2379688 (D. Md. Aug. 15, 2025)........................................................ 10, 25

*City of New York v. U.S. Dep't of Defense*, 913 F.3d 423 (4th Cir. 2019) .................................... 8

*Clarke v. Securities Industry Assn.*, 479 U.S. 388 (1987) ........................................... 26

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024) .......... 17, 18

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017)................................................... 28

*Food & Drug Admin. v. R.J. Reynolds Vapor Co.*, 145 S.Ct. 1984 (2025) ................................ 26

*Frazier v. Prince George's Cnty.*, 86 F.4th 537 (4th Cir. 2023) .................................... 7

*Global Health Council v. Trump*, App. No. 25-5097,
    2025 WL 2480618 (D.C. Cir. Aug. 28, 2025)........................................................ 24, 25

*Gonzalez v. Cuccinelli*, 985 F.3d 366 (4th Cir. 2021) .......................................... 15, 16

*James A. Merritt & Sons v. Marsh*, 791 F.2d 328 (4th Cir. 1986) .............................. 29

*Jake's Fireworks Inc. v. U.S. Consumer Product Safety Commission*,
    498 F. Supp. 3d 792 (D. Md. 2020) ............................................................ 12

*Kane Ctny. v. United States*, 127 Fed. Cl. 696, 697 (Ct. Cl. 2016) ............................ 17

*Lincoln v. Vigil*, 508 U.S. 182 (1993) ...................................................... 19, 22

*Lovo v. Miller*, 107 F.4th 199 (4th Cir. 2024).................................................................... 13, 15, 16

*Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1990)............................................................... 7, 8, 13

*Martynenko v. Donis*, Case No. 24-cv-02218-LKG,
    2025 WL 1685667 (D. Md. June 16, 2025) .................................................................. 17

*Mayor & City Council of Baltimore v. CFPB*, Case No. 25-cv-458-MJM,
    2025 WL 814500 (D. Md. Mar. 14, 2025) .................................................................... 12

*Nat'l Inst. of Health v. Am. Public Health Ass'n*, 606 U.S. __,
    2025 WL 2415669 (Aug. 21, 2025) .............................................................................. 30

*Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Defense*,
    990 F.3d 834 (4th Cir. 2021)........................................................................................ 7

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................................. 7

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ................................... *passim*

*People for the Ethical Treatment of Animals v. Tabak*,
    662 F. Supp. 3d 581 (D. Md. 2023) ............................................................................. 10

*Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011) ...................................... 29

*Public Citizen v. Stockman*, 528 F. Supp. 824 (D.C.C. 1981) ...................................... 27

*Sackett v. EPA*, 566 U.S. 120 (2012) .............................................................................. 23-24

*Tawah v. Noem*, Case No. 24-cv-3469-DKC,
    2025 WL 2021661 (D. Md. July 18, 2025) .................................................................. 16-17

*Thompson v. North Am. Stainless, LP*, 562 U.S. 170 (2011)......................................... 26

*Train v. City of New York*, 420 U.S. 35 (1975).............................................................. 17

*Trump v. Sierra Club*, 140 S. Ct. 1 (2019)..................................................................... 24-25

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ..................................................... 6, 28, 29

**Statutes:**

Impoundment Control Act:
    2 U.S.C. § 682(3) ............................................................................ 21
    2 U.S.C. § 683(a) ....................................................................... 20, 26
    2 U.S.C. § 683(b) ........................................................................... 21
    2 U.S.C. § 684(a) ........................................................................... 26
    2 U.S.C. § 686(a) ....................................................................... 20, 21
    2 U.S.C. § 687 ........................................................................ 24, 26, 27

Administrative Procedure Act (APA):
    5 U.S.C. § 551(13) ............................................................................ 7
    5 U.S.C. § 701(a)(1) ........................................................................ 23
    5 U.S.C. § 701(a)(2) ........................................................................ 22
    5 U.S.C. § 702 .............................................................................. 13
    5 U.S.C. § 704 ........................................................................... 7, 13
    5 U.S.C. § 706(1) .............................................................. 6, 12, 13, 15
    5 U.S.C. § 706(2) ................................................................. 6, 12, 27

Public Health Service Act:
    42 U.S.C. § 299a(b)(1) ...................................................................... 4
    42 U.S.C. § 299b ......................................................................... 3, 14
    42 U.S.C. § 299b-1 ......................................................................... 14
    42 U.S.C. § 299b-34(a) ................................................................... 4, 14
    42 U.S.C. § 299b-36(e) ..................................................................... 14
    42 U.S.C. § 299b-37(e) ..................................................................... 14
    42 U.S.C. § 299c-1(a)(1) ............................................................... 15, 16

Appropriations Acts:
    Further Consolidated Appropriations Act of 2024,
      Pub. L. No. 118-47, 138 Stat. 612 ..................................................... 4, 5, 17
    Full-Year Continuing Appropriations and Extensions Act of 2025,
      Pub. L. No. 119-4, 139 Stat. 9 ......................................................... 5, 17

**Regulations:**

42 C.F.R. § 67.10(a) ............................................................................ 4

42 C.F.R. § 67.14(a) ......................................................................... 4, 14

42 C.F.R. § 67.15(a) ....................................................................... 4, 15, 16

42 C.F.R. § 67.16 .......................................................................... 4, 15, 16

42 C.F.R. § 67.17(a) ................................................................. 2, 4, 14, 16, 22

**Rules:**

Fed. R. Civ. P. 65(c)  ................................................................................................ 30

**Other Authorities:**

GAO, B-337203, *Department of Health and Human Services—*
*National Institutes of Health—Application of Impoundment Control Act*
*to Availability of Funds for Grants* (Aug. 5, 2025)  .................................................... 28

GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2, § B.8, GAO-16-464SP
    (Washington, D.C.: Mar. 2016), *available at*
    https://www.gao.gov/legal/appropriations-law/red-book (last visited Sept. 4, 2025)..............20

Defendants, by and through undersigned counsel, hereby submit this Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction (ECF No. 4; the "Motion").

## INTRODUCTION[1]

The Agency for Healthcare Research and Quality (AHRQ), a component agency of the Department of Health and Human Services (HHS), is charged with improving the quality and safety of healthcare delivery. In furtherance of its mission, AHRQ supports health services research through grant funding (among other things). Congress appropriated $369 million to AHRQ for fiscal year 2025. This appropriation was a lump-sum that could be used for any purpose in furtherance of AHRQ's mission.

Plaintiffs are organizations whose members (or in the case of one Plaintiff, itself) have grant applications pending with AHRQ and hope to receive a portion of the lump-sum funds appropriated to AHRQ. Plaintiffs allege that, while AHRQ has allocated $55 million in grants for fiscal year 2025, AHRQ has stopped all grant-making activities over the past two months due to a mid-July reduction-in-force (the "RIF") of many of the AHRQ employees responsible for grant-making. Plaintiffs allege that they are being harmed by the lost opportunity to compete for grants funded by the fiscal year 2025 appropriations, which (at least in the normal course) are scheduled to lapse on September 30, 2025.

Plaintiffs bring five claims, all under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA"), challenging AHRQ's alleged cessation of grant-making activity. In their Motion, Plaintiffs ask this Court to order preliminary injunctive relief requiring Defendants to "restart the review of [AHRQ] grant applications and the award of grants using AHRQ's

---

[1] Capitalized terms used but not defined in this Introduction shall have the meaning ascribed to them in the Background section of this brief. Citations herein to "Mem." refer to the Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, ECF No. 4-1.

appropriated funds" and "to make available for obligation all funds that were appropriated to AHRQ for grantmaking in fiscal year 2025." ECF No. 4-14.

