# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SOCIETY OF GENERAL INTERNAL
MEDICINE, ET AL.,

      Plaintiffs,

v.

ROBERT F. KENNEDY, JR., ET AL.,

      Defendants.

Case No.: 8:25-cv-02751-BAH

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

   A.  The Statutory and Regulatory Framework Governing AHRQ ........................................... 3

   B.  Factual Background ............................................................................................................ 5

   C.  Procedural History ............................................................................................................. 6

LEGAL STANDARDS ........................................................................................................... 7

ARGUMENT ........................................................................................................................... 9

   I.   Plaintiffs Fail to Plead Sufficient Facts Showing That They Are Entitled to Relief ........... 9

   II.  Plaintiffs Have Not Established Standing to Bring Their Claims ...................................... 11

   III.  Plaintiffs Do Not Seek Judicial Review of a Discrete and Final Agency Action .............. 13

       A.  Plaintiffs do not challenge a *discrete* agency action ................................................ 14

       B.  Plaintiffs do not challenge a *final* agency action ..................................................... 16

   IV.  Plaintiffs Impermissibly Seek to Compel Agency Action that AHRQ Is Not Required
        to Take, and Therefore All of Plaintiffs' Claims Should Be Dismissed ........................... 18

   V.   Defendants Have Not Violated the PHS Act or AHRQ's Regulations,
       and Therefore Count I Should Be Dismissed ................................................................... 19

   VI.  Defendants Have Not Violated the Appropriations Acts,
       and Therefore Count II Should Be Dismissed .................................................................. 23

   VII.  Plaintiffs Cannot Rely Upon the ICA to Support an APA Contrary-to-Law Claim,
        and Therefore Count III Should Be Dismissed ................................................................ 25

       A.  The ICA precludes judicial review under the APA ................................................... 25

       B.  Plaintiffs are not within the zone of interests that the ICA is meant to protect ....... 28

   VIII.  The Actions Plaintiffs Challenge Are Committed to Agency Discretion by Law
         and Therefore Are Not Subject to APA Review ............................................................. 29

CONCLUSION ...................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, Case Nos. 25-cv-00400-AHA,
   25-cv-00402-AHA, 2025 WL 2537200 (D.D.C. Sept. 3, 2025) .............................................. 24

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ........................................................................ 23

*Air Courier Conference of Am. v. American Postal Workers Union*,
   498 U.S. 517 (1991) ..................................................................................................... 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................. 8, 11

*Associated Gen. Contractors v. California State Council of Carpenters*,
   459 U.S. 519 (1983) ............................................................................................... 19-20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 8, 11

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................................... 17

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984) ......................................................... 25, 26, 27

*Child Trends, Inc. v. U.S. Dep't of Educ.*, 787 F. Supp. 3d 81 (D. Md. 2025) .............................. 13

*Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700 (D. Md. 2025) ......... 15, 23, 27, 28

*City of New York v. U.S. Dep't of Defense*, 913 F.3d 423 (4th Cir. 2019) ................................... 16

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .................................................................... 12

*Clarke v. Securities Industry Assn.*, 479 U.S. 388 (1987) ............................................................ 28

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024) ............... 24

*Dep't of State v. AIDS Vaccine Advoc. Coal.*,
   606 U.S. __, 2025 WL 2740571 (Sept. 26, 2025) ....................................................... 24

*Dreher v. Experian Info. Sols.*, 856 F.3d 337 (4th Cir. 2017) ....................................................... 12

*Est. of Green v. City of Annapolis*, Case No. 24-cv-1351-MJM,
   2025 WL 1029555 (D. Md. Apr. 7, 2025) ...................................................... 8, 9, 10

*Food & Drug Admin. v. R.J. Reynolds Vapor Co.*, 145 S.Ct. 1984 (2025) ................................. 28

*Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) ............................................. 17, 28

*Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159 (4th Cir. 2016)................................................. 10

*Gonzalez v. Cuccinelli*, 985 F.3d 366 (4th Cir. 2021) ........................................................ 20, 22

*Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472 (4th Cir. 2011)..............22

*Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448 (4th Cir. 2012) ......................... 7

*Kane Ctny. v. United States*, 127 Fed. Cl. 696 (Ct. Cl. 2016) ...................................................... 23

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994)............................................................ 8

*Lincoln v. Vigil*, 508 U.S. 182 (1993) .................................................................................... 23, 30

*Lovo v. Miller*, 107 F.4th 199 (4th Cir. 2024).......................................................... 18, 19, 20, 21

*Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1990)....................................................... 14, 15, 16, 18

*Martynenko v. Donis*, Case No. 24-cv-02218-LKG,
    2025 WL 1685667 (D. Md. June 16, 2025) ......................................................................... 23

*Mayor & City Council of Baltimore v. CFPB*, Case No. 25-cv-458-MJM,
    2025 WL 814500 (D. Md. Mar. 14, 2025) ...................................................................... 17-18

*In re Moore*, 488 F. Supp. 3d 231 (D. Md. 2020).......................................................................8

*Moretti v. Thorsdottir*, 157 F.4th 352 (4th Cir. 2025) ..................................................................8

*Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Defense*,
    990 F.3d 834 (4th Cir. 2021)..............................................................................................14

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009)....................8

*New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. 2025) ...........................................................27

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................................. 24-25

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004) ..................................... *passim*

*O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2023) ...........................................................11

*Oregon Council for Humanities v. U.S. DOGE Service*, 794 F. Supp. 3d 840 (D. Or. 2025).......27

*Public Citizen v. Stockman*, 528 F. Supp. 824 (D.C.C. 1981) ............................................... 28-29

*Rhode Island v. Trump*, 781 F. Supp. 3d 25 (D.R.I. 2025).........................................................27

*Sackett v. EPA*, 566 U.S. 120 (2012) ...........................................................25

*State of Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197 (4th Cir. 2025)................................6, 13

*Tawah v. Noem*, Case No. 24-cv-3469-DKC,
  2025 WL 2021661 (D. Md. July 18, 2025)...............................................22

*Train v. City of New York*, 420 U.S. 35 (1975)...............................................23

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ...............................................11, 12

*United States v. Garcia*, 855 F.3d 615 (4th Cir. 2017)...............................................9

**Statutes:**

Impoundment Control Act:
  2 U.S.C. § 683(a) ...........................................................26
  2 U.S.C. § 684(a) ...........................................................26
  2 U.S.C. § 686(a) ...........................................................26
  2 U.S.C. § 687 ...........................................................26

Administrative Procedure Act (APA):
  5 U.S.C. § 701(a)(1) ...........................................................25
  5 U.S.C. § 701(a)(2) ...........................................................29
  5 U.S.C. § 702 ...........................................................18
  5 U.S.C. § 704 ...........................................................13, 18
  5 U.S.C. § 706(1) ...........................................................7, 18, 19
  5 U.S.C. § 706(2) ...........................................................6, 18

Public Health Service Act ("PHS Act"):
  42 U.S.C. § 299a(b)(1) ...........................................................3
  42 U.S.C. § 299b ...........................................................3
  42 U.S.C. § 299b-1 ...........................................................19
  42 U.S.C. § 299b-4(b) ...........................................................19
  42 U.S.C. § 299b-31(c) ...........................................................19
  42 U.S.C. § 299b-34(a) ...........................................................3, 19
  42 U.S.C. § 299b-36(e) ...........................................................19
  42 U.S.C. § 299b-37(e) ...........................................................19
  42 U.S.C. § 299c-1(a)(1) ...........................................................20-21

Appropriations Acts:
  Further Consolidated Appropriations Act of 2024,
    Pub. L. No. 118-47, 138 Stat. 612 ...........................................................5, 23
  Full-Year Continuing Appropriations and Extensions Act of 2025,
    Pub. L. No. 119-4, 139 Stat. 9 ...........................................................5, 23

**Regulations:**

42 C.F.R. § 67.14 ................................................................. 4, 12, 20

42 C.F.R. § 67.15 ..................................................................... 5, 21

42 C.F.R. § 67.16 ..................................................................... 5, 21

42 C.F.R. § 67.17 ........................................................ 2, 3, 4, 20, 21, 29

**Rules:**

Fed. R. Civ. P. 12(b)(1) ............................................................. 7, 8

Fed. R. Civ. P. 12(b)(6) ............................................................. 7, 8

**Other Authorities:**

5B Wright & Miller, Fed. Prac. & Proc. § 1357 (4th ed. 2025) ....................................8

Defendants, by and through undersigned counsel, hereby submit this Memorandum of Law in Support of Their Motion to Dismiss (the "Motion").