This Court should deny the Motion because Plaintiffs cannot show that they are likely to succeed on any of their APA claims. First, Plaintiffs do not identify a discrete and final agency action subject to judicial review under the APA. Rather, they launch a prohibited programmatic attack against the agency for alleged failures in the wholesale operation of its grant program. Furthermore, no final decision regarding the grant program has been made; rather, the agency is currently evaluating options on how to best move forward.

Second, Plaintiffs improperly ask this Court to compel agency action that AHRQ is not legally required to take. Outside of general statutory requirements under the Public Health Service Act requiring AHRQ to fund grants in certain areas of research—which are not alleged to have been violated, AHRQ has discretion in determining whether and when to award any grant. Its regulations expressly provide:

> Within the limits of available funds, the Administrator **may** award grants to those applicants whose projects are being considered for funding, which **in the judgment of the Administrator**, will promote best the purposes of Title IX of the PHS Act . . . , AHCPR priorities, and the regulations of this subpart.

42 C.F.R. § 67.17(a). In fact, Congress did not restrict the use of funds appropriated to AHRQ in any way (for example, by requiring that any specific amount be used to fund grants), nor did Congress require—via language in the Appropriations Acts or the Public Health Service Act—that AHRQ allocate the entirety of the appropriated funds in any given fiscal year. Relatedly, the lump-sum funding decisions that Plaintiffs challenge are committed to agency discretion by law and therefore not subject to judicial review under the APA.

Furthermore, Plaintiffs cannot use alleged violations of the Impoundment Control Act, 2 U.S.C. § 681 *et seq.* (the "ICA"), to support their APA contrary-to-law claim, because the ICA

precludes judicial review, and Plaintiffs are not within the zone of interests that the ICA was intended to protect.  Even if Plaintiffs could assert an APA cause of action based on alleged violations of the ICA, the ICA does not require AHRQ to make the funds available in the manner and at the pace that Plaintiffs ask this Court to order.

Even if Plaintiffs could show a likelihood of success on the merits, their Motion should be denied because they do not satisfy the other elements of a preliminary injunction.  Plaintiffs do not establish irreparable harm in the absence of emergency relief, and the balance of equities does not weigh in Plaintiffs' favor.

For these reasons and those discussed below, Defendants respectfully request that the Motion be denied.

## BACKGROUND

A.    <u>The Statutory and Regulatory Framework Governing AHRQ</u>

AHRQ, a component agency of HHS, was established in 1999 pursuant to title IX of the Public Health Service Act, 42 U.S.C. § 299 *et seq.*  AHRQ's mission is "to enhance the quality, appropriateness, and effectiveness of health services, and access to such services, through the establishment of a broad base of scientific research and through the promotion of improvements in clinical and health system practices, including the prevention of diseases and other health conditions."  *Id.* § 299(b).  To fulfill its mission, AHRQ conducts and supports "(1) research that develops and presents scientific evidence regarding all aspects of health care" (including in certain specified areas); "(2) the synthesis and dissemination of available scientific evidence"; and "(3) initiatives to advance private and public efforts to improve health care quality."  *Id.*

The Public Health Service Act authorizes—and with respect to certain very specific areas of health services research, requires—AHRQ's Director to provide grants in furtherance of these

goals. *E.g.*, *id.* § 299a(b)(1) ("The Director *may* provide training grants in the field of health services research . . .") (emphasis added); *id.* § 299b-34(a) ("The Director . . . *shall* award—(1) technical assistance grants or contracts to eligible entities to provide technical support to institutions that deliver heath care . . . ; and (2) implementation grants or contracts to eligible entities to implement the models and practices described under paragraph (1).") (emphasis added).

AHRQ's grantmaking is governed by a set of regulations found at 42 C.F.R. § 67.10 *et seq.* *See* 42 C.F.R. § 67.10(a). While AHRQ must abide by any applicable statutory mandates, AHRQ's regulations confer nearly unlimited discretion upon the Administrator of AHRQ in determining whether to award any grant, providing:

> Within the limits of available funds, the Administrator *may* award grants to those applicants whose projects are being considered for funding, which *in the judgment of the Administrator*, will promote best the purposes of Title IX of the PHS Act . . . , AHCPR priorities, and the regulations of this subpart.

*Id.* § 67.17(a) (emphasis added). There are no statutory or regulatory requirements regarding the timing for awarding grants, nor how much money AHRQ must put towards grant funding.

With respect to grant applications, the regulations provide that "[t]o apply for a grant, an entity or individual must submit an application in the form and at the time that the Administrator requires." *Id.* § 67.14(a). The regulations provide that in awarding grants, AHRQ must follow certain prescribed processes, including a peer review process. *Id.* § 67.15(a). After undergoing peer review, grant applications that are "recommended for further consideration" are evaluated by the Administrator, who considers certain specified factors and then "shall: give consideration for funding, defer for a later decision, pending receipt of additional information, or give no further consideration for funding, to any application for a grant under this subpart." *Id.* § 67.16.

In the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 (the "2024 Appropriations Act"), Congress appropriated a lump-sum of $369,000,000 to AHRQ "[f]or

carrying out titles III and IX of the PHS Act, part A of title XI of the Social Security Act, and section 1013 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003." 2024 Appropriations Act, 138 Stat. 460, 661-62. In the Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4 (the "2025 Continuing Resolution," and together with the 2024 Appropriations Act, the "Appropriations Acts"), Congress continued funding AHRQ at the same level for fiscal year 2025. 2025 Continuing Resolution, 139 Stat. 9, 10-11, § 1101(a)(8).

## B.    The Instant Case

President Donald J. Trump became President of the United States on January 20, 2025. Since that date, there has been significant restructuring at many federal agencies, including AHRQ. On July 14, 2025, many AHRQ employees were let go via a reduction-in-force (the "RIF"). The legality of the RIF is not at issue in this case.

To date, none of the grants awarded by AHRQ prior to the change in Administration have been terminated. According to Plaintiffs' own allegations, AHRQ has allocated approximately $55 million in fiscal year 2025 on grants. Mem. at 8. Plaintiffs further acknowledge that grantmaking activities were ongoing at the agency until at least mid-July, as employees subject to the RIF continued to "process non-competing applications for continuation awards for existing grantees" until their separation date on July 14, 2025. ECF No. 1 (Complaint) ¶ 33. However, Plaintiffs allege that AHRQ has not approved any *new* grants since April 1, 2025. *Id.* ¶ 33. The declaration of a former AHRQ employee submitted by Plaintiffs states that AHRQ has "received approval from HHS to outsource some of the work on its contracts to other parts of HHS with experience managing the contracting process," and that "[a]s a result, some AHRQ initiatives supported by contracts are now moving forward." ECF No. 4-4 (Exhibit 2, Declaration of John Doe #2) ¶ 17. However, the former employee states that "as of the time I left the agency, I was

not aware of any similar plan to outsource AHRQ's grantmaking functions to other parts of HHS. Instead, the grantmaking process at AHRQ has halted." *Id.* ¶ 18.

On August 21, 2025, Plaintiffs filed the instant Complaint for Declaratory and Injunctive Relief, ECF No. 1 (the "Complaint" or "Compl."), asserting five APA causes of action. In Counts I-III, Plaintiffs claim that the alleged cessation of AHRQ's grant program violates the Public Health Service Act and AHRQ regulations (Count I), the Appropriations Acts (Count II), and the ICA (Count III), and is thus contrary to law under APA § 706(2)(A). *Id.* ¶¶ 42-54. In Count IV, Plaintiffs claim that the same actions are arbitrary and capricious under APA § 706(2)(A). *Id.* ¶¶ 55-57. In Count V, Plaintiffs claim that the same actions constitute agency action unlawfully withheld, which this Court should therefore compel under APA § 706(1). *Id.* ¶¶ 58-61.