### INTRODUCTION[1]

Defendant Agency for Healthcare Research and Quality (AHRQ), a component agency of the Department of Health and Human Services (HHS), is responsible for improving the quality and safety of healthcare delivery in the United States.  Congress appropriated $369 million to AHRQ for fiscal year 2025.  This appropriation was a lump-sum that could be used for any purpose in furtherance of AHRQ's mission.  Among other activities, AHRQ supports health services research through grant funding.  Plaintiffs are organizations whose members (or in the case of one Plaintiff, itself) have grant applications pending with AHRQ and hope to receive a portion of the lump-sum funds appropriated to AHRQ.

On August 21, 2025, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief, ECF No. 1 (the "Complaint" or "Compl."), asserting five claims under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA"), each premised on allegations that AHRQ unlawfully shut down its grant program in the summer of 2025.  Since the filing of the Complaint, it has become clear as a matter of public record that this central allegation is untrue.  According to the Tracking Accountability in Government Grants System (TAGGS) database, a publicly available source of HHS grants on which Plaintiffs themselves rely, by the 2025 fiscal year-end, AHRQ spent $94,121,718 on grants, including $39,294,716 since this lawsuit was filed (in connection with 75 grants).  Accordingly, there is simply no factual basis for Plaintiffs' claims, and they should be dismissed.

But even in the absence of this significant development, Plaintiffs' APA claims would still

---

[1] Capitalized terms used but not defined in this Introduction shall have the meaning ascribed to them in the Background section of this brief.

be subject to dismissal for lack of subject matter jurisdiction and/or failure to state a claim. First, Plaintiffs do not establish standing to bring their claims, because (among other reasons) they do not allege a cognizable injury in fact. Second, Plaintiffs do not identify a discrete and final agency action subject to judicial review under the APA. Rather, they launch a prohibited programmatic attack against the agency for alleged failures in the wholesale operation of its grant program. Furthermore, no final decision regarding the grant program has been made; rather, the agency is evaluating options on how to best move forward.

Third, Plaintiffs improperly ask this Court to compel agency action that AHRQ is not legally required to take. AHRQ's regulations bestow discretion on AHRQ's Administrator in determining whether to award any grant, providing that "the Administrator *may* award grants" for projects, which "*in the judgment of the Administrator*" will best promote the purposes underlying AHRQ's governing laws and the agency's priorities. 42 C.F.R. § 67.17(a) (emphasis added). AHRQ is also not required to evaluate every grant application it receives. Rather, when AHRQ determines to award a grant, it may only do so after having followed the procedures set forth in its governing regulations. Furthermore, Congress did not restrict the use of funds appropriated to AHRQ in any way (for example, by requiring that any specific amount be used to fund grants), nor did Congress require—via language in the Appropriations Acts or the Public Health Service Act—that AHRQ obligate the entirety of the appropriated funds in any given fiscal year. For these reasons, Defendants have not violated any statute or regulation that could support Plaintiffs' contrary-to-law claims in Counts I and II.

Regarding Count III, Plaintiffs cannot use alleged violations of the Impoundment Control Act, 2 U.S.C. § 681 *et seq.* (the "ICA"), to support their APA contrary-to-law claims, because the ICA precludes judicial review, and Plaintiffs are not within the zone of interests that the ICA was

2

intended to protect. Lastly, the lump-sum funding decisions that Plaintiffs challenge are committed to agency discretion by law and therefore not subject to judicial review under the APA.

For these reasons and those discussed below, Defendants respectfully request that the Motion be granted and the Complaint be dismissed.

## BACKGROUND

### A.    The Statutory and Regulatory Framework Governing AHRQ

AHRQ was established in 1999 pursuant to title IX of the Public Health Service Act, 42 U.S.C. § 299 *et seq.* (the "PHS Act"). AHRQ's mission is "to enhance the quality, appropriateness, and effectiveness of health services, and access to such services, through the establishment of a broad base of scientific research and through the promotion of improvements in clinical and health system practices, including the prevention of diseases and other health conditions." *Id.* § 299(b). The PHS Act broadly authorizes—and with respect to certain very specific areas of health services research, directs—AHRQ's Director to provide grants in furtherance of these goals. *E.g.*, 42 U.S.C. § 299a(b)(1) ("The Director may provide training grants in the field of health services research . . ."); *id.* § 299b-34(a) ("The Director . . . shall award—(1) technical assistance grants or contracts to eligible entities to provide technical support to institutions that deliver heath care . . .").

AHRQ's grantmaking is governed by a set of regulations found at 42 C.F.R. § 67.10 *et seq.* AHRQ's regulations confer nearly unlimited discretion upon the Administrator of AHRQ in determining whether to award any grant, providing:

> Within the limits of available funds, the Administrator ***may*** award grants to those applicants whose projects are being considered for funding, which ***in the judgment of the Administrator***, will promote best the purposes of Title IX of the PHS Act . . . , AHCPR priorities, and the regulations of this subpart.

42 C.F.R. § 67.17(a) (emphasis added). In the context of awarding continuation grants (*i.e.*, funding that continues an already-approved project into a subsequent budget period, as opposed to

funding a brand new award), AHRQ's regulations further provide that "[i]n all cases, continuation awards require a determination by the Administrator that continuation is in the best interest of the Federal Government." *Id.* § 67.17(d).  In addition, "[n]either the approval of any application nor the award of any grant commits or obligates the Federal Government in any way to make any additional, supplemental, continuation, or other award with respect to any approved application." *Id.* § 67.17(e).  There are no statutory or regulatory requirements regarding the timing for awarding grants, nor how much money AHRQ must put towards grant funding.

Regarding the application process, AHRQ's regulations provide that "[t]o apply for a grant, an entity or individual must submit an application in the form and at the time that the Administrator requires." *Id.* § 67.14(a).  AHRQ invites applications for proposed projects through the public issuance of Notices of Funding Opportunities (NOFOs).  AHRQ issues NOFOs primarily via Program Announcements and Requests for Applications, depending on the specificity and priority of the research area.  Program Announcements identify broad areas of interest, encourage research pipelines that the agency wants to keep open year over year, and typically do not specify a number of grants to be awarded or have set aside funding.  Requests for Applications are time-limited, narrowly defined opportunities that typically indicate the estimated amount of funds set aside for the competition and number of awards.  *See generally* https://www.ahrq.gov/funding/fund-opps/index.html.[2]  These announcements are made on Grants.gov and AHRQ's website and describe the purpose, scope, eligibility requirements, and submission procedures for each funding opportunity.  NOFOs are issued at the discretion of the agency and may be modified or cancelled prior to award if agency priorities, funding availability, or other considerations change.[3]

---

[2] *See also* https://grants.nih.gov/grants/glossary.htm (glossary of grant-related terms defining "Program Announcement" and "Request for Application").  (This glossary is often linked in AHRQ's NOFOs.)

[3] A review of AHRQ's online grant archive (*see* https://archive.ahrq.gov/fund/granarch.htm#PA) reflects that a number of NOFOs have been cancelled in past years.  *E.g.*, Notice of Cancellation of AHRQ RFA-HS-13-009 dated

AHRQ's regulations provide that in awarding grants, AHRQ must follow certain processes, including independent peer review. 42 C.F.R. § 67.15(a). After peer review, applications that are "recommended for further consideration" are evaluated by the Administrator, who exercises considerable discretion in assessing various specified factors and then "shall: give consideration for funding, defer for a later decision, pending receipt of additional information, or give no further consideration for funding, to any application for a grant under this subpart." *Id.* § 67.16.