In conjunction with filing the Complaint, Plaintiffs filed the instant Motion, which asks this Court to enter a preliminary injunction requiring Defendants "to restart the review of [AHRQ's] grant applications and the award of grants using AHRQ's appropriated funds"; "to make available for obligation all funds that were appropriated to AHRQ for grantmaking in fiscal year 2025"; and to extend the September 30, 2025 deadline for AHRQ to obligate funds for grants "throughout the pendency of this litigation." ECF No. 4-14 (proposed order).

## ARGUMENT

## I.     <u>Legal Standard for a Preliminary Injunction</u>

A preliminary injunction is "extraordinary" relief that may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). Plaintiffs must satisfy four elements to show entitlement to a preliminary injunction, including: first, that they are likely to succeed on the merits; second, that they will likely experience irreparable harm unless the court grants relief; third, that the balance of equities

weighs in their favor; and fourth that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023). The last two factors – balance of equities and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs fail to meet their burden at each step.

## II.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

### A.    Plaintiffs' Claims Fail Because They Do Not Seek Judicial Review of a Discrete and Final Agency Action.

The APA limits judicial review to "final agency action." 5 U.S.C. § 704. Final agency action is a term of art involving two components—agency action and finality of agency action— each of which must be satisfied in order for a district court to have subject matter jurisdiction over a plaintiff's APA claim challenging agency conduct. *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Defense*, 990 F.3d 834, 839 (4th Cir. 2021) ("each of the two components—agency action and finality of agency action—narrows the scope of judicial review"). Neither jurisdictional requirement is met here.

### 1.    *Plaintiffs do not challenge a* discrete *agency action subject to APA review.*

The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). The Supreme Court has found that these categories of action each "involve circumscribed, discrete agency actions." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004). And a "failure to act" is "properly understood as a failure to take an *agency action*—that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)," which must have "the same characteristic of discreteness shared by all the preceding items." *Id.* at 62-63. In short, "[u]nder the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891

(1990).

The APA's discreteness requirement prohibits "broad programmatic attacks" against an administrative agency for allegedly failing to meet its statutory obligations. *Norton*, 542 U.S. at 64. "General deficiencies in compliance . . . lack the specificity requisite for agency action." *Id.* at 66. Such programmatic challenges belong "in the offices of the Department or the halls of Congress, where programmatic improvements are normally made," not in district court. *Lujan*, 497 U.S. at 891. This distinction preserves fundamental tenets of separation of powers. As the Supreme Court explained in *Norton*,

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. . . . ***The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA***.

542 U.S. at 66-67 (emphasis added). *See also, e.g.*, *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019) (the APA distinguishes between "discrete acts, which are reviewable, and programmatic challenges, which are not" and noting that, otherwise, "courts would be forced to enter a disfavored 'obey the law' injunction, [] or to engage in day-to-day oversight of the executive's administrative practices").

In *Lujan*, for example, the plaintiff sought judicial review of a "land withdrawal review program," claiming that the Bureau of Land Management (BLM) was failing to meet its statutory obligations in reviewing certain land-related applications and classifying public lands. 497 U.S. at 890. The allegations in the complaint described this program as consisting of numerous individual land use decisions. *Id.* (explaining that the challenged "land withdrawal review program extends to, currently at least, 1250 or so individual classification terminations and withdrawal

revocations"). The Supreme Court held that the claims were unreviewable under the APA because the plaintiff failed to plead "an identifiable action or event," explaining that

> the flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.

*Id.* at 893, 899.

The Fifth Circuit's decision in *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484 (5th Cir. 2014), is also instructive. There, a Tribe sought to challenge the approval of all "drilling leases and permits to third parties" on land to which the Tribe asserted title. *Id.* at 486. The Fifth Circuit held that it lacked jurisdiction under the APA to hear such a "blanket challenge to all of the Government's actions with respect to all permits and leases" that was directed at "the way the Government administers these programs and not to a particular and identifiable action taken by the Government." *Id.* at 491-92.

Applying these principles here, Plaintiffs' challenges to the alleged "halting of all grantmaking activity" (Mem. at 14) and the "failure to process, peer review, and evaluate grant applications" writ large (*id.* at 15) must fail. Plaintiffs challenge, and seek to remediate, systematic changes to AHRQ's "grantmaking *apparatus*" and "grantmaking *program.*" *Id.* at 1, 2-5, 6. Plaintiffs' Motion and the declarations submitted in support thereof describe a wholesale program being run by AHRQ rather than an "identifiable event or action" taken by AHRQ that could fall within the APA's purview. *See, e.g.*, Mem. at 2-5; ECF No. 4-3 (Exhibit 1); ECF No. 4-4 (Exhibit 2).[2] Notably, Plaintiffs focus on statistics about the agency's overall grantmaking process and

---

[2] Plaintiffs explain, for example, that "the agency has historically operated a *robust program* of external grantmaking, supporting researchers at universities [and] other institutions seeking to better understand and improve the care that patients receive." Mem. at 1 (emphasis added). The declarations describe the grant review and award processes, noting the "many steps that led to new grant awards." ECF No. 4-3 (Exhibit 1) ¶¶ 8-19; *see also* ECF No. 4-4 (Exhibit

discuss actions taken (or not taken) vis-à-vis individual grant applications only as examples to support their challenges to a broader, systemic failure.[3]  Mem. at 5-10.  For example, Plaintiffs explain that AHRQ is appropriated "nearly $300 million to spend on grants and other external research" (Mem. at 17) and submit a declaration indicating that AHRQ receives "approximately 700 grant applications" each year (ECF No. 4-3, Exhibit 1 ¶ 13).  Plaintiffs further allege that AHRQ "has so far obligated only around $55 million in fiscal year 2025 on grants—less than 40 percent of what it spent out of an identical appropriation last fiscal year."  Mem. at 8.

The relief sought in Plaintiffs' proposed order, ECF No. 4-14, makes the programmatic nature of their claims clear.  Plaintiffs ask this Court to order Defendants "to restart the review of [AHRQ] grant applications and the award of grants using AHRQ's appropriated funds" and "to make available for obligation all funds that were appropriated to AHRQ for grantmaking in fiscal year 2025."  ECF No. 4-14.  The requested relief is not directed at any identifiable action or event[4]; rather, Plaintiffs seek the kind of wholesale improvement of agency operations—*i.e.*, the spending

---

2) ¶ 5 ("AHRQ has historically operated a wide variety of grant programs to fund research related to the agency's mission of promoting the quality and effectiveness of healthcare.").

[3] An APA claim challenging AHRQ's failure to act vis-à-vis a plaintiff's specific grant application would satisfy the APA's discreteness requirement.  *See People for the Ethical Treatment of Animals v. Tabak*, 662 F. Supp. 3d 581, 591 (D. Md. 2023) (cited by Plaintiffs in Mem. at 15; holding that NIH's decision to award a specific grant constitutes final agency action, but that the plaintiff's challenge to "any 'approvals of grants to conduct sepsis experiments on animals since October 23, 2019'" "sweep[s] too broadly" and holding that "as a matter of law, the Court cannot construe a generalized description of a potential course of conduct as a final agency action").

Nevertheless, such a claim would still fail in this case because there is no statute or regulation that requires AHRQ to process grant applications on any particular timeline, such that the Court cannot compel the discretionary pace of AHRQ's grant determinations.  *See supra* at 14-19.  And even if the APA allowed such a claim, the *TRAC* factors would militate against finding the agency's less than two-month pause is unreasonable.  In any event, that is not this case, which alleges a broad programmatic failure on the part of AHRQ.