In the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47 (the "2024 Appropriations Act"), Congress appropriated a lump-sum of $369,000,000 to AHRQ "[f]or carrying out titles III and IX of the PHS Act, part A of title XI of the Social Security Act, and section 1013 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003." 138 Stat. 460, 661-62. In the Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4 (the "2025 Continuing Resolution," and together with the 2024 Appropriations Act, the "Appropriations Acts"), Congress continued funding AHRQ at the same level for fiscal year 2025. 139 Stat. 9, 10-11, § 1101(a)(8). The Appropriations Acts contain no set-aside for grant funding (they make no mention of grants at all). Instead, the amount is a lump-sum appropriation that can be used for any purpose in furtherance of AHRQ's mission.[4]

**B.    Factual Background**

Like many federal agencies, AHRQ has been in a period of transition. In March 2025, HHS announced a restructuring of its 28 divisions, including AHRQ, with the stated goals of

---

Apr. 30, 2013, which states "This Notice is to inform the scientific community of the cancellation of the [NOFO]. Applications submitted will not be reviewed," *available at* https://grants.nih.gov/grants/guide/notice-files/NOT-HS-13-007.html. *See also* Notice of Cancellation of PA17-260 and PA 17-261 dated Dec. 17, 2018, *available at* https://grants.nih.gov/grants/guide/notice-files/NOT-HS-19-004.html; Notice of Cancellation of PA 15-179 and PA 16-420 dated Dec. 18, 2018, *available at* https://grants.nih.gov/grants/guide/notice-files/NOT-HS-19-005.html.

[4] For example, according to Plaintiffs' allegations, AHRQ spent $140 million on grants in fiscal year 2024 (*i.e.*, 28% of its total budget of $500 million). Compl. ¶¶ 3-4.

saving taxpayer dollars, streamlining functions, and consolidating redundant units. *See* https://www.hhs.gov/press-room/hhs-restructuring-doge.html. On July 14, 2025, many AHRQ employees were let go via a reduction-in-force (the "RIF"). The legality of the RIF is not at issue.[5]

Instead, the Complaint is focused on allegations that AHRQ has impermissibly shut down its grant program. *E.g.*, Compl. ¶¶ 5-7. Yet, Plaintiffs acknowledge that AHRQ had obligated approximately $55 million in fiscal year 2025 on grants as of the date this lawsuit was filed. *Id.* ¶ 36. Plaintiffs further acknowledge that grantmaking activities were ongoing at the agency until at least mid-July, as employees subject to the RIF continued to "process non-competing applications for continuation awards" until their separation date on July 14, 2025. *Id.* ¶ 33.

Since the Complaint was filed, AHRQ awarded 75 additional continuation grants, nearly doubling its fiscal year 2025 expenditures on grants and bringing the total to $94,121,718. *See* Exhibit A (discussed *infra* at 9). AHRQ processed these grants using grant specialists at the Food and Drug Administration (FDA) (another HHS component agency).

## C.   <u>Procedural History</u>

On August 21, 2025, Plaintiffs filed the instant Complaint, asserting five causes of action under the APA. In Counts I-III, Plaintiffs claim that the alleged cessation of AHRQ's grant program and failure to process grant applications violates the PHS Act and AHRQ regulations (Count I), the Appropriations Acts (Count II), and the ICA (Count III), and is thus contrary to law under Section 706(2)(A) of the APA. Compl. ¶¶ 42-54. In Count IV, Plaintiffs claim that the cessation of AHRQ's grant program is arbitrary and capricious under Section 706(2)(A) of the APA. *Id.* ¶¶ 55-57. In Count V, Plaintiffs claim that the failure to process grant applications is

---

[5] Nor could it be, as Plaintiffs do not have standing to challenge the RIF. *See State of Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197 (4th Cir. 2025) (holding that plaintiff states lacked standing to challenge the widespread termination of federal probationary employees, including at HHS).

agency action unlawfully withheld, which this Court should therefore compel under Section 706(1) of the APA. *Id.* ¶¶ 58-61.  Plaintiffs ask this Court to enter an order "[d]eclar[ing] that Defendants' action halting AHRQ grantmaking functions, including by refusing to consider new grant applications and continuing grant applications, is contrary to law and/or arbitrary and capricious"; "[d]eclar[ing] unlawful and set[ting] aside as arbitrary, capricious, an abuse of discretion, or otherwise contrary to law Defendants' action rendering non-functional and halting AHRQ's grantmaking program"; "compelling Defendants to undertake statutorily required steps to peer review and evaluate pending grant applications and to award grants"; and "[e]njoin[ing] Defendants from taking any steps that hinder AHRQ's ability to perform its statutorily mandated grantmaking tasks." *Id.* at 20 (Prayer for Relief).

In conjunction with filing the Complaint, Plaintiffs filed a Motion for Preliminary Injunction, ECF No. 4 (the "PI Motion").  The Court delayed ruling on the PI Motion and allowed Plaintiffs to move to extend the September 30, 2025 appropriations deadline.  ECF Nos. 17, 19, 20.  Ultimately, the Court entered an Order directing AHRQ "to preserve and set aside $70,000,000 until the instant litigation is resolved so that meaningful relief may be available to the Plaintiffs should they prevail."  ECF No. 27.

## LEGAL STANDARDS

Defendants file this Motion pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

*Rule 12(b)(1)*.  A defendant can move for dismissal of a plaintiff's case under Rule 12(b)(1) for lack of subject matter jurisdiction by asserting the plaintiff does not have any "right to be in the district court at all."  *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012).  Federal district courts are courts of limited jurisdiction, constrained to exercise only

the authority conferred by Article III of the United States Constitution and affirmatively granted by federal statute. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). The plaintiff bears the burden of establishing the court's power to hear their case. *In re Moore*, 488 F. Supp. 3d 231, 235 (D. Md. 2020). In ruling on a Rule 12(b)(1) motion, the Court "may consider evidence outside of the pleadings without converting the motion to one for summary judgment." *Id.* at 236.

*Rule 12(b)(6)*. To defeat a Rule 12(b)(6) motion, a complaint must allege sufficient facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice and are not entitled to the assumption of truth. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). A court is also "not obliged . . . to accept as true the allegations of the complaint that conflict with its exhibits." *Moretti v. Thorsdottir*, 157 F.4th 352, 359 (4th Cir. 2025). The factual allegations that are taken as true "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In deciding a Rule 12(b)(6) motion, courts "may consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned without converting the motion into one for summary judgment under Rule 12(d)." 5B Wright & Miller, Fed. Prac. & Proc. § 1357 (4th ed. 2025). Specifically, "the court may take judicial notice of publicly available information on state and federal government websites without converting the motion to one for summary judgment." *Est. of Green v. City of Annapolis*, Case No. 24-cv-1351-MJM, 2025 WL 1029555, at *4 (D. Md. Apr. 7, 2025) (quoting *Est. of Green v.*

*City of Annapolis*, 696 F. Supp. 3d 130, 147 (D. Md. 2023)).  *See also United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

The TAGGS online database is a publicly available source of HHS grants, which Plaintiffs relied upon in both their Complaint and PI Motion to support the allegation that AHRQ had shut down its grant program.  *See* Compl. ¶ 36; ECF No. 4-1 at 7, 8 (referring to TAGGS as a "publicly available, official source of HHS grants").  Attached hereto as **Exhibit A** is a list of AHRQ's grant actions with respect to fiscal year 2025 funds, which was exported from TAGGS.  To generate Exhibit A, undersigned counsel utilized the same method as Plaintiffs in their PI Motion (*see* ECF No. 4-1 at 8, n.8)—*i.e.*, by filtering the TAGGS database for awards with "Issue Date FY" of 2025, "Funding FY" of 2025, and "Operating Division" of AHRQ; and then exporting the results into a PDF.  *See* https://taggs.hhs.gov/SearchAward.  In deciding this Motion, the Court may take judicial notice of the information contained in Exhibit A because it is publicly available information from a federal government website.  *See, e.g.*, *Green*, 2025 WL 1029555, at *4.