[4] This case is not like the circumstances before this Court in *Child Trends, Inc. v. U.S. Dep't of Educ.*, which involved APA claims challenging the government's "decision to terminate eighteen of a total of twenty Comprehensive Centers awards and all REL awards."  Case No. 25-cv-1154-BAH, 2025 WL 2379688, at *4, *7 & n.9 (D. Md. Aug. 15, 2025).  Plaintiffs here do not allege that there has been any "decision to terminate" AHRQ's grant program.  To the contrary, they concede that the program continues to exist.  Rather, Plaintiffs take issue with the grant program's operation following the RIF.

of $300 million and the review of 700 grant applications—that is not contemplated or authorized by the APA.  Granting such relief presents a substantial risk that it becomes "the task of the supervising court, rather than the agency, to work out compliance with [AHRQ's] broad statutory mandate." *Norton*, 542 U.S. at 66-67.

> ## 2.    *Plaintiffs do not challenge a <u>final</u> agency action subject to APA review.*

Two conditions must be satisfied for agency action to be "final" within the meaning of the APA.  "First, the action must mark the 'consummation' of the agency's decisionmaking process— it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  The alleged "halting of all AHRQ grantmaking" and "failure to process, peer review, and evaluate grant applications" (Mem. at 14-15) do not meet these conditions of finality.

According to Plaintiffs, the grantmaking activity at AHRQ halted less than two months ago—on July 14, 2025, the date on which the number of grants management staff was reduced. Compl. ¶ 33 ("In the weeks between the April 1 RIF notice and the July 14 separation date, AHRQ required some OMS staff to continue working so that they could process non-competing applications for continuation awards for existing grantees. . . ."); *id.* ¶ 34 ("After the RIF was finalized in mid-July, AHRQ grantmaking ground to a halt.").  Plaintiffs do not allege that these circumstances are permanent; but, rather, that they result from the RIF at the agency—the legality of which is not at issue here.  Plaintiffs point to an email dated July 23, 2025, which in fact suggests the opposite.  It explicitly states that the agency is considering how to move forward and that no decision has been made regarding the grant program:

> We are ***currently*** unable to process grant awards and ***are evaluating options*** for
> our grant program.  With the permanent separation of these staff, FY2025 funding

of non-competing applications is ***uncertain***.

ECF No. 4-7 (Exhibit 5, which attaches the July 23, 2025 email as Exhibit A) (emphasis added). Further, none of AHRQ's awarded grants have been terminated since the change in Administration, and, as Plaintiffs point out, AHRQ requested (and received) the same level of funding for fiscal year 2025, all of which suggest an intention to continue the grant program (albeit perhaps not in the form or on the timeline that Plaintiffs desire).

To the extent there has been any agency decision or action at all, it certainly cannot be characterized as "mark[ing] the 'consummation' of the agency's decisionmaking process," nor have any "rights or obligations [] been determined." *Bennett*, 520 U.S. at 177-78. Accordingly, Plaintiffs' APA claims fail. *See, e.g.*, *Mayor & City Council of Baltimore v. CFPB*, Case No. 25-cv-458-MJM, 2025 WL 814500, at \*11-12 (D. Md. Mar. 14, 2025) ("Plaintiffs fail to make any showing of such a final agency decision. Instead, they challenge a disembodied and unrealized decision to drain the CFPB of its operating funds and reserves, without any evidence that such a decision has been reached at all or generated any legal consequences."); *Jake's Fireworks Inc. v. U.S. Consumer Product Safety Commission*, 498 F. Supp. 3d 792, 803 (D. Md. 2020) (in order to be a final agency action, "there must be no indication that the decision will be revised in the future, that there is an appeal or further review pending, or that there is any entitlement to further action").

### B. Plaintiffs Impermissibly Seek to Compel Agency Action That AHRQ Is Not Required to Take.

Plaintiffs couch Counts I-IV of their Complaint in terms of agency *action* "not in accordance with law" or "arbitrary" or "capricious" under Section 706(2) of the APA. *See* Compl. ¶¶ 42, 46, 49, 55. But where an APA claim involves assertions that a federal agency failed to take certain action mandated by statute, such a claim is properly characterized as a failure to act claim that seeks to "compel agency action unlawfully withheld" under Section 706(1) of the APA. *See*

12

*Norton*, 542 U.S. at 64-65 (noting that the claim in *Lujan* was "couched as unlawful agency 'action'" but "would have fared no better if they had characterized the agency's alleged 'failure to revise land use plans in proper fashion' . . . in terms of 'agency action unlawfully withheld under § 706(1)'").  Here, all of Plaintiffs' claims rest on allegations that Defendants failed to take action mandated by statute, and Plaintiffs ask this Court to compel Defendants to take such action.  *See* Compl. ¶¶ 45, 48, 54, 57, at 20 (Prayer for Relief); ECF No. 4-14 (proposed order).  Accordingly, their claims are properly considered as arising under Section 706(1) of the APA.[5]

Section 706(1) authorizes a court to "compel agency action *unlawfully* withheld."  5 U.S.C. § 706(1) (emphasis added).  In *Norton*, the Supreme Court explained that this means "the only agency action that can be compelled under the APA is action legally *required*"—*i.e.*, "a precise, definite act about which an official has no discretion whatsoever."  542 U.S. at 63 (internal quotations omitted).  *See also Lovo v. Miller*, 107 F.4th 199, 211 (4th Cir. 2024) ("claims to compel agency action are limited to enforcement of a specific, *unequivocal* command, over which an official has no discretion.").  "The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law)."  *Norton*, 542 U.S. at 65.

Here, Plaintiffs ask this Court to order Defendants "to restart the review of [AHRQ] grant applications and the award of grants using AHRQ's appropriated funds" and "to make available for obligation all funds that were appropriated to AHRQ for grantmaking in fiscal year 2025."  ECF No. 4-14 (proposed order granting preliminary injunction).  But none of these tasks are mandated by either statute or regulation, and, as a result, the Court lacks subject matter jurisdiction to compel them under the APA.

---

[5] To be clear, "Sections 702, 704, and 706(1) all insist upon an 'agency action,' either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1))."  *Norton*, 542 U.S. at 62.

1.      *Neither the Public Health Service Act nor AHRQ's regulations require AHRQ to award new grants, evaluate grant applications (let alone on Plaintiffs' desired timeline), or allocate a certain amount of funds toward grant awards.*

Plaintiffs claim that AHRQ is statutorily required to fund grants focused on certain aspects of the healthcare system. *See* Mem. at 16 ("The Public Health Service Act mandates that the agency issue grants related to certain topics crucial to healthcare quality and the healthcare system" and citing 42 U.S.C. §§ 299b, 299b-1(b)(c), 299b-34(a), 299b-36(e), 299b-37(e)).  But a careful review of Plaintiffs' pleadings reveals no allegation that AHRQ is not currently funding such grants and thereby satisfying whatever statutory obligations exist.  Indeed, Plaintiffs readily acknowledge that "the agency has so far obligated only around $55 million in fiscal year 2025 on grants" (Mem. at 8, 17), and there is no evidence (nor even an allegation) that these grants fall short of satisfying the cited statutory requirements.