## ARGUMENT

## I.    Plaintiffs Fail to Plead Sufficient Facts Showing That They Are Entitled to Relief.

Each of Plaintiffs' five APA claims are premised on allegations that AHRQ shut down its grant program in the summer of 2025.  *See* Compl. ¶¶ 45 (Count I – "Defendants' cessation of AHRQ's grants program, including by not processing grant applications or issuing grant awards, is in violation of the Public Health Service Act and relevant AHRQ regulations."); 48 (Count II – "Defendants' cessation of AHRQ's grant program has made it impossible for AHRQ to obligate the funds that Congress has appropriated to it to support health services research.  Defendants' actions therefore violate the appropriations statutes mandating that the agency expend funds."); 54

(Count III – "By making it impossible for AHRQ to spend the funds appropriated to it for grantmaking this fiscal year, or otherwise refusing to spend those funds, Defendants have deferred or rescinded funds in a manner contrary to the Impoundment Control Act, in violation of the APA."); 57 (Count IV – "By halting AHRQ's grantmaking program, Defendants have acted arbitrarily and capriciously."); 60 (Count V – "By halting AHRQ's grantmaking program, Defendants have ensured that AHRQ cannot satisfy its obligations to process, review, and evaluate grant applications."); *see also id.* ¶¶ 5-7.  The Complaint acknowledges that at the time of filing AHRQ had spent $55 million in fiscal year 2025 funds on its grant program, and that no existing grants (let alone the entire program) had been terminated.  *Id.* ¶ 36.  Nevertheless, Plaintiffs have emphasized that the "action at issue here" is "the halting of grantmaking **going forward**."  ECF No. 15 (Plaintiffs' reply in further support of their PI Motion) at 3 (emphasis added).

Publicly available information on a federal government website (TAGGS) shows that, since the filing of the Complaint, AHRQ awarded nearly $40 million in 75 continuation grants, which were processed by grant specialists at FDA.  *See* Exhibit A (discussed *supra* at 9).  This brings the grand total for AHRQ's fiscal year 2025 expenditures on grants to $94,121,718—a far cry from the total "cessation of AHRQ's grant program" decried in the Complaint.

In deciding this Motion, the Court need not assume the truth of Plaintiffs' allegation that AHRQ shut down its grant program, because it is belied by TAGGS data—information on which the Court may take judicial notice.  *Green*, 2025 WL 1029555, at *4.[6]

Absent the allegation that AHRQ shut down its grant program, Plaintiffs' claims are

---

[6] In addition, Plaintiffs relied upon TAGGS data to form the basis of their allegation that AHRQ had ceased to operate its grant program. Compl. ¶ 36; ECF No. 4-1 at 7 & 8.  If a plaintiff "relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim.'"  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166–67 (4th Cir. 2016) (quoting *Thompson v. Illinois Dep't of Prof'l Regulation,* 300 F.3d 750, 754 (7th Cir.2002)) (describing the exhibit-prevails rule).  Accordingly, the Court should credit the information contained on the TAGGS website over conflicting allegations in the Complaint.

reduced to vague speculations—that AHRQ lacks any plan to restart the peer review process for evaluating new grant applications, and that if AHRQ fails to award new grants then at some point in the future AHRQ may not meet some statutory mandate.  Even if true, Plaintiffs' conjectures do not state a plausible claim.  Plaintiffs fail to "raise a right to relief above the speculative level" and have not articulated "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  Plaintiffs offer no facts that would permit a reasonable inference that Defendants acted or failed to act arbitrarily, capriciously, or contrary to law.  *Iqbal*, 556 U.S. at 678.

## II.    Plaintiffs Have Not Established Standing to Bring Their Claims.

To establish Article III standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  A "concrete" injury is one that is "real, and not abstract." *Id.* at 424 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)).  Concrete injuries may be "tangible"—*i.e.*, involve physical or monetary harm—or "intangible," in which case they must "have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."  *Id.* at 424-25.  Examples of concrete intangible harms include reputational harms, disclosure of private information, intrusion upon seclusion, and "harms specified by the Constitution itself" (such as abridgment of free speech and infringement of free exercise).  *Id.* at 425.  However, "[t]he intangible harm of enduring a statutory violation, standing alone, typically won't suffice under Article III—unless there's a separate harm (or a materially increased risk of another harm) associated with the violation."  *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 243 (4th Cir. 2023).  "In other words, 'under Article III, an injury in law is not an injury in fact.'"  *Id.* (quoting *TransUnion*, 594 U.S. at 427).  Plaintiffs bear the burden of demonstrating standing,

11

which they must do "for each claim that they press and for each form of relief that they seek." *TransUnion*, 594 U.S. at 430-31 ("standing is not dispensed in gross").

Here, Plaintiffs' alleged injuries are all intangible and include: (1) "not receiving adequate and timely responses to their applications"; (2) "hav[ing] no way of competing for [] funding"; and (3) "hav[ing] wasted hundreds of hours putting together applications that will never be reviewed." Compl. ¶ 40. Plaintiffs have not met their burden in demonstrating that these intangible harms have any "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425.

*First*, grant applicants are not entitled to a response on their applications. *Infra* at 20-23. Even if they were, a statutory violation alone is not a concrete harm, and Plaintiffs have not alleged that they have suffered a harm that AHRQ's regulations were aimed at preventing when they did not hear back on their applications. *E.g.*, *Dreher v. Experian Info. Sols.*, 856 F.3d 337, 345 (4th Cir. 2017) ("it would be an end-run around the qualifications for constitutional standing if any nebulous frustration resulting from a statutory violation would suffice as an informational injury").

Second, AHRQ's issuance of a NOFO does not guarantee that a grant will be awarded. All of AHRQ's active NOFOs were issued as Program Announcements, which describe continuing, new, or expanded program interests and typically do not have set aside funds or a defined timeline associated with an award. *Supra* at 4. Plaintiffs also acknowledge that their members are in various stages of the application process. Some have not been through peer review, and Plaintiffs do not allege that these applicants are likely to be awarded funding, which depends on a host of factors, including evaluation by an independent peer review panel.[7] Compl. ¶ 39; *but see id.* ¶¶

---

[7] 42 C.F.R. § 67.15(d)(2)(iii) (requiring peer review panels to be independent). *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413-14 (2013) ("we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment").

32, 38, 39 (alleging that pending applications for continuation grants and those ranked highly in the peer review process were likely to receive funding). In addition, continuation grants are, by definition, non-competing. *Id.* ¶ 32. Accordingly, Plaintiffs' lost-opportunity-to-compete theory of harm does not fit the context of AHRQ's grant program, which is far more elastic than the bid procedure context in which courts have found the loss of an opportunity to compete may constitute a cognizable Article III injury. *Compare Child Trends, Inc. v. U.S. Dep't of Educ.*, 787 F. Supp. 3d 81, 95 (D. Md. 2025) (Hurson, J.) (finding that "the type of harm alleged by Plaintiffs—the loss of the right to bid—appears to register as an injury for Article III standing purposes" where plaintiffs had demonstrated "a probable expectation of competitiveness in bidding for grants and contracts" to fund ***statutorily-mandated*** programs).

Third, and finally, Plaintiffs' injury in the form of having wasted time completing applications fails to articulate a concrete harm (the time was voluntarily expended in response to NOFOs that in no way guaranteed that any awards would be made at all, let alone to Plaintiffs); lacks causation (the time completing the applications was spent prior to any alleged unlawful action, not as a result thereof); and is not redressable (the time spent cannot be revived by any court order). Further, to redress this alleged injury, Plaintiffs seek prospective, equitable relief in the form of an Order compelling AHRQ to take "steps to peer review and evaluate pending grant applications." Compl. at 20 (¶ c). But "[p]rospective relief must . . . be justified by prospective injury," not past expenses (like the spent time Plaintiffs point to here). *State of Maryland*, 151 F.4th at 209. Accordingly, Plaintiffs lack standing to bring their claims.

## III.    Plaintiffs Do Not Seek Judicial Review of a Discrete and Final Agency Action.

The APA limits judicial review to "final agency action." 5 U.S.C. § 704. Final agency action is a term of art involving two components—agency action and finality of agency action—

each of which must be satisfied in order for a district court to have subject matter jurisdiction over a plaintiff's APA claim challenging agency conduct. *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Defense*, 990 F.3d 834, 839 (4th Cir. 2021) ("each of the two components—agency action and finality of agency action—narrows the scope of judicial review"). Neither jurisdictional requirement is met here, and all of Plaintiffs' claims should be dismissed.