Instead, Plaintiffs merely allege that AHRQ is no longer awarding **new** grants.  *E.g.*, Mem. at 17.  But nothing in the statutory or regulatory scheme governing AHRQ requires the agency to award new grants, nor are there any requirements that grants be awarded on a particular timeline or in a particular amount.  To the contrary, the regulations provide that grant applications must be submitted "in the form and at the time that the Administrator requires." 42 C.F.R. § 67.14(a).  And the regulations expressly bestow nearly unlimited discretion upon the AHRQ Administrator regarding whether to award a grant, providing:

> Within the limits of available funds, the Administrator **may** award grants to those applicants whose projects are being considered for funding, which **in the judgment of the Administrator**, will promote best the purposes of Title IX of the PHS Act and (if applicable) section 1142 of the Social Security Act, AHCPR priorities, and the regulations of this subpart.

42 C.F.R. § 67.17(a) (emphasis added).  The Fourth Circuit has repeatedly held that similar statutory/regulatory language is not mandatory such that an agency's failure to act is not

reviewable under the APA.  *See Lovo*, 107 F.4th at 212-13 (interpreting regulation providing that "USCIS *may* adjudicate [certain immigration-related] applications," to mean that "whether to adjudicate the [] Applications at all is left to USCIS's discretion"); *Gonzalez v. Cuccinelli*, 985 F.3d 366, 365-71 (4th Cir. 2021) (statutory language providing that "[t]he Secretary *may* grant work authorization . . ." was discretionary, and agency action could not be compelled under APA § 706).  Accordingly, the Court may not compel AHRQ to award new grants because that is not an action that AHRQ is legally required to take.  *Norton*, 542 U.S. at 64.

Similarly, Plaintiffs allege that AHRQ is failing to evaluate pending grant applications via the peer review and evaluation process set forth in AHRQ's governing statutes and regulations. Mem. at 21-22.  The Public Health Service Act provides:  "Appropriate technical and scientific peer review shall be conducted with respect to each application for a grant . . . under this chapter." 42 U.S.C. § 299c-1(a)(1).  AHRQ's implementing regulations provide that "[a]ll applications for support under this subpart will be submitted by the Administrator for review to a peer review group," after which "the Administrator will evaluate applications recommended for further consideration, taking into account [certain specified] factors" and on that basis "shall: give consideration for funding, defer for a later decision, pending receipt of additional information, or give no further consideration for funding, to any application for a grant under this subpart . . . ." 42 C.F.R. §§ 67.15(a), 67.16(a), (b).

While these statutes and regulations use "shall" and/or "will"—words that are often considered mandatory—the Fourth Circuit instructs that "the impact of seemingly mandatory or permissive language depends heavily on the context in which it appears."  *Lovo*, 107 F.4th at 212. In *Lovo*, the Fourth Circuit considered analogous regulatory language (specifically, 8 C.F.R. § 212.7(e)(8), which provides that "USCIS *will* adjudicate a [certain immigration-related]

application in accordance with" certain statutes) and held that, when properly viewed in context, it simply requires that "*when, in its discretion*, USCIS decides to adjudicate claims, it must do so in accordance with the standards and procedures laid out in the statute and regulations." 107 F.4th at 213. The Fourth Circuit therefore held that the district court lacked jurisdiction to compel the agency to act on plaintiff's immigration application.

The same construction that the Fourth Circuit applied in *Lovo* applies to this case: when, in its discretion, AHRQ decides to award a grant (*see* 42 C.F.R. § 67.17(a), providing that "the Administrator *may* award grants . . ."), it may only do so after following the mandatory procedures, including the peer review and evaluation process, set forth in applicable statutes and regulations (*see* 42 U.S.C. § 299c-1(a)(1); 42 C.F.R. §§ 67.15(a), 67.16(a), (b)). As in *Lovo*, this Court lacks jurisdiction to compel AHRQ to evaluate grant applications.

Finally, even if these statutes and regulations could be interpreted as requiring AHRQ to evaluate and process grant applications as a general matter, there is no requirement that AHRQ do so on any particular timeline.[6] As a result, the pace at which AHRQ evaluates grant applications is discretionary, and the Court lacks jurisdiction to compel AHRQ to act on Plaintiffs' desired timeline. *See, e.g.*, *Gonzalez*, 985 F.3d at 369 (agency action could not be compelled where "there [was] no timeline or mandate to act, adjudicate, or implement the provision"); *Tawah v. Noem*, Case No. 24-cv-3469-DKC, 2025 WL 2021661, at *4 (D. Md. July 18, 2025) (holding that "[b]ecause the statutory timeframe is still discretionary, the APA still does not authorize judicial review of asylum application adjudications . . . , and the court still lacks jurisdiction to review

---

[6] Plaintiffs essentially concede this point, merely pointing to the fact that all fiscal year 2025 appropriations are, unless otherwise stated, scheduled to lapse on September 30, 2025. Mem. at 23. This is not a statutorily required or enforceable timeline for the agency to act on grant applications. This wholly unsupported argument absurdly suggests that the general lapse of lump-sum appropriations could be considered a mandatory statutory timeline for literally any agency action.

Plaintiff's APA claim," citing *Tawah v. Mayorkas*, Case No. 23-cv-02920-TJS, 2024 WL 2155060, at *3 (D. Md. May 14, 2024)); *Martynenko v. Donis*, Case No. 24-cv-02218-LKG, 2025 WL 1685667, at *4 (D. Md. June 16, 2025) ("the pace at which USCIS adjudicates asylum applications is left to the agency's discretion.  And so, the Plaintiff has also not shown that the Court may consider his claim under the APA.").

> 2.    *The Appropriations Acts do not require that AHRQ allocate all funds it has been appropriated in lump-sum, let alone that it allocate such funds towards grantmaking.*

The Appropriations Acts authorize funding for AHRQ in a lump-sum of $369,000,000 "[f]or carrying out titles III and IX of the PHS Act, part A of title XI of the Social Security Act, and section 1013 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003."  2024 Appropriations Act, 138 Stat. 460, 661-62; 2025 Continuing Resolution, 139 Stat. 9, 10-11, § 1101(a)(8).

Contrary to Plaintiffs' suggestion (Mem. at 16-17), the Appropriations Acts do not, of their own force, compel AHRQ to allocate every dollar of appropriated funds.  Nothing in the language of the Appropriations Acts (nor that of any other statute or regulation, *see supra* at 14-17) requires it.  *Compare Train v. City of New York*, 420 U.S. 35, 38-43 & n.2 (1975) (enforcing statutory mandate that appropriated funds "shall be allotted"); *Kane Cnty. v. United States*, 127 Fed. Cl. 696, 697 (Ct. Cl. 2016) (finding payments were mandatory pursuant to statute mandate that "appropriated sums shall be made available . . . for obligation or expenditure").  The Supreme Court recently discussed the history of appropriations laws, explaining that such laws were originally enacted to function as a *limit* on Executive spending, and, accordingly, they often "provided the Executive discretion over how much to spend up to a cap."  *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 429-34 (2024).  The Supreme Court

expressly rejected the notion that "Congress violated the Appropriations Clause by permitting [the agency] to decide how much funding to draw up to a cap." *Id.* at 436.

Plaintiffs cite Justice (then-Judge) Kavanaugh's decision in *In re Aiken Cnty.*, 725 F.3d 255, 261, n.1 (D.C. Cir. 2013), for the proposition that "[t]he executive branch 'does not have unilateral authority to refuse to spend . . . funds' that Congress appropriated." Mem. at 16-17. But *Aiken County* involved the violation of a statutory mandate. More specifically, the Nuclear Waste Policy Act provided that the Nuclear Regulatory Commission (NRC) "shall consider" a license application and "shall issue a final decision approving or disapproving" the application within 3 years. 725 F.3d at 257. While the NRC had appropriated funds at its disposal for complying with this statutory mandate, it had refused to do so on policy grounds. *Id.* at 258-59. Justice Kavanaugh held that agencies "must follow statutory *mandates* so long as there is appropriated money available" for doing so. *Id.* at 259. No such unfulfilled statutory mandate exists in this case.