### A.    Plaintiffs do not challenge a <u>discrete</u> agency action.

The APA contemplates judicial review of specific, identifiable agency action, as that term is defined in the APA. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (the categories of "agency action" subject to judicial review under the APA each "involve circumscribed, discrete agency actions"); *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 891 (1990) ("[u]nder the terms of the APA, respondent must direct its attack against some particular 'agency action' that causes it harm"). This discreteness requirement prohibits "broad programmatic attacks" against an administrative agency for allegedly failing to meet its statutory obligations. *See Norton*, 542 U.S. at 64, 66 ("General deficiencies in compliance [with statutory mandates] . . . lack the specificity requisite for agency action."). As the Supreme Court explained in *Norton*,

> If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. . . . ***The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA***.

542 U.S. at 66-67 (emphasis added).

Here, Plaintiffs do not point to any specific action or event that they claim was unlawful. Instead, Plaintiffs challenge the agency's broadscale operation (or, rather, alleged non-operation) of its grant program (*e.g.*, Compl. ¶¶ 45, 48, 57, 60) and the failure to process grant applications

(*e.g.*, *id.* ¶ 61).  Plaintiffs assert generalized claims that AHRQ must "restart" its grantmaking program in order to comply with broad statutory mandates.  *E.g.*, *id.* ¶ 7 ("The Court should declare unlawful and set aside Defendants' cessation of its grantmaking process and its refusal to consider and process grant applications, and require the agency to restart its grantmaking process, as required by law.").  This is precisely the kind of programmatic challenge that the Supreme Court rejected in *Norton*.  542 U.S. at 66.[8]

Plaintiffs' allegations that AHRQ has purportedly failed to process grant applications (which underlie Count V, *see* Compl. ¶ 61) also fail to satisfy the APA's discreteness requirement. Through these allegations, Plaintiffs attempt to combine numerous individual actions (or, rather, failures to act) in order to bring a broader challenge.  The Supreme Court rejected this approach to APA challenges in *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1990).

In *Lujan*, the plaintiff alleged that the Bureau of Land Management (BLM) had made various land-use decisions in violation of its statutory obligations.  *Id.* at 890.  Rather than challenge any of these actions individually, the plaintiff sought to challenge all of them together, grouped under what it described as a "land withdrawal review program."  *Id.*  The Supreme Court found that, in doing so, the plaintiff failed to plead "an identifiable action or event" reviewable under the APA, which requires a plaintiff to "direct its attack against some *particular* agency action that causes it harm."  *Id.* at 891, 899.  The Supreme Court explained that

> the flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.

---

[8] These allegations are not like those before this Court in *Child Trends, Inc. v. U.S. Dep't of Educ.*, 795 F. Supp. 3d 700 (D. Md. 2025) (Hurson, J.), which involved APA claims challenging specific action—namely, the government's "***decision to terminate*** eighteen of a total of twenty Comprehensive Centers awards and all REL awards." *Id.* at 711, 714 & n.9 (emphasis added).  Plaintiffs here do not allege that there has been any "decision to terminate" AHRQ's grant program.  To the contrary, they concede (as they must) that the grant program continues to exist.  Rather, Plaintiffs take issue with the grant program's operation following the RIF.

*Id.* at 893.[9]

These principles apply here.  Plaintiffs in this case do not challenge any discrete agency action, but rather seek to force sweeping action on any and all pending grant applications (regardless of the kind of application or where it is in the process).

Finally, the relief sought further establishes the programmatic nature of Plaintiffs' claims.  The relief is not directed at any identifiable event that Plaintiffs seek to remediate or undo, but rather vaguely refers to Defendants' "action" in halting AHRQ's grant program.  Compl. at 20 (¶¶ a, b).  It is also unclear how the Court could grant the relief sought (*e.g.*, compel Defendants to "undertake statutorily required steps to peer review and evaluate pending grant applications and to award grants" and enjoin "any steps that hinder AHRQ's ability to perform its statutorily mandated grantmaking tasks," *id.* ¶¶ c, d) without inserting itself into the day-to-day management of the agency.  Granting Plaintiffs' requested relief presents a substantial risk that it becomes "the task of the supervising court, rather than the agency, to work out compliance with [AHRQ's] broad statutory mandate."  *Norton*, 542 U.S. at 66-67.  At bottom, Plaintiffs seek the kind of wholesale improvement of agency operations that is not contemplated or authorized by the APA.

### B.    Plaintiffs do not challenge a <u>final</u> agency action.

Two conditions must be satisfied for agency action to be "final" within the meaning of the APA.  "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one

---

[9] *See also City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 433 (4th Cir. 2019) (rejecting the plaintiffs' characterization of their claims "as simply an aggregation of many small claims, each one seeking to compel the individual reports required by the [governing statute].  On this view, what the cities seek is not programmatic because each specific act that DOD has failed to perform is discrete when considered on its own.  But any limit on programmatic assessment would be rendered meaningless if such an argument prevailed.  All governmental programs are the aggregation of individual decisions, many of which are required by law.  The APA ensures that it is the individual decisions that are assessed as agency action, rather than the whole administrative apparatus.").

by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). The alleged "cessation of AHRQ's grants program" (Compl. ¶¶ 45, 48, 57, 60) and "failure to act on AHRQ grant applications" (*id.* ¶ 61) do not meet these conditions of finality.

According to Plaintiffs, the grantmaking activity at AHRQ halted on July 14, 2025, after the RIF was finalized. *Id.* ¶ 34. Plaintiffs do not allege that these circumstances are permanent; but, rather, that they result from the RIF at the agency—the legality of which is not at issue here. Plaintiffs point to an email dated July 23, 2025, which in fact suggests the opposite. It explicitly states that the agency is considering how to move forward and that no decision has been made regarding the grant program:

> We are ***currently*** unable to process grant awards and ***are evaluating options*** for our grant program. With the permanent separation of these staff, FY2025 funding of non-competing applications is ***uncertain***.

*Id.* (emphasis added); ECF No. 4-7 (Exhibit 5 to PI Motion, which attaches the July 23, 2025 email as Exhibit A). Significantly, since the filing of this lawsuit, AHRQ awarded 75 continuation grants in the amount of $39,294,716, bringing the total fiscal year 2025 expenditures on grants to $94,121,718. *See* Exhibit A. In short, the record in this case reflects an intention to continue the grant program, albeit perhaps not in the form or on the timeline that Plaintiffs desire.

Accordingly, to the extent there has been any agency decision or action at all, it cannot be characterized as "mark[ing] the 'consummation' of the agency's decisionmaking process," nor have any "rights or obligations [] been determined," *Bennett*, 520 U.S. at 177-78. Plaintiffs' APA claims should be dismissed. *See, e.g.*, *Mayor & City Council of Baltimore v. CFPB*, Case No. 25-cv-458-MJM, 2025 WL 814500, at *11-12 (D. Md. Mar. 14, 2025) ("Plaintiffs fail to make any showing of such a final agency decision. Instead, they challenge a disembodied and unrealized

17

decision to drain the CFPB of its operating funds and reserves, without any evidence that such a decision has been reached at all or generated any legal consequences.").

## IV. Plaintiffs Impermissibly Seek to Compel Agency Action That AHRQ Is Not Required to Take, and Therefore All of Plaintiffs' Claims Should Be Dismissed.