To the extent there were any lingering question regarding Justice Kavanaugh's view on what appropriations statutes require, it was resolved in the Supreme Court's 2024 decision in *Consumer Fin. Prot. Bureau*, 601 U.S. 416. In addition to joining the majority opinion, Justice Kavanaugh joined in Justice Kagan's concurring opinion, which explained:

> Congress has never thought it necessary to designate specific amounts for specific items. Over the years, many appropriations have instead given the Executive leeway to decide how to allocate funds, up to a ceiling, among a set of activities. As the Court shows, the First Congress made appropriations of "sums not exceeding" stated amounts for "broad categories" of purposes; the Executive then decided the level of funding it would use for all things within a category. In instituting these "lump-sum grants," the First Congress created a template for later ones to follow. Examples of such grants abound in our history. . . . Our government practice has been replete with instances of general appropriations to be expended as directed by designated government agencies. The CFPB's authority to take and allocate moneys up to a statutory cap is just one more instance to add to the list.

601 U.S. at 442-43 (Kagan, J. concurring). Thus, it is now well-established that appropriations

statutes need not, and often do not, require the agency to expend all funds appropriated to it. That is the case here, where Congress appropriated a lump-sum to AHRQ, leaving to AHRQ's discretion the manner in which those appropriated funds are expended (or not expended).

Finally, Plaintiffs point to the Report from the Senate Committee on Appropriations, S. Rep. No. 118-84 (the "Committee Report"), in support of their argument that AHRQ must spend a significant (though unspecified) amount of its appropriated funds on grants. *See* Mem. at 4 ("only a small portion of [the appropriated] amount—$73 million—was to be spent on program support, leaving hundreds of millions to be spent instead on grants and other projects to fund health services research," citing the Committee Report). But the Committee Report is not binding on the agency and does not alter the analysis. As the Supreme Court explained in *Lincoln v. Vigil*,

> a fundamental principle of appropriations law is that where 'Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and ***indicia in committee reports and other legislative history as to how the funds should be or are expected to be spent do not establish any legal requirements on' the agency***.

508 U.S. 182, 192 (1993) (emphasis added). *See also Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 646 (2005) ("The relevant case law makes clear that restrictive language contained in Committee Reports is not legally binding.").[7]

### 3. The Impoundment Control Act does not compel AHRQ to make appropriated funds available in the manner and at the pace that Plaintiffs are asking the Court to order here.

As discussed, the Appropriations Acts do not, of their own force, require AHRQ to allocate all funding appropriated to it. It is the Impoundment Control Act, 2 U.S.C. § 681 *et seq.* (the

---

[7]*See also Cherokee Nation of Oklahoma*, 543 U.S. at 647 (Scalia, J., concurring) (explaining that a Senate Committee Report "at most indicates the intent of one Committee of one Chamber of Congress—and realistically, probably not even that, since there is no requirement that Committee members vote on, and small probability that they even read, the entire text of a staff-generated report.").

"ICA"), that governs circumstances in which the President makes a policy determination not to expend funds.[8]    But that statute cannot serve as a proper basis for an injunction either. Fundamentally, Plaintiffs cannot rely upon alleged violations of the ICA to support an APA contrary-to-law claim, because the ICA precludes judicial review and Plaintiffs are not within the zone of interests that the ICA was intended to protect.    These points are discussed in greater detail *infra* at 23-28.    But even assuming Plaintiffs could assert such a claim, Plaintiffs' requested relief would *still* be wholly inappropriate because no provision of the ICA even purports to require an agency to make funds available at this point.

Rather, the ICA establishes a structure to allow the President and Congress to engage in an interbranch dialogue when the President determines not to allocate appropriated funds.    At a high level, the President is directed to transmit a special message to Congress when he "determines" that "budget authority should be rescinded for fiscal policy or other reasons."    2 U.S.C. § 683(a); *see also id.* § 686(a).[9]    After that message is sent, Congress may consider whether to rescind the

---

[8] To be clear, Defendants do not agree that an impoundment has occurred.    The ICA distinguishes between "deferrals, which must be reported, and 'programmatic' delays, which are not impoundment and are not reportable under the [ICA]."    GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2, § B.8, GAO-16-464SP (Washington, D.C.: Mar. 2016), *available at* https://www.gao.gov/legal/appropriations-law/red-book (last visited Sept. 4, 2025) (hereinafter "GAO Redbook").    The GAO Redbook explains:

> A programmatic delay is one in which operational factors unavoidably impede the obligation of budget authority, notwithstanding the agency's reasonable and good faith efforts to implement the program.    Since intent is a relevant factor, the determination requires a case-by-case evaluation of the agency's justification in light of all of the surrounding circumstances.    A programmatic delay may become a reportable deferral if the programmatic basis ceases to exist.

*Id.*  Plaintiffs' own allegations argue that the halting of grantmaking activity at AHRQ is the unavoidable result of the RIF and lack of operational capacity, not some determination by the agency that it will no longer award grants.    *See* Mem. at 5-8; *see also* Mem. at 25 ("To the extent Defendants have offered any explanation for their delay, they have blamed the recent RIF, which they apparently initiated without any plan to continue the agency's statutory functions. Although that is at best a sign of the negligence behind the cessation of AHRQ's grant program, Plaintiffs cannot know on the current record why Defendants targeted AHRQ's grantmaking apparatus or whether there is any lurking impropriety.").

[9] The President's obligation to send a special message to Congress only attaches once the President "determines" that "budget authority should be rescinded for fiscal policy or other reasons," 2 U.S.C. § 683(a), and nothing in the record indicates that the President or his subordinates have made any such determination with respect to specific budgetary authority at this time.    To the contrary, the July 23, 2025 email upon which Plaintiffs heavily rely (*see* Mem. at 1, 7-

budget authority in question.  And if Congress has not rescinded "all or part of the amount proposed to be rescinded" within "45 calendar days of continuous sessions of the Congress" after receipt of the message, *id.* §§ 682(3), 683(b), then the amount proposed to be rescinded "shall be made available for obligation," *id.* § 683(b).  That final provision requiring the covered appropriations to be made available thus takes effect only following Congress's receipt of the contemplated message and the elapsing of 45 days.

But in this case, there is no dispute that the President has not yet sent a special message to Congress proposing to rescind any budgetary authority.  Nor has the Comptroller General found that the President has improperly failed to send a special message and made a report in lieu of the special message.  *Cf.* 2 U.S.C. § 686(a) (providing that if the Comptroller General finds that the President "proposes to defer budget authority" but "has failed to transmit a special message," the "Comptroller General shall make a report" to Congress that "shall be considered a special message").  Thus, at this point, the interbranch process contemplated by the statute has not even begun, much less concluded.  As a result, the statute's provision requiring that certain appropriations be made available has no applicability to this case and cannot support an injunction under the APA.  *See Norton*, 542 U.S. at 63 ("the only agency action that can be compelled under the APA is an action legally *required*").  Plaintiffs' requested relief seeks to skip over the procedural mechanism laid out in the ICA, have this Court step into the middle of that interbranch political process, and broadly require AHRQ to make funds available now.

### C.    The Actions Plaintiffs Challenge Are Committed to Agency Discretion by Law and Therefore Are Not Subject to APA Review.