Plaintiffs couch Counts I-IV of their Complaint in terms of agency *action* "not in accordance with law" or "arbitrary" or "capricious" under Section 706(2) of the APA. *See* Compl. ¶¶ 42, 46, 49, 55. But where an APA claim involves assertions that a federal agency failed to take certain action mandated by statute, such a claim is properly characterized as a failure to act claim that seeks to "compel agency action unlawfully withheld" under Section 706(1) of the APA. *See Norton*, 542 U.S. at 64-65 (noting that the claim in *Lujan* was "couched as unlawful agency 'action'" but "would have fared no better if they had characterized the agency's alleged 'failure to revise land use plans in proper fashion' . . . in terms of 'agency action unlawfully withheld under § 706(1)'"). Here, all of Plaintiffs' claims rest on allegations that Defendants failed to take action mandated by statute, and Plaintiffs ask this Court to compel Defendants to take such action. *See* Compl. ¶¶ 7, 45, 48, 54, 57, 60-61, at 20 (Prayer for Relief). Accordingly, all five claims are properly considered as arising under Section 706(1) of the APA.[10]

Section 706(1) authorizes a court to "compel agency action *unlawfully* withheld." 5 U.S.C. § 706(1) (emphasis added). In *Norton*, the Supreme Court explained that this means "the only agency action that can be compelled under the APA is action legally *required*"—*i.e.*, "a precise, definite act about which an official has no discretion whatsoever." 542 U.S. at 63 (internal quotations omitted). *See also Lovo v. Miller*, 107 F.4th 199, 211 (4th Cir. 2024) ("claims to compel agency action are limited to enforcement of a specific, *unequivocal* command, over which an

---

[10] To be clear, "Sections 702, 704, and 706(1) all insist upon an 'agency action,' either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1))." *Norton*, 542 U.S. at 62.

official has no discretion.").  "The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law)."  *Norton*, 542 U.S. at 65.

Here, Plaintiffs ask this Court to order Defendants to restart its grantmaking program and "undertake statutorily required steps to peer review and evaluate grant applications and to award grants."  Compl. at 20 (Prayer for Relief); *see also id.* ¶ 7 ("The Court should declare unlawful and set aside Defendants' cessation of its grantmaking process and its refusal to consider and process grant applications, and require the agency to restart its grantmaking process, as required by law.").  But, as discussed in greater detail *infra* at 19-24, none of these tasks are mandated by statute or regulation.  As a result, the Court lacks subject matter jurisdiction to compel them under the APA.

## V.    Defendants Have Not Violated the PHS Act or AHRQ's Regulations, and Therefore Count I Should Be Dismissed.

In Count I, Plaintiffs merely allege that AHRQ is statutorily required to fund grants focused on certain aspects of the healthcare system.  *See* Compl. ¶¶ 19, 43 (citing 42 U.S.C. §§ 299b-1(b)-(c), 299b-4(b), 299b-31(c), 299b-34(a), 299b-36(d)(1) & (e)(3), 299b-37(e)).  Yet, Plaintiffs acknowledge that AHRQ has a grant program and, as of the date that the Complaint was filed, spent $55 million in fiscal year 2025 on that program—an amount that has since almost doubled.  Compl. ¶ 36; Exhibit A.  Plaintiffs make no allegation that AHRQ is not currently funding whatever limited grants are statutorily required.[11]  "It is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the [applicable] laws in ways that have not been alleged."  *Associated Gen. Contractors v. California State Council of*

---

[11] Plaintiffs essentially conceded this point in the PI Motion briefing, in which they speculated that "even if AHRQ is currently supporting some research grants, the agency will, at best, if it has not already—fall out of compliance with those obligations as awards issued in the beginning of the fiscal year run out."  ECF No. 15 (Plaintiffs' reply) at 7.

*Carpenters*, 459 U.S. 519, 526 (1983).

Nothing in the statutory or regulatory scheme governing AHRQ requires the agency to award grants each year, nor are there any requirements that grants be awarded on a particular timeline or in a particular amount. To the contrary, the regulations provide that grant applications must be submitted "in the form and at the time that the Administrator requires." 42 C.F.R. § 67.14(a). And the regulations expressly bestow nearly unlimited discretion upon the AHRQ Administrator regarding whether to award a grant, providing:

> Within the limits of available funds, the Administrator *may* award grants to those applicants whose projects are being considered for funding, which *in the judgment of the Administrator*, will promote best the purposes of Title IX of the PHS Act and (if applicable) section 1142 of the Social Security Act, AHCPR priorities, and the regulations of this subpart.

42 C.F.R. § 67.17(a) (emphasis added).[12] The Fourth Circuit has repeatedly held that similar statutory/regulatory language is not mandatory such that an agency's failure to act is not reviewable under the APA. *See Lovo*, 107 F.4th at 212-13 (interpreting regulation providing that "USCIS *may* adjudicate [certain immigration-related] applications," to mean that "whether to adjudicate the [] Applications at all is left to USCIS's discretion"); *Gonzalez v. Cuccinelli*, 985 F.3d 366, 365-71 (4th Cir. 2021) (statute providing that "[t]he Secretary *may* grant work authorization . . ." was discretionary, and agency action could not be compelled under APA § 706).

Furthermore, AHRQ has not violated any statute or regulation by failing to process every single pending grant application via the peer review and evaluation process on Plaintiffs' desired timeline. Compl. ¶¶ 20-21, 43-45, 59. The PHS Act provides: "Appropriate technical and

---

[12] In the context of awarding continuation grants, AHRQ's regulations further provide that "[i]n all cases, continuation awards require a determination by the Administrator that continuation is in the best interest of the Federal Government." 42 C.F.R. § 67.17(d). In addition, "[n]either the approval of any application nor the award of any grant commits or obligates the Federal Government in any way to make any additional, supplemental, continuation, or other award with respect to any approved application." *Id.* § 67.17(e).

scientific peer review shall be conducted with respect to each application for a grant . . . under this chapter."   42 U.S.C. § 299c-1(a)(1).   AHRQ's implementing regulations provide that "[a]ll applications for support under this subpart will be submitted by the Administrator for review to a peer review group," after which "the Administrator will evaluate applications recommended for further consideration, taking into account [certain specified] factors" and on that basis "shall: give consideration for funding, defer for a later decision, pending receipt of additional information, or give no further consideration for funding, to any application for a grant under this subpart . . . ." 42 C.F.R. §§ 67.15(a), 67.16(a), (b).

While these statutes and regulations use "shall" and/or "will"—words that are often considered mandatory—the Fourth Circuit instructs that "the impact of seemingly mandatory or permissive language depends heavily on the context in which it appears."  *Lovo*, 107 F.4th at 212. In *Lovo*, the Fourth Circuit considered analogous regulatory language (specifically, 8 C.F.R. § 212.7(e)(8), which provides that "USCIS *will* adjudicate a [certain immigration-related] application in accordance with" certain statutes) and held that, when properly viewed in context, it simply requires that "*when, in its discretion*, USCIS decides to adjudicate claims, it must do so in accordance with the standards and procedures laid out in the statute and regulations."  107 F.4th at 213.  The Fourth Circuit therefore held that the district court lacked jurisdiction to compel the agency to act on the plaintiff's immigration application.

The same construction that the Fourth Circuit applied in *Lovo* applies to this case:  when, in its discretion, AHRQ decides to award a grant (*see* 42 C.F.R. § 67.17(a), providing that "the Administrator *may* award grants . . ."), it may only do so after following the mandatory procedures, including the peer review and evaluation process, set forth in applicable statutes and regulations (*see* 42 U.S.C. § 299c-1(a)(1); 42 C.F.R. §§ 67.15(a), 67.16(a), (b)).  As in *Lovo*, this Court lacks

jurisdiction to compel AHRQ to evaluate all grant applications it receives.

Further, an interpretation of AHRQ's regulations as requiring, on the one hand, that any and all grant applications be processed via peer review and evaluation by the Administrator, yet, on the other hand, as permitting discretion over whether any particular grant is awarded at the end of that process, would be unreasonable and violate the "axiomatic canon of statutory interpretation which states that 'to the extent possible, a court's interpretation should ensure that the statutory scheme is coherent and consistent.'" *Healthkeepers, Inc. v. Richmond Ambulance Auth.*, 642 F.3d 466, 472, 474 (4th Cir. 2011) ("this Court has an obligation to construe statutes as being reasonable"). Such an interpretation would require a lengthy and expensive bureaucratic exercise (peer review) with no legal or practical consequence (a grant award)—an absurd result that is inconsistent with the regulations' evident purpose. In enacting its governing regulations, AHRQ did not mandate the administrative processes of peer review and Administrator evaluation merely for their own sake, but rather to ensure that it funds meritorious and scientifically rigorous research.