Even if Plaintiffs had properly identified a discrete and final agency action that AHRQ was

---

8, 20) explains that the agency is "evaluating options for our grant program."  *See* ECF No. 4-7 (Exhibit 5, Declaration of Amal N. Trivedi, which attaches the July 23, 2025 email as Exhibit A).

required to take, their claims would still fail. Under the APA, agency action that is "committed to agency discretion by law" is not subject to judicial review. 5 U.S.C. § 701(a)(2). As detailed above, AHRQ has discretion regarding whether to award a grant or evaluate a grant application, the timeline for doing so, and the amount of any grants awarded. *See supra* at 14-19. Indeed, AHRQ's regulations expressly bestow nearly unlimited discretion upon the AHRQ Administrator regarding the award of grants. 42 C.F.R. § 67.17(a). Therefore, AHRQ's decisions regarding whether to award grants, when to do so, and the amount(s) of the grants awarded are agency actions "committed to agency discretion by law" and unreviewable under the APA.

AHRQ's grant funding decisions are "committed to agency discretion by law" for another reason—which is, as explained *supra* at 17-19, that the Appropriations Acts provide a lump-sum appropriation to AHRQ. One paradigmatic decision "traditionally regarded as committed to agency discretion" is "[t]he allocation of funds from a lump-sum appropriation." *Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993) (holding that where Congress simply allocated an annual "lump-sum appropriation[]" to the agency, the decision to no longer fund a particular program was "committed to agency discretion."). "After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 191. Lump-sum appropriations thus leave it to the agency to decide how "'resources are best spent'" and "whether a particular program 'best fits the agency's overall policies.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). While Congress may set outer guardrails on "permissible statutory objections," courts have "no leave to intrude" so long as agencies adhere to those limits in allocating funding. *Id.*

Here, Congress appropriated a lump-sum amount to AHRQ in order to fulfill broad statutory purposes. While the Public Health Service Act requires that AHRQ fund grants for

specific health topics, as explained above, there is no allegation that AHRQ is not already doing so. *See supra* at 14. With respect to the actions that Plaintiffs seek this Court to compel – *i.e.*, awarding new grants, evaluating grant applications, obligating all appropriated funds, and doing the same on Plaintiffs' timeline – these actions all fall entirely within AHRQ's discretion and are not subject to judicial review.

> **D.    Plaintiffs Cannot Rely Upon the Impoundment Control Act to Support Its APA Contrary-to-Law Claim.**

As explained, Defendants have not violated any statutory mandate (*see supra* at 14-17), nor have they violated the Appropriations Acts (*see supra* at 17-19). None of these statutes require AHRQ to award new grants or consider grant applications, to do either task on any particular timeline, or to spend the entirety of the lump-sum funds appropriated to the agency (*see supra* at 14-19). To the extent AHRQ is statutorily mandated to award certain grants related to certain healthcare topics, there is no allegation that AHRQ is not currently doing so (*see supra* at 14).

Instead, it is the ICA that—as a general matter—requires federal agencies to spend funds appropriated by Congress. But Plaintiffs cannot use the ICA to undergird their APA contrary-to-law claim for at least two reasons: (1) the ICA is a statute that "precludes judicial review" under the APA; and (2) Plaintiffs are not within the zone of interests sought to be protected by the ICA.

> *1.    The Impoundment Control Act precludes judicial review under the APA.*

A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). "[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). *See also Sackett v. EPA*, 566 U.S. 120, 130 (2012) ("Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust

administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not subject to the administrative process, is strong.").

Just days ago, the D.C. Circuit applied this principle in the same context as the instant case and held that the ICA bars plaintiffs from bringing suit under the APA to enforce the ICA.  *See Global Health Council v. Trump*, App. No. 25-5097, 2025 WL 2480618, at *9-11 & n.17 (D.C. Cir. Aug. 28, 2025).[10]  The plaintiffs—organizations who received, or whose members received, federal foreign assistance funds—asserted that the Executive Branch did not intend to expend all foreign assistance funds appropriated under the 2024 Appropriations Act, that the failure to allocate all appropriated funds violated the ICA, and that these allegations could support an APA contrary-to-law claim.  *Id.* at *1, 9-11. The D.C. Circuit rejected plaintiffs' arguments, finding that

> the ICA created a complex scheme of notification of the Congress, congressional action on a proposed rescission or deferral and suit by a specified legislative branch official if the executive branch violates its statutory expenditure obligations.  *See* 2 U.S.C. § 682 *et seq.*  Moreover, under the ICA, the Comptroller General may bring suit only 25 days after he has provided the Congress with a statement explaining "the circumstances giving rise to the action contemplated."  2 U.S.C. § 687.  As in *Block*, it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits at any time and without notice to the Congress of the alleged violation.

*Id.* at 10.  Accordingly, the D.C. Circuit held that "the grantees have no cause of action to undergird their APA contrary-to-law claim."  *Id.* at 11.

The same reasoning and conclusion apply in this case and preclude Plaintiffs from bringing an APA contrary-to-law claim based on alleged violations of the ICA.  Plaintiffs have no cause of action allowing them to assert claims against AHRQ for failing to spend appropriated funds in the manner and at the pace Plaintiffs desire.  *Cf. Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (granting

---

[10] The D.C. Circuit's original opinion in *Global Health Council* was issued on August 13, 2025.  The opinion was re-issued with certain amendments on August 28, 2025.  The amendments do not impact the central holding discussed herein, which is that a plaintiff cannot enforce the ICA through an APA contrary-to-law claim.

stay of injunction pending appeal, as "the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with" a statute governing the transfer of funds among appropriation accounts).

Defendants acknowledge this Court's recent decision in *Child Trends, Inc. v. U.S. Dep't of Educ.*, Case No. 25-cv-1154-BAH, 2025 WL 2379688 (D. Md. Aug. 15, 2025), in which this Court considered *Global Health Council* and noted that, while the Government's "position is not without support," the D.C. Circuit's view that plaintiffs "'lacked a cause of action to undergird their APA contrary-to-law claim' on the basis of an alleged ICA violation" "is not universally shared." *Id.* at *12. This Court went on, however, to distinguish *Global Health Council* on the basis that the plaintiffs alleged that "Defendants have not only withheld funds appropriated by Congress but have also refused to carry out an express statutory mandate," and held that "[t]he combination of statutory violations sets the case at bar apart from the narrower set of circumstances before the D.C. Circuit in *Global Health Council*." *Id.* at *13. As explained in detail *supra* at 14-19, no such statutory violations exist in this case. Accordingly, while Defendants respectfully disagree with this Court's *Child Trends* ruling to the extent it suggests that the ICA could form the basis of an APA contrary-to-law claim, the instant case involves "a materially different situation" (*id.*) that sets it apart from *Child Trends*.

> 2.  *Plaintiffs are not within the zone of interests that the Impoundment Control Act is meant to protect.*

To invoke the APA, a "plaintiff must establish the injury" it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conference of Am. v. American Postal Workers Union*, 498 U.S. 517, 523 (1991) (quotation omitted). That limitation reflects the common-sense intuition that Congress does not intend to extend a cause of action to "plaintiffs who might technically be injured in an Article III sense but

whose interests are unrelated to the statutory prohibitions" they seek to enforce.  *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 178 (2011).  Thus, where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987).  "[T]he 'relevant statute' for an APA zone-of-interests analysis is not the APA itself, but the statute under which the relevant agency acted."  *Food & Drug Admin. v. R.J. Reynolds Vapor Co.*, 145 S.Ct. 1984, 1991, n.4 (2025).

Plaintiffs—organizations whose members hope to be awarded some of the appropriated funds—are not within the zone of interests meant to be protected by the ICA.  The ICA is directed at regulating the relationship between Congress and the Executive Branch.  It establishes a structure to allow the President and Congress to engage in an interbranch dialogue when the President determines not to allocate appropriated funds.