Finally, even if these statutes and regulations could be interpreted as requiring AHRQ to evaluate and process grant applications as a general matter, there is no requirement that AHRQ do so on any particular timeline. As a result, the pace at which AHRQ evaluates grant applications is discretionary, and the Court lacks jurisdiction to compel AHRQ to act on Plaintiffs' desired timeline. *See, e.g.*, *Gonzalez*, 985 F.3d at 369 (agency action could not be compelled where "there [was] no timeline or mandate to act, adjudicate, or implement the provision"); *Tawah v. Noem*, Case No. 24-cv-3469-DKC, 2025 WL 2021661, at *4 (D. Md. July 18, 2025) (holding that "[b]ecause the statutory timeframe is still discretionary, the APA still does not authorize judicial review of asylum application adjudications . . . , and the court still lacks jurisdiction to review Plaintiff's APA claim," citing *Tawah v. Mayorkas*, Case No. 23-cv-02920-TJS, 2024 WL

2155060, at *3 (D. Md. May 14, 2024)); *Martynenko v. Donis*, Case No. 24-cv-02218-LKG, 2025 WL 1685667, at *4 (D. Md. June 16, 2025) ("the pace at which USCIS adjudicates asylum applications is left to the agency's discretion.  And so, the Plaintiff has also not shown that the Court may consider his claim under the APA.").

Accordingly, Plaintiffs do not allege a violation of the PHS Act or AHRQ regulations that can support Count I, and this claim should be dismissed.[13]

## VI.    Defendants Have Not Violated the Appropriations Acts, and Therefore Count II Should Be Dismissed.

The Appropriations Acts do not require that AHRQ obligate all funds it has been appropriated in lump-sum, let alone that it obligate such funds towards grantmaking.  The Appropriations Acts authorize funding for AHRQ in a lump-sum of $369,000,000 "[f]or carrying out titles III and IX of the PHS Act, part A of title XI of the Social Security Act, and section 1013 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003."  2024 Appropriations Act, 138 Stat. 460, 661-62; 2025 Continuing Resolution, 139 Stat. 9, 10-11, § 1101(a)(8).  This is a lump-sum appropriation, with no mandatory language at all.

The Appropriations Acts do not, of their own force, compel AHRQ to obligate every dollar of appropriated funds.  Nothing in the language of the Appropriations Acts (nor that of any other statute or regulation, *see supra* at 19-23) requires it.[14]  The Supreme Court recently discussed the

---

[13] In similar vein (discussed *supra* at 18-19), an order compelling AHRQ to award grants or process grant applications would violate the principles set forth in *Norton*, 542 U.S. at 64, because these are not actions that AHRQ is legally required to take.  And, relatedly (as discussed *infra* at 29-30), an order compelling AHRQ to spend its lump-sum appropriation on grants or the processing of grant applications would be directly contrary to the Supreme Court's holding in *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993), which held that the allocation of funds from a lump-sum appropriation is committed to agency discretion by law and not reviewable.

[14] *Compare Child Trends*, 795 F. Supp. 3d at 722 ("Defendants have not only withheld funds appropriated by Congress but have also refused to carry out an express statutory mandate to operate Comprehensive Centers and RELs at the required capacity"); *Train v. City of New York*, 420 U.S. 35, 38-43 & n.2 (1975) (enforcing statutory mandate that appropriated funds "shall be allotted"); *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) (holding that agencies "must follow statutory *mandates* so long as there is appropriated money available"); *Kane Ctny. v. United States*, 127 Fed. Cl. 696, 697 (Ct. Cl. 2016) (finding payments were mandatory pursuant to statute mandate that "appropriated sums shall be made available . . . for obligation or expenditure").

history of appropriations laws, explaining that such laws were originally enacted to function as a *limit* on Executive spending, and, accordingly, they often "provided the Executive discretion over how much to spend up to a cap." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, 601 U.S. 416, 429-34 (2024); *id.* at 442-43 (Kagan, J., concurring) ("Our government practice has been replete with instances of general appropriations to be expended as directed by designated government agencies."). Thus, it is now well-established that appropriations statutes need not, and often do not, require the agency to expend all funds appropriated to it. That is the case here, where Congress appropriated a lump-sum to AHRQ, included no mandatory language whatsoever, and left to AHRQ's discretion how those appropriated funds are expended (or not expended).

Finally, even if the Appropriations Acts could be construed as requiring AHRQ to spend the entirety of its lump-sum appropriations, Plaintiffs cannot base an APA claim on alleged violations of the Appropriations Acts because the ICA precludes judicial review. *See infra* at 25-28 (similar argument that the ICA precludes judicial review of an APA challenge based on an alleged violation of the ICA itself). Some courts have rejected this argument in recent months, including in *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, Case Nos. 25-cv-00400-AHA, 25-cv-00402-AHA, 2025 WL 2537200 (D.D.C. Sept. 3, 2025). However, on September 26, 2025, the Supreme Court granted the Government's application to stay the *AIDS Vaccine* preliminary injunction, finding that "[t]he Government, at this early stage, has made a sufficient showing that the Impoundment Control Act precludes respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue here." *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 606 U.S. __, 2025 WL 2740571 (Sept. 26, 2025). While the Supreme Court noted that "[t]his order should not be read as a final determination on the merits," *id.*, the standard for the emergency relief that was granted includes "a strong showing that [the stay applicant] is likely to

succeed on the merits." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

**VII.    Plaintiffs Cannot Rely Upon the ICA to Support an APA Contrary-to-Law Claim, and Therefore Count III Should Be Dismissed.**

As discussed, the Appropriations Acts do not, of their own force, require AHRQ to obligate all funding appropriated to it.  It is the ICA that governs circumstances in which the President makes a policy determination not to expend funds.  But Plaintiffs cannot rely upon alleged violations of the ICA to support an APA contrary-to-law claim for at least two reasons:  (1) the ICA is a statute that precludes judicial review under the APA; and (2) Plaintiffs are not within the zone of interests sought to be protected by the ICA.

**A.    The ICA precludes judicial review under the APA.**

A plaintiff may not seek review under the APA if "statutes preclude judicial review."  5 U.S.C. § 701(a)(1).  "[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984).  *See also Sackett v. EPA*, 566 U.S. 120, 130 (2012) ("Where a statute provides that particular agency action is reviewable at the instance of one party, who must first exhaust administrative remedies, the inference that it is not reviewable at the instance of other parties, who are not subject to the administrative process, is strong.").

In *Block*, the Supreme Court held that the Agricultural Marketing Agreement Act of 1937 precluded judicial review under the APA.  467 U.S. at 341.  That statute allowed specific people (dairy handlers) to obtain judicial review in federal district court of certain decisions by the Secretary of Agriculture after exhausting administrative remedies.  *Id.* at 346.  Someone other than those specific people—consumers—tried to bring APA claims challenging the Secretary's decisions.  *Id.* at 347.  The Supreme Court held that the plaintiff-consumers could not bring their

claims because the statute precluded judicial review, pointing to two aspects of the statute:  (1) that the statutory scheme "contemplates a cooperative venture" between the dairy handlers and the Secretary, but nowhere did the statute allow for participation by consumers; and (2) that the dairy handlers were required to exhaust remedies before bringing suit, whereas consumers were not subject to exhaustion requirements.  *Id.* at 345-48.

The ICA has these same characteristics.  The ICA establishes a similar "cooperative venture" between the legislative and executive branches by providing for Congressional oversight when the Executive branch defers budgetary authority.  There is no role for private parties to play in that scheme.  At a high level, the ICA requires the President to submit a "special message" to Congress when he elects to rescind or defer budget authority.  2 U.S.C. §§ 683(a), 684(a).  If the President improperly fails to submit a special message, then the Comptroller General—the head of the Government Accountability Office (GAO) and, as such, a legislative branch official—must make a report in lieu of the special message to Congress.  *Id.* § 686(a).  The ICA authorizes the Comptroller General to bring suit in the United States District Court for the District of Columbia, which is empowered to enter "any decree, judgment, or order which may be necessary or appropriate to make such budget authority available for obligation."  *Id.* § 687.  Before bringing such suit, however, the Comptroller General is required to furnish an "explanatory statement . . . of the circumstances giving rise to the action contemplated" to the Speaker of the House of Representatives and the President of the Senate and wait 25 calendar days of continuous session of Congress.  *Id.*  In other words, just like the statute in *Block*, the ICA authorizes a particular individual—the Comptroller General—to bring a civil action, and, again like the statute in *Block*, the ICA prescribes a specific format and prerequisites for bringing that action.