Specifically, the ICA directs the President to notify Congress when he proposes to defer or rescind appropriated funds, *see* 2 U.S.C. §§ 683(a), 684(a), which allows Congress to determine how to respond given the particular circumstances of a specific proposal.  The ICA specifies particular forms of legislative action that Congress may undertake to address proposed rescissions.  *See id*. § 688.  To the extent that the ICA contemplates litigation to enforce any obligation to spend appropriate funds, it provides for suits brought by the Comptroller General, an official within the Legislative Branch.  2 U.S.C. § 687.  And the ICA imposes limitations on the bringing of any such suit, which reinforce Congress's desire to control any response to the Executive's actions: no such suit may be brought until the Comptroller General files "an explanatory statement" of "the circumstances giving rise to the" contemplated suit "with the Speaker of the House of

Representatives and the President of the Senate" and then "25 calendar days of continuous session of the Congress" elapse. *Id.*

That structure provides no role for third parties like Plaintiffs to play in either the legislative or judicial enforcement processes. It does not contemplate enforcement at the behest of private parties at all. And it certainly does not contemplate that private parties would be entitled to bring enforcement actions without regard to the procedural limitations that Congress imposed for the Comptroller General.

In *Public Citizen v. Stockman*, 528 F. Supp. 824, 827-30 (D.C.C. 1981), the court provided an extensive analysis of the ICA and its underlying purposes, describing "the objectives which underlie the ICA" as follows:

> Congress sought to retain principal dominion over the impoundment process and crafted a flexible scheme for involving the judiciary in disputes spawned by the Act's provisions. The Comptroller General's determination as to whether to bring suit, and Congress' decision whether to sanction the institution of such a suit, will obviously turn on a host of politically sensitive factors, including the potential impact that such a suit will have on the legislative-executive relationship.

*Id.* at 830. The court further explained that: "The value of section 1406 will be lessened considerably if private litigants are free to embroil the judiciary in controversies arising under the ICA; the courts would be forced to rule on the legality of executive withholdings in the absence of Congress' preliminary assessment of the crucial political dimensions involved in such a suit." *Id.* The court held that the ICA did not create a private right of action that would allow the plaintiff to sue under the ICA directly. *Id.* The court also expressly rejected the plaintiff's alternative argument that the suit could instead proceed under APA § 706, finding that the plaintiff's interests were not "within the zone of interests intended to be protected by the ICA," which "was clearly enacted to safeguard Congress' interests, not those of private citizens." *Id.* at 830 n.1. For the same reasons, Plaintiffs in this case do not fall within the zone of interests meant to be protected

by the ICA, and therefore cannot bring an APA suit to attempt to enforce the ICA.

Lastly, Plaintiffs point to a recent decision issued by the Government Accountability Office (GAO)[11] determining that HHS violated the ICA by withholding funds from obligation and expenditure.  *See* Mem. at 18-19, citing GAO, B-337203, *Department of Health and Human Services—National Institutes of Health—Application of Impoundment Control Act to Availability of Funds for Grants* (Aug. 5, 2025) (the "GAO Decision").[12]  The GAO Decision does not support Plaintiffs' request for the Court to inject itself into the political process set forth in the ICA.  The exact opposite is true—if anything, it demonstrates that the process established by the ICA is *working* and reflects that judicial interference at this stage would entirely upend any opportunity for that process to play out in the circumstances of this case.

III.    **Plaintiffs Have Not Demonstrated Irreparable Harm**

Plaintiffs' alleged injuries in this case do not involve the kind of irreparable harm that can support entry of a preliminary injunction.  *Winter*, 555 U.S. at 22.  First, injuries "in terms of money, time and energy necessarily expended in the absence of a stay" do not constitute irreparable harm.  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).  Accordingly, Plaintiffs' asserted injuries in the form of allegedly having "wasted hundreds of hours preparing applications that will never be reviewed," having "embarked on projects that they intended to carry over multiple years, but that they will have to essentially abandon," and/or "facing significant setbacks in their career development" (*see* Mem. at 26-27) are not cognizable forms of harm that can support a preliminary injunction.  In addition, the Fourth Circuit has held in an analogous context that the loss of an

---

[11] The Comptroller General is the head of the GAO, an agency within the legislative breach of the federal government.

[12] The GAO Decision did not involve "essentially identical circumstances," as Plaintiffs claim.  Mem. at 18.  The GAO Decision states that "[a]t issue here is whether NIH's actions to pause *Federal Register* notice submissions of grant review meetings and its cancelation of over 1,800 existing grants violated the ICA."  GAO Decision at 11.

opportunity to bid on a military contract does not constitute irreparable harm.  *See James A. Merritt & Sons v. Marsh*, 791 F.2d 328, 331 (4th Cir. 1986) ("While Merritt may lose the opportunity to bid on an undetermined number of military contracts during the suspension period, we cannot agree with the district court that this loss constitutes irreparable harm").  Accordingly, Plaintiffs' alleged "opportunity to compete for funding" (Mem. at 26-27) is not irreparable.

Furthermore, Plaintiffs ask this Court to enter an injunction directing Defendants "to restart the review of [AHRQ] grant applications and the award of grants" and "to make available for obligation all funds that were appropriated to AHRQ for grantmaking in fiscal year 2025."  ECF No. 4-14.  Thus, AHRQ would have to "restart" its review of grant applications, but not necessarily those of Plaintiffs, and to make appropriated funds available for allocation to someone, but not necessarily Plaintiffs.  Defendants could review grant applications, award grants, and make all of the funds at issue available to entities that have no connection to either Plaintiff or their members without running afoul of any order entered by this Court.  The injunction requested by Plaintiffs is thus not necessary for—or even effective at—avoiding Plaintiffs' alleged injuries.  This disconnect between the harms alleged and the relief granted dooms Plaintiffs' argument that they are likely to suffer irreparable injury.  *Winter*, 555 U.S. at 22; *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011) (explaining that there must be "a sufficient causal connection" between the alleged irreparable harm and the activity to be enjoined).

## IV.    **The Balance of Equities Does Not Favor Plaintiffs**

Even if Plaintiffs' alleged injuries were sufficient to establish irreparable harm, such harm does not outweigh the harm to the Government and the public that would be occasioned if a preliminary injunction were to issue in this case.  An injunction here would effectively disable Defendants from assessing the effectiveness and consistency with agency goals and priorities of a

29

grant program over which the Administrator is granted significant discretion.

In addition, a preliminary injunction would harm the Government by obligating it to disburse funds, both through the award of grants and the incurring of operational costs that would be required to do the same, which the Government would likely never recover. *Nat'l Inst. of Health v. Am. Public Health Ass'n*, 606 U.S. __, 2025 WL 2415669, at *1 (Aug. 21, 2025) (in staying preliminary injunction, finding that "while the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.' . . . The Government faces such harm here. The plaintiffs do not state that they will repay grant money if the Government ultimately prevails."). These harms are amplified because the injunction sought is not limited to grant programs that Plaintiffs allegedly participate in. Thus, the balance of the equities weighs in favor of Defendants and relief should be denied.

## V.    **The Court Should Require Plaintiffs to Post Security**

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). To the extent that the Court grants relief to Plaintiffs, Defendants respectfully request that the Court require Plaintiffs to post security for any taxpayer funds distributed during the pendency of the Court's Order.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

Dated:  September 4, 2025

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:      */s/  Jessica Dillon*
Jessica F.W. Dillon (Bar No. 19249)
S. Nicole Nardone
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4892 (direct)
(410) 962-2310 (fax)
jessica.dillon@usdoj.gov
nicole.nardone@usdoj.gov

*Counsel for Defendants*