The D.C. Circuit recently applied *Block* under nearly identical circumstances and held that

the ICA bars plaintiffs from bringing suit under the APA to enforce the ICA. *Global Health Council v. Trump*, 153 F.4th 1, 17-20 (D.C. Cir. 2025). The plaintiffs—organizations whose members received federal foreign assistance funds—asserted that the Executive Branch did not intend to expend all such funds appropriated under the 2024 Appropriations Act, that the failure to obligate all appropriated funds violated the ICA, and that these allegations could support an APA contrary-to-law claim. *Id.* The D.C. Circuit rejected plaintiffs' arguments, finding that:

> the ICA created a complex scheme of notification of the Congress, congressional action on a proposed rescission or deferral and suit by a specified legislative branch official if the executive branch violates its statutory expenditure obligations. *See* 2 U.S.C. § 682 *et seq.* Moreover, under the ICA, the Comptroller General may bring suit only 25 days after he has provided the Congress with a statement explaining "the circumstances giving rise to the action contemplated." 2 U.S.C. § 687. As in *Block*, it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits at any time and without notice to the Congress of the alleged violation.

*Id.* at 18-19. Accordingly, the D.C. Circuit held that "the grantees have no cause of action to undergird their APA contrary-to-law claim." *Id.* at 20. The same reasoning and conclusion apply in this case and preclude Count III.

Defendants acknowledge this Court's recent summary judgment ruling in *Child Trends*, 795 F. Supp. 3d 700, in which this Court considered *Global Health Council* and noted that the D.C. Circuit's view that plaintiffs "'lacked a cause of action to undergird their APA contrary-to-law claim' on the basis of an alleged ICA violation" "is not universally shared."[15] *Id.* at 721. This Court went on, however, to distinguish *Global Health Council* on the basis that the plaintiffs alleged that "Defendants have not only withheld funds appropriated by Congress but have also

---

[15] However, each of the cases cited in *Child Trends* for this point involved alleged violations of statutory mandates and not merely a violation of the ICA. *See New York v. Trump*, 769 F. Supp. 3d 119, 138 n. 13 (D.R.I. 2025) (statutes provided that the agency "shall" make certain grants according to a statutory formula, which the agency was allegedly violating); *Oregon Council for Humanities v. U.S. DOGE Service*, 794 F. Supp. 3d 840, 887 (D. Or. 2025) (similar); *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 48-49 (D.R.I. 2025) (finding that the actions of the agency violated mandatory statutory duties).

refused to carry out an express statutory mandate," and held that "[t]he combination of statutory violations sets the case at bar apart from the narrower set of circumstances before the D.C. Circuit in *Global Health Council*." *Id.* at 722. As explained *supra* at 19-24, no such statutory violations exist in this case. Accordingly, while Defendants respectfully disagree with this Court's *Child Trends* ruling to the extent it suggests that the ICA could form the basis of an APA contrary-to-law claim, the instant case involves "a materially different situation" (*id.*) that sets it apart from *Child Trends*.

> **B.    Plaintiffs are not within the zone of interests that the ICA is meant to protect.**

To invoke the APA, a plaintiff must establish that the injury it complains of "falls within the zone of interests sought to be protected by the statutory provision" at issue. *Air Courier Conference of Am. v. American Postal Workers Union*, 498 U.S. 517, 523 (1991). Where, as here, the plaintiff is not the object of a challenged regulatory action, the plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987). "[T]he 'relevant statute' for an APA zone-of-interests analysis is not the APA itself, but the statute under which the relevant agency acted." *Food & Drug Admin. v. R.J. Reynolds Vapor Co.*, 145 S.Ct. 1984, 1991, n.4 (2025).

Plaintiffs—organizations whose members hope to be awarded some of the appropriated funds—are not within the zone of interests meant to be protected by the ICA. As discussed *supra* at 26-27, the ICA is directed at regulating the relationship between Congress and the Executive Branch. It establishes a structure for interbranch dialogue when the President determines not to obligate appropriated funds. That structure provides no role for third parties like Plaintiffs.

In *Public Citizen v. Stockman*, 528 F. Supp. 824, 827-30 (D.C.C. 1981), the Court

undertook an extensive analysis of the ICA and its purposes, finding that:

> Congress sought to retain principal dominion over the impoundment process and crafted a flexible scheme for involving the judiciary in disputes spawned by the Act's provisions.  The Comptroller General's determination as to whether to bring suit, and Congress' decision whether to sanction the institution of such a suit, will obviously turn on a host of politically sensitive factors, including the potential impact that such a suit will have on the legislative-executive relationship.

*Id.* at 830.   The court further explained that: "The value of section 1406 will be lessened considerably if private litigants are free to embroil the judiciary in controversies arising under the ICA; the courts would be forced to rule on the legality of executive withholdings in the absence of Congress' preliminary assessment of the crucial political dimensions involved in such a suit."  *Id.* The court held that the ICA did not create a private right of action that would allow the plaintiff to sue under the ICA directly.   *Id.*   The court also expressly rejected the plaintiff's alternative argument that the suit could instead proceed under APA § 706, finding that the plaintiff's interests were not "within the zone of interests intended to be protected by the ICA," which "was clearly enacted to safeguard Congress' interests, not those of private citizens."   *Id.* at 830 n.1.  For the same reasons, Plaintiffs in this case do not fall within the zone of interests meant to be protected by the ICA, and therefore cannot bring an APA suit to enforce the ICA.

## VIII.  The Actions Plaintiffs Challenge Are Committed to Agency Discretion by Law and Therefore Are Not Subject to APA Review.

Under the APA, agency action that is "committed to agency discretion by law" is not subject to judicial review.  5 U.S.C. § 701(a)(2).  AHRQ has discretion regarding whether to award a grant (including the process of evaluating a grant application), the timeline for doing so, and the amount of any grants awarded.  *See supra* at 19-24.  AHRQ's regulations expressly bestow nearly unlimited discretion upon the AHRQ Administrator regarding the award of grants.  42 C.F.R. § 67.17(a).  These decisions are agency actions "committed to agency discretion by law" and

unreviewable under the APA.

AHRQ's grant funding decisions are "committed to agency discretion by law" for another reason—which is, as explained *supra* at 23-24, that the Appropriations Acts provide a lump-sum appropriation to AHRQ. One paradigmatic decision "traditionally regarded as committed to agency discretion" is "[t]he allocation of funds from a lump-sum appropriation." *Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993) (holding that where Congress simply allocated an annual "lump-sum appropriation[]" to the agency, the decision to no longer fund a particular program was "committed to agency discretion."). "After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 191. Lump-sum appropriations thus leave it to the agency to decide how "'resources are best spent'" and "whether a particular program 'best fits the agency's overall policies.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). While Congress may set outer guardrails on "permissible statutory objections," courts have "no leave to intrude" so long as agencies adhere to those limits in allocating funding. *Id.*

Here, Congress appropriated a lump-sum amount to AHRQ in order to fulfill broad statutory purposes. While Plaintiffs allege that the PHS Act requires AHRQ to fund grants for specific health topics, as explained *supra* at 19-20, there is no allegation that AHRQ is not already doing so. With respect to the actions that Plaintiffs ask this Court to compel—awarding new grants, evaluating applications, obligating appropriated funds, and doing the same on Plaintiffs' timeline—these actions fall within AHRQ's discretion and are not subject to judicial review.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be granted and the Complaint dismissed with prejudice.

Dated:  January 20, 2026

                                              Respectfully submitted,

                                              Kelly O. Hayes
                                              United States Attorney

                                  By:    */s/  Jessica Dillon*
                                              Jessica F.W. Dillon (Bar No. 19249)
                                              S. Nicole Nardone
                                              Assistant United States Attorney
                                              36 South Charles Street, 4th Floor
                                              Baltimore, Maryland 21201
                                              (410) 209-4892 (direct)
                                              (410) 962-2310 (fax)
                                              jessica.dillon@usdoj.gov
                                              nicole.nardone@usdoj.gov

                                              *Counsel for Defendants*

